UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

In Re:

BENJAMIN JEFFERY ASHMORE,

Debtor.

Case No. 13-17450 (VFP)

Chapter 7 Proceeding

Honorable Vincent F. Papalia

Hearing Date: March 15, 2016 at 10:00 a.m.

## BRIEF OF FORMER DEBTOR BENJAMIN JEFFERY ASHMORE IN OPPOSITION TO MOTION TO REOPEN CASE

HELLRING LINDEMAN GOLDSTEIN & SIEGAL LLP
Patricia A. Staiano, Esq.
Robert S. Raymar, Esq.
Attorneys for Former Debtor Benjamin Jeffery Ashmore
One Gateway Center
Newark, New Jersey 07102-5323
973.621.9020

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

    THE SDNY LITIGATION WAS DISCLOSED BY ASHMORE AND
    ADDRESSED IN THIS CASE .................................................................................... 2

    THE CLEANEDISON CONTINGENT CONTRACT RIGHT WAS
    INADVERTENTLY NOT DISCLOSED AND IS DE MINIMIS ................................... 7

    HERBST'S AND ASHMORE'S INVESTMENT IN THE SDNY LITIGATION
    IN RELIANCE UPON THE FORMER TRUSTEE'S DETERMINATION AND
    REPRESENTATION THAT ASHMORE COULD PROCEED WITH THE
    LITIGATION ............................................................................................................ 8

    THE FORMER TRUSTEE MAKES AND WITHDRAWS A PRIOR MOTION
    TO REOPEN ........................................................................................................... 10

ARGUMENT .................................................................................................................. 11

    I.    STANDARDS THE COURT SHOULD APPLY IN DETERMINING TO
        REOPEN A CASE UNDER 11 U.S.C. §350(b) .................................................. 11

    II.   IF THE CASE IS REOPENED AT ALL, IT ONLY SHOULD BE FOR
        THE LIMITED PURPOSE OF ADMINISTERING THE $8,553
        PAYMENT FROM CLEANEDISON .................................................................. 14

    III.  IN ACCORDANCE WITH THE FORMER TRUSTEE'S AGREEMENT
        WITH THE DEBTOR AND HER REPRESENTATIONS TO THE
        DISTRICT COURT IN NEW YORK, THE COURT SHOULD NOT
        REOPEN THE CASE TO ADDRESS THE SDNY LITIGATION ..................... 15

CONCLUSION .............................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

In re Adair,
    253 B.R. 85 (9th Cir. BAP (Cal.) 2000) ...................................................................16

In re Allen,
    2008 Bankr. LEXIS 366 (N.D. Ga. Feb. 14, 2008) ...............................................16

Auday v. Wet Seal Retail, Inc.,
    698 F.3d 902 (6thCir. 2012) .................................................................................16

Barletta v. Tedeschi,
    121 B.R. 669 (N.D.N.Y. 1990) .............................................................................16

In re Bianucci,
    4 F.3d 526 (7th Cir. 1993) ............................................................................12, 19

Catalano v. Commissioner,
    279 F.3d 682 (9th Cir. 2002) ...............................................................................16

Chartschlaa v. Nationwide Mut. Ins. Co.,
    538 F.3d 116 (2d Cir. 2008) .................................................................................16

In re Cutter,
    2006 U.S. Dist. LEXIS 61242 (E.D.N.Y. 2006) .................................................15

In re Fellheimer,
    443 B.R. 355 (Bankr. E.D. Pa. 2010) ...............................................11, 12, 18, 19

Fink v. Edgelink,
    553 Fed. Appx. 189, 2014 U.S. App. LEXIS 1086 (3d. Cir. 2014) .............11, 14

In re Frazer/Exton Development, L.P.,
    503 B.R. 620 (Bankr. E.D. Pa. 2013) ...............................................11, 12, 18, 19

In re Furlong,
    660 F.3d 81 (1st Cir. 2011)...................................................................................16

In re Hunter,
    76 B.R. 117 (Banr. S.D. Ohio 1987) ...................................................................16

In re Judd,
    78 F.3d 110 (3d Cir. 1996) ...................................................................................15

In re Kane,
    628 F.3d 631 (3d Cir. 2010) .................................................................................16

LLP Mortgage et al v. Brinley et al.,
    547 F.3d 643 (6th Cir. 2008) ...................................................................16

In re Matheny,
    2014 Bankr. LEXIS 3456 (W.D. Pa. 2014) .........................................15

In re Mead,
    2012 Bankr. LEXIS 714 (E.D.N.C. 2012) ...........................................15

In re Mesta Machine Company,
    67 B.R. 147 (W.D. Pa. 1985) .................................................................15

Morlan v. Universal Guaranty Life Ins. Co.,
    298 F.3d 609 (7th Cir. 2002) .................................................................16

In re Munoz-Gonzalez,
    2001 Bankr. LEXIS 2375 (Bankr. C.D. Ill. 2001) ...............11, 13, 14, 19

In re Plumlee,
    236 B.R. 606 (E.D. Va. 1999) ......................................................13, 19

In re Rashid,
    2004 U.S. Dist. LEXIS 25032 (E.D. Pa. 2004) ...............11, 12, 18, 19

In re Reed,
    940 F.2d 1317 (9th Cir. 1991) ...............................................................16

In re Sheib,
    2014 Bankr. LEXIS 3084 (Bankr. W.D. Pa. 2014) ...............11, 12, 18

In re Woods,
    173 f.3d 770 (10th Cir. 1999) ...............................................................16

## Statutes

11 U.S.C. §341 ...............................................................................2, 3, 17

11 U.S.C. §350(b) ...................................................................................11

## Other Authorities

Local Civil Rule 56.1....................................................................................9

## PRELIMINARY STATEMENT

The former trustee, Barbara A. Edwards, Esq. (the "former Trustee" or "Edwards"),

wishes to reopen this case primarily because CGI Group, Inc. and CGI Federal, Inc. ("CGI

defendants"), have moved to dismiss the former debtor, Benjamin Jeffery Ashmore's ("Ashmore")

whistleblower action in the Southern District of New York ("SDNY") filed on November 28,

2011, Civil Action No. 11-8611 (the "SDNY litigation"), for lack of standing on the ground that it

is an asset of the bankruptcy estate. The CGI defendants, who are and were strangers to

Ashmore's bankruptcy, seek to utilize his closed Chapter 7 case to obtain a windfall by the

dismissal of Ashmore's legitimate whistleblower claims, to the detriment of Ashmore and his

creditors.[1] Notwithstanding the former Trustee's concerns, Ashmore does have standing to

litigate that case -- as the defendants in that action have concededly been doing for over <u>two years</u>

since Ashmore's bankruptcy was closed.

As will be discussed in greater detail in this Brief, well over two years ago, the

former Trustee determined, in her administration of the Chapter 7 case, to <u>abandon the</u>

<u>whistleblower SDNY litigation</u> and allow Ashmore to conduct it in order to benefit the estate

under exigent and unusual circumstances. The former Trustee fashioned a methodology to retain

an interest for the estate in <u>the recovery</u> achieved through that litigation without the estate bearing

the financial burden of the litigation. The former Trustee could not find an attorney to represent

her in the litigation. In reliance on the former Trustee's decision, Ashmore retained his current

counsel <u>after</u> the former Trustee had Ashmore sign an agreement embodying the former Trustee's

decision and <u>after</u> the bankruptcy case was closed. Based on that agreement, and on the former

Trustee's letter the next day to the SDNY notifying the Court that the former Trustee was closing

---

[1] The CGI defendants' lack of standing to file their so-called Limited Objection and the mootness of that objection
have already been addressed in Ashmore's prior Brief on standing (Document 45).

Ashmore's bankruptcy case and abandoning the SDNY litigation to him, Ashmore and his counsel have litigated the whistleblower action aggressively for two years. The SDNY litigation itself, rather than any proceeds it ultimately produces, is not an asset of the estate, and Ashmore has not yet achieved a recovery in the SDNY litigation. Therefore, in accordance with Edwards' <u>own decision</u> as to how to administer the Chapter 7 case, and Ashmore's reliance upon that decision, it is premature to open this case.

The other issue the former Trustee raises as a possible basis to open the case concerns an asset worth only $8,553. As discussed hereafter, there are efficient and effective ways to preserve this $8,553 for the estate without reopening the case.

## STATEMENT OF FACTS

### THE SDNY LITIGATION WAS DISCLOSED BY ASHMORE AND ADDRESSED IN THIS CASE

On April 8, 2013, Ashmore filed a voluntary Chapter 7 bankruptcy petition <u>pro se</u> in this Court (Document 1).[2] Ashmore disclosed, and continued to disclose, the SDNY litigation, in his petition (Document 1), during the pendency of his bankruptcy, at his 11 U.S.C. §341 meeting of creditors, in documents publicly filed on the docket (Document 18-1), and at a hearing in this Court before the Honorable Morris Stern, U.S.B.J.

On May 13, 2013, Ashmore appeared for his 11 U.S.C. §341 meeting of creditors. Ashmore disclosed to the former Trustee that depositions were scheduled in the SDNY litigation. Because he did not have his social security card with him, the hearing was adjourned. Declaration of Benjamin Jeffery Ashmore ("Ashmore Dec.") ¶ 2.[3] At his continued §341 meeting on August

---

[2] All references to "Document" are to those on the docket of this case.

[3] References in this Brief to the Declaration of Benjamin Jeffery Ashmore ("Ashmore Dec.") and the Declaration of Robert L. Herbst ("Herbst Dec.") are to the declarations filed previously in this matter on February 11, 2016 (Document 45). References to the Supplemental Declaration of Benjamin Jeffery Ashmore ("Ashmore Supp. Dec.") and Supplemental Declaration of Robert L. Herbst ("Herbst Supp. Dec.") are to the supplemental declarations filed with this Brief.

12, 2013, Ashmore stated: "One [pending case] is Ashmore v. CGI Group." "It is a Sarbanes

Oxley whistleblowing complaint." "The CGI -- it's undetermined. In the Complaint, my lawyer

asked for over a million dollars." Ashmore Dec., Exhibit A.

On June 19, 2013, Ashmore filed a motion to dismiss his bankruptcy petition.

(Document 13). Two days later, on June 21, 2013, at the former Trustee's request, Ashmore wrote

her a detailed letter detailing the facts and circumstances of the SDNY litigation and attaching the

complaint. (Document 18-1). In that letter, Ashmore also disclosed that: (1) there was a limited

protective order in place in the SDNY litigation which limited his ability to provide certain details;

and (2) while no settlement offer had been forthcoming from the CGI defendants, Ashmore hoped

that the disclosures obtained in discovery would induce the CGI defendants to make a settlement

offer substantial enough to conclude the case, compensate Ashmore and permit him to satisfy his

creditors in full.[4] Id. On July 17, 2013, that letter was filed with this Court. Id.

On July 17, 2013, the former Trustee filed opposition to Ashmore's motion to

dismiss this bankruptcy case. (Document 18). The former Trustee's position at that time was that

she should administer the asset, retaining counsel herself to prosecute the action on behalf of the

estate.

At the July 23, 2013 hearing on Ashmore's dismissal motion before the Hon.

Morris Stern, Ashmore again forthrightly provided details about the SDNY litigation. The Court

was advised that the SDNY litigation was a complex federal whistleblower action that both

Ashmore and the former Trustee considered potentially lucrative. Ashmore Dec., Exhibit B. In

his June 21, 2013 letter to the former Trustee, Ashmore had advised that (at the time) he "was

hopeful" the SDNY case could settle in the near future. (Document 18-1) (However, this

---

[4] The CGI defendants produced the discovery after Ashmore commenced his bankruptcy proceeding, and it included
key documents of which Ashmore was not previously aware. Ashmore Dec. ¶ 3.

3

prediction did not come to pass.)  Later, at the July 23, 2013 hearing before Judge Stern, the former

Trustee's counsel stated:

> ...[T]here's apparently...a whistleblower lawsuit that now appears
> to be ready to be settled. It might pay off. There may be -- so there's
> an asset or a potential asset.
>
> And it's our position that the case should stay here so that we can
> have an orderly -- it's even in Mr. Ashmore's best interest, not just
> the creditors' interest, that we can have an orderly distribution of the
> asset if it comes to fruition.  If it doesn't, Mr. Ashmore can still get
> his discharge and there will be certainty and finality to the
> proceeding.  (Emphasis added.)

Ashmore Dec., Ex. B, pp. 2-3.  At the conclusion of the hearing, Judge Stern noted he did not think

that he should "at this time dismiss this case.  Things may change in the future...." Id., p. 7

(emphasis added).

Over a month after the hearing before Judge Stern, things did change.  On

September 6, 2013, Ashmore's prior counsel in the SDNY litigation, David N. Mair, Esq.,

declined to be retained by the former Trustee.  Ashmore Dec., Exhibit C.  On September 9, 2013,

Mr. Mair wrote to the SDNY to seek a stay in the SDNY litigation to provide time for the former

Trustee to retain counsel and substitute in as the party-in-interest.  Ashmore Dec., Exhibit D.  On

September 11, 2013, the SDNY directed Ashmore and/or the former Trustee to email a letter to the

SDNY by September 18 explaining what steps were being undertaken to substitute parties, and

advising that if no such steps were being taken, the Court might have to dismiss the case due to

lack of standing.  Ashmore Dec., Exhibit E.  On September 13, 2013, the CGI defendants' counsel

wrote to the SDNY requesting that the September 20, 2013 status conference be used "to discuss

the impact of Mr. Ashmore's bankruptcy filing on the [SDNY litigation]" noting that "it is Mr.

Mair's understanding that 'Mr. Ashmore no longer has standing to pursue the claims in this action

as plaintiff' as a result of his bankruptcy filing...." Ashmore Dec., Exhibit F.

4

On September 16, 2013, two days before that deadline, the former Trustee's counsel faxed a letter to Ashmore, representing that the former Trustee's office had spoken to Ashmore's former attorney and was informed that "at this point in time it is not possible for him to determine when the matter will be concluded. Therefore, I am willing to close the bankruptcy case and not administer the asset at this time. That will allow you and your present counsel to continue with the litigation without any delay or jeopardy." Ashmore Dec., Exhibit G. The former Trustee demanded Ashmore's "assur[ance] that should the amount you collect from the litigation generates [sic] a significant distribution to unsecured creditors, you will consent to the reopening of the case and not claim that the litigation was abandoned by my closing of the case." Ashmore Dec., Exhibit G. Ashmore, unrepresented in the bankruptcy case, effectively abandoned by his prior counsel in the SDNY litigation, and possibly facing imminent dismissal of that case, agreed, so that he could proceed with his litigation, prosecuting the action himself.[5] The agreement was reflected in four lines at the bottom of the September 16 Letter Agreement that were countersigned by Ashmore. (Hereinafter, this letter as a whole will be referred to as the "September 16 Letter Agreement.")

As the former Trustee candidly told the SDNY two years later, she "made an informed decision to allow Mr. Ashmore to proceed with the Litigation." Declaration of Robert L. Herbst ("Herbst Dec."), Exhibit C (p.3). She had no choice but to abandon the prosecution of the litigation to Ashmore because, as she recently informed this Court, "The Trustee consulted with other attorneys regarding possible retention as special litigation counsel to represent the estate in that litigation on (sic) contingent basis. The Trustee was unable to find competent counsel willing to undertake that representation." (Document 46, ¶ 5).

---

[5] In a letter dated September 19, 2013, Mr. Mair informed the SDNY that he had earlier concluded that he no longer wanted to represent Ashmore. Ashmore Dec., Exhibit C.

On September 17, 2013, having obtained Ashmore's signature on the September 16

Letter Agreement, the former Trustee filed her "Report of No Distribution," and her lawyer wrote

a letter to the SDNY, copying counsel to the CGI defendants, advising as to the SDNY litigation:

"we have closed the bankruptcy proceeding. It may proceed outside of the Bankruptcy Court

jurisdiction."[6]  Ashmore Dec., Exhibit H.  (Emphasis added.)  On November 6, 2013, Ashmore,

who was pro se, provided the CGI defendants' counsel with a copy of the September 16 Letter

Agreement and advised that it had not been filed in this Court. Ashmore Dec., ¶ 12.  On November

18, 2013, Ashmore received his discharge. (Document 24).  Four days later, this Court closed

Ashmore's case and discharged the former Trustee.  (Document 26; Court's Docket 11/22/13).

Significantly, before Ashmore's case was closed and the former Trustee was

discharged, Ashmore's former lawyer was given leave to withdraw as counsel on October 30,

2013.  Herbst Dec. ¶ 2.  On October 30, 2013, Ashmore informed the former Trustee of this, and

asked for the names of the attorneys that the former Trustee had contacted so that he could find

substitute counsel.  Supplemental Declaration of Benjamin Jeffery Ashmore ("Ashmore Supp.

Dec.") ¶2.  The former Trustee's only reaction or reply to Ashmore was providing a firm contacted

by the former Trustee and noting "we have now closed our file."  Ashmore Supp. Dec., Exhibit A.

It is apparent that the former Trustee had no interest in again searching for counsel, or substituting

in the bankruptcy estate as the party-in-interest and seeking leave for more time to find competent

counsel, content with her prior abandonment of the prosecution to Ashmore.

At the time that Ashmore's bankruptcy was closed and the SDNY litigation was left

to him to litigate himself, discovery was ongoing, summary judgment practice was anticipated,

---

[6] Edwards' Report of No Distribution, set forth on the docket of the bankruptcy case (on September 17, 2013), stated that it was based on: "Key information about this case as reported in the schedules filed by the debtor(s) or otherwise found in the case record." Hence, Edwards clearly and publicly set forth that the case had "been fully administered" and that there was "no property available for distribution from the estate over and above that exempted by law." This was true then and it is true to this day.

6

and the CGI defendants had not made a single settlement offer. See, pp. 8-9 herein; Ashmore Dec.

¶ 11. Unable to find counsel, and because the CGI defendants, then, would not settle Ashmore's

claims for any amount, the former Trustee could not have prosecuted the action and would have

been forced to abandon the action to Ashmore, with or without Ashmore's agreement to the

September 16 Letter Agreement.

## THE CLEANEDISON CONTINGENT CONTRACT RIGHT WAS INADVERTENTLY NOT DISCLOSED AND IS DE MINIMIS

In September 2012, Ashmore entered into a settlement agreement with his former

employer, CleanEdison, Inc. ("CleanEdison"), resolving litigation. Ashmore Supp. Dec., ¶ 3. At

that time, he executed a Stipulation of Discontinuance with Prejudice with respect to this litigation,

but it was not filed by adversary counsel until February of 2013. Ashmore Supp. Dec., Exhibit B,

¶ 3. In the agreement, Ashmore waived any equity in CleanEdison that may have been obtained by

virtue of his constructive termination, and he obtained a small contingent contract right to a

possible future payment based on future events. After executing this settlement agreement, events

that impacted CleanEdison's finances gave Ashmore reason to believe that his contingent contract

right had no value at all. Thus, at the time Ashmore filed his petition in April 2013, he

inadvertently failed to disclose this contingent contract right in his petition. Ashmore Supp. Dec.,

¶¶ 3-4.

In September 2015, Ashmore received $8,553 in full satisfaction of the contingent

contract right arising from the September 2012 settlement agreement. Ashmore Supp. Dec. ¶ 5.

Ashmore agrees that the $8,553 is part of the bankruptcy estate, and agrees that, upon direction of

this Court, he will escrow these funds with his counsel for the benefit of Ashmore's bankruptcy

estate pending resolution of the SDNY litigation. Ashmore Supp. Dec. ¶ 5. However, should the

Court determine that the case should be reopened now to administer this limited asset, Ashmore

will abide the direction of the Court as to the funds. Ashmore Supp. Dec. ¶ 5.

**HERBST'S AND ASHMORE'S INVESTMENT IN THE
SDNY LITIGATION IN RELIANCE UPON THE FORMER
TRUSTEE'S DETERMINATION AND REPRESENTATION THAT
ASHMORE COULD PROCEED WITH THE LITIGATION**

On January 15, 2014 (after the bankruptcy case was closed), Robert L. Herbst, Esq.

("Herbst") was retained as counsel for Ashmore in the SDNY litigation. Herbst Dec., ¶ 2.  Herbst

discussed the status of the SDNY litigation with the former Trustee's law partner and counsel

before agreeing to the retention.  Herbst Dec., ¶ 2.  Herbst was assured that the former Trustee's

intention in drafting the September 16 Letter Agreement and September 17, 2013 letter to the

SDNY was to permit Ashmore to litigate his case to conclusion, without any interference or input

from the former Trustee, before the bankruptcy case might be reopened.  Supplemental

Declaration of Robert L. Herbst ("Herbst Supp. Dec."), ¶ 2-4, Exhibits A-C.

In reliance upon the September 16 Letter Agreement, the September 17, 2013

trustee's letter to the SDNY, and Herbst's confirmatory communications with the former Trustee's

then counsel, Herbst and Ashmore engaged in very heavy litigation against CGI.  In the following

two years, the following significant litigation events occurred:

In February 2014, the CGI defendants' motion concerning Ashmore's alleged

violations of an April 16, 2013 limited protective order was briefed, argued, and then denied by the

SDNY.  Herbst Dec., ¶ 3.  On February 26, 2014, the parties in the SDNY litigation commenced a

lengthy discovery dispute over documents Ashmore had demanded from the CGI defendants in

August 2013.[7]  Herbst Dec., ¶ 3.

On March 4, 2014, Dr. Crawford, Ashmore's economic expert in the SDNY

litigation, submitted his report, which found, among other things, that Ashmore's economic

---

[7] Due to a typographical error, this date was stated to be August 2014 in the Herbst Dec.

damages alone then ranged from $1.9 to $2.4 million.[8]  Herbst Dec., Exhibit A.  The CGI

defendants do not have an opposing expert witness.  Herbst Dec., ¶ 4.

A settlement conference was held in the SDNY on July 11, 2014.  Herbst Dec., ¶ 5.

In advance of this settlement conference, Ashmore submitted a lengthy settlement memorandum

and 176 pages of exhibits.  Herbst Dec., ¶ 5.

On July 21, 2014, the parties continued to litigate their ongoing discovery disputes

in the SDNY, including Ashmore's filing under seal of a 23-page brief and 245 pages of exhibits.

Herbst Dec., ¶ 6.  On August 28, 2014, Herbst took the deposition of a CGI representative.

Immediately prior to the close of discovery on October 1, 2014, the CGI defendants produced in

un-redacted form over 15,000 pages of documentation, much of which was highly complex

financial data.  Herbst Dec., ¶ 6.

During the late October to December 2014 time period, Ashmore prepared and

submitted a lengthy 98-page Response to Defendant's Statement of Material Facts under Local

Civil Rule 56.1[9] to the SDNY in preparation for the CGI defendants' proposed summary judgment

motion, and reviewed and analyzed CGI's Statement.  Herbst Dec., ¶ 7.  Then, between January

and March 2015, the parties prepared and submitted lengthy briefs in connection with the CGI

defendants' motion for summary judgment in the SDNY and Ashmore's motion to remove the

confidential designations of documents produced by the CGI defendants.  The motion papers and

exhibits filed on behalf of Ashmore exceeded 1,900 pages, in addition to the need to review the

CGI defendants' voluminous filings.  Herbst Dec., ¶ 7.

---

[8] Because Dr. Crawford's assumptions about this whistleblower's ability to regain comparable employment have not
been realized – among other reasons – the SDNY jury could reasonably conclude that his economic loss will
substantially exceed $2.4 million.  Herbst Dec. ¶ 4.

[9] This rule is similar to Local Civil Rule 56.1 in this District.

On September 23, 2015, the SDNY granted in part and denied in part the summary judgment motion, and scheduled trial for January 11, 2016. Herbst Dec., ¶ 9. Thereafter, new co-counsel for the CGI defendants, Proskauer, began to raise issues concerning Ashmore's "standing" in the SDNY litigation based on what had occurred in this Court, with the information that <u>the CGI defendants have had in their possession for more than two years</u>. Herbst Dec., ¶ 9.

## THE FORMER TRUSTEE MAKES AND
## WITHDRAWS A PRIOR MOTION TO REOPEN

On September 22, 2015, having been misinformed by the CGI defendants' counsel about purported settlement discussions in the SDNY litigation, the former Trustee moved to reopen the bankruptcy case. Herbst Dec., ¶ 10; Document 27. While the former Trustee's first motion to reopen was pending, the SDNY stayed the trial and all pre-trial scheduling deadlines. Herbst Dec., ¶ 11. On October 27, 2015, the former Trustee withdrew her motion to reopen. (Document 31). Her counsel then wrote the SDNY a letter, stating in part:

> Counsel for the [CGI] defendants seems to be requesting that this court require Ms. Edwards to accept a lower settlement proposal than had been offered to Mr. Ashmore because that amount should be sufficient to pay all of the scheduled unsecured claims in Mr. Ashmore's chapter 7 case. However, Mr. Ashmore and his counsel believe that the claims asserted in the Litigation are worth substantially more than the amount of the unsecured claims in that matter.

> Since the Debtor is entitled to a distribution of estate property pursuant to 11 U.S.C. §726(A)(6), he does have an interest in the Litigation and whether it should be settled for any given amount. If the trustee were to propose to accept a settlement in the bankruptcy case, Mr. Ashmore would have standing to object if it unreasonably affected his interest in the claim. The trustee believes the court would not approve the settlement proposed by the defendants under the facts of this case. Therefore, <u>the trustee believes that all of the parties, including Mr. Ashmore and his creditors, are better served by allowing the Litigation to proceed consistent with the agreement between the parties.</u>

> The timing of the defendants' concern for Mr. Ashmore's creditors also is suspect. There was no attempt to conceal Mr. Ashmore's

10

chapter 7 filing or the bankruptcy estate's interest in any recovery in
the Litigation. It was only after this matter was scheduled for trial
that the defendants made it an issue. <u>Ms. Edwards made an
informed decision to allow Mr. Ashmore to proceed with the
Litigation.</u> There are no undisclosed promises between the
parties....

Ms. Edwards withdrew her motion to reopen the bankruptcy case at
this time because it had seemed to create confusion as to who was in
a position to prosecute the Litigation....

Herbst Dec., Exhibit C (emphasis added).

## ARGUMENT

### I.    STANDARDS THE COURT SHOULD APPLY IN DETERMINING TO REOPEN A CASE UNDER 11 U.S.C. §350(b)

While, as the former Trustee suggests, the decision to reopen a bankruptcy case is

left to the sound discretion of the Court, certain standards must be applied in determining whether

the Court should exercise that discretion. As stated by the court in <u>In re Munoz-Gonzalez</u>, 2001

Bankr. LEXIS 2375, *15 (Bankr. C.D. Ill. 2001), even when sufficient grounds exist to reopen:

[r]eopening is not mandatory....The bankruptcy court has broad
discretion to weigh the equitable factors when deciding whether to
reopen a case.

It is without question that the movant "bears the burden of demonstrating circumstances sufficient

to justify the reopening of his bankruptcy case." <u>In re Rashid</u>, 2004 U.S. Dist. LEXIS 25032, *9

(E.D. Pa. 2004); <u>In re Sheib</u>, 2014 Bankr. LEXIS 3084, *7 (Bankr. W.D. Pa. 2014) ("The moving

party must ordinarily demonstrate that there is a compelling cause [to reopen]."); <u>In re

Frazer/Exton Development, L.P.</u>, 503 B.R. 620, 634 (Bankr. E.D. Pa. 2013); <u>In re Fellheimer</u>, 443

B.R. 355, 359-360 (Bankr. E.D. Pa. 2010).

As noted by the Third Circuit in <u>Fink v. Edgelink</u>, 553 Fed. Appx. 189, 2014 U.S.

App. LEXIS 1086, *195 (3d. Cir. 2014), relying on the Bankruptcy Appellate Panel from the

Ninth Circuit, "the inquiry requires a balancing of the cost of such reopening with the expected

11

benefits." In this context, courts have held that a bankruptcy case should not be reopened when the asserted purpose for the reopening would appear to be futile and a waste of judicial resources. See, e.g., In re Sheib, supra, 2014 Bankr. LEXIS 3084, at *7 - *8 (citations omitted) ("However, 'a closed bankruptcy proceeding should not be reopened where it appears that to do so would be futile and a waste of judicial resources.'...In such an instance, no purpose would be served by reopening and, accordingly, there would be no cause to reopen."); In re Frazer/Exton Development L.P., supra, 503 B.R. at 635; In re Fellheimer, supra, 443 B.R. at 359; In re Rashid, supra, 2004 U.S. Dist. LEXIS 25032 at *10 ("Further, when the purpose of reopening is to litigate issues that clearly have no merit, the matter should remain closed.")

Numerous courts have put forth similar lists of non-exclusive factors which a court should consider in exercising its discretion to reopen, often including the following:

> (1) the length of time that the case was closed;
>
> (2) whether a non-bankruptcy forum, such as a state court, has the ability to determine the issue sought to be posed by the debtor;
>
> (3) whether prior litigation in bankruptcy court implicitly determined that the state court would be the appropriate forum to determine the parties' rights, post-bankruptcy;
>
> (4) whether any parties would be prejudiced if the case were/were not reopened;
>
> (5) the extent of the benefit which the debtor seeks to achieve by reopening; and
>
> (6) whether it is clear at the outset that the debtor would not be entitled to any relief after the case was reopened.

In re Frazer/Exton Development, L.P., supra, 503 B.R. at 634-635; In re Rashid, supra, 2004 U.S. Dist. LEXIS 25032 at *9-10; In re Fellheimer, supra, 443 B.R. at 359.

The length of time the case was closed before seeking to reopen and the prejudice that will be incurred by parties in interest are clearly critical factors here. See, In re Bianucci, 4

12

F.3d. 526, 528 (7th Cir. 1993) (passage of time coupled with prejudice can be a sufficient basis to deny reopening of the case); In re Plumlee, 236 B.R. 606, 610-611 (E.D. Va. 1999) (citations omitted) ("However, when deciding whether to reopen an estate, the length of time between the estate's closing and the motion to reopen it should be 'of crucial significance' to the bankruptcy court.... 'As the time between closing of the estate and its reopening increases, so must also the cause for reopening increase in weight.'"); In re Munoz-Gonzalez, supra, 2001 Bankr. LEXIS 2375 at *15 ("In deciding whether to reopen a closed case, the court may consider the length of time that has passed since the case was closed, the value of the potential bankruptcy asset at issue and any potential prejudice to the debtor.").

Within this legal context, the former Trustee has not met her burden to persuade this Court to exercise its discretion to reopen this case as the former Trustee has requested. Indeed, it would be futile to reopen the case at this time given the September 16 Letter Agreement and Ashmore's agreement to escrow the $8,853 in CleanEdison funds. The creditors are being protected at virtually no expense to the estate.

Two years have passed between the closing of this case in November 2013 and the former Trustee's motion to reopen in December 2015. Moreover, the former Trustee asserts that the principal impetus behind her motion is the effort by the CGI defendants -- who are strangers to this case -- to dismiss the SDNY litigation based on Ashmore's alleged lack of standing there, resulting from the closed bankruptcy case here. The former Trustee has already rejected this position in writing. See Herbst Dec., Exhibit C. Further, reopening this case would, in effect, renege on the September 16 Letter Agreement that the Trustee prepared and had Ashmore, a pro se Debtor, sign, and on her representation to the SDNY in her attorney's September 17, 2013 letter. Not holding the former Trustee to her agreement would greatly prejudice Ashmore, who acted diligently for two years in reliance on that agreement. Ashmore fully intends that his bankruptcy

13

case be reopened at the conclusion of the SDNY litigation to permit his recovery in the SDNY

litigation to be used to pay allowed claims.

## II.    IF THE CASE IS REOPENED AT ALL, IT ONLY SHOULD BE FOR THE LIMITED PURPOSE OF ADMINISTERING THE $8,553 PAYMENT FROM CLEANEDISON

As set forth in the Statement of Facts, long prior to the filing of the petition, in

September 2012 Ashmore entered into a settlement agreement with CleanEdison as a result of

which he obtained a small contingent contract right to a possible future payment based on future

events that might or might not occur.  Subsequent to executing this agreement, events that

indicated CleanEdison's finances gave Ashmore the impression that his future contingent contract

right was of no value.  Thus, at the time Ashmore filed his petition in April 2013, Ashmore failed

to disclose this contingent contract right in his petition.  In September 2015, Ashmore received

$8,553 in full satisfaction of this contingent contract right.  Ashmore inadvertently did not disclose

this contingent contract right in his petition and schedules.  The value of the asset is minimal.

Ashmore agrees that the CleanEdison funds are an asset of his bankruptcy estate,

but the time is not ripe to reopen the case.  In balancing the factors for and against reopening the

case, Ashmore respectfully requests that the Court consider the alternative of ordering him to

escrow $8,553 with his counsel pending resolution of the SDNY litigation, as will be discussed

hereinafter.  See Fink, supra, 2014 U.S. App. LEXIS 2086 at *195; In re Munoz-Gonzalez, supra,

2001 Bankr. LEXIS 2375 at *15.  At that time, the case should be reopened to administer both the

proceeds of the SDNY litigation and the escrowed funds, rather than just the $8,553.

Alternatively, if this Court were to reopen this case at this time to administer the

$8,553 payment, Ashmore would follow the direction of the Court to provide these funds to the

appointed Chapter 7 trustee.  However, the case should be reopened only for that limited purpose,

and, as discussed hereinafter in this Brief, not for any broader purpose associated with the SDNY

litigation. Numerous courts have held that a court may direct the reopening of a bankruptcy case

for a specified limited purpose. See e.g., In re Judd, 78 F.3d 110, 117 (3d Cir. 1996); In re Cutter,

2006 U.S. Dist. LEXIS 61242, *3 (E.D.N.Y. 2006); In re Matheny, 2014 Bankr. LEXIS 3456,

*15-16 (W.D. Pa. 2014); In re Mesta Machine Company, 67 B.R. 147 (W.D. Pa. 1985); In re

Mead, 2012 Bankr. LEXIS 714, *4-5 (E.D.N.C. 2012).

### III.    IN ACCORDANCE WITH THE FORMER TRUSTEE'S AGREEMENT WITH THE DEBTOR AND HER REPRESENTATIONS TO THE DISTRICT COURT IN NEW YORK, THE COURT SHOULD NOT REOPEN THE CASE TO ADDRESS THE SDNY LITIGATION

As discussed in greater detail in the Statement of Facts, the nature and status of the

SDNY litigation was fully disclosed to the Trustee and this Court in 2013 during Ashmore's

bankruptcy. The former Trustee successfully opposed Ashmore's motion to dismiss this case,

stating an intent to take over the SDNY litigation, as she believed a possible settlement to be

imminent. It turned out that no settlement was imminent and Ashmore's counsel in the SDNY

litigation did not want to represent the former Trustee going forward.[10]  The former Trustee had no

counsel willing to pursue the SDNY litigation. At this time, on September 12, 2013, the District

Judge in the SDNY litigation demanded a letter by September 18 explaining what steps were being

taken to substitute parties, with a threat of possible dismissal if steps were not being taken.

Under these difficult circumstances, in order to preserve a potential asset for

Ashmore's estate without incurring unknown and possibly extraordinary expense for the estate,

and with the time period for conclusion of the SDNY litigation unknown, two days before the

District Judge's deadline, the former Trustee faxed the September 16 Letter Agreement to

Ashmore, who was pro se in the bankruptcy. In this letter, the former Trustee represented that she

would "close the bankruptcy case and not administer the asset at this time," which would allow

---

[10] In fact, Ashmore's counsel advised the SDNY on September 19, 2013 that he was seeking to withdraw entirely from the SDNY litigation.

Ashmore "to continue with the litigation without any delay or jeopardy." All the Trustee required

was Ashmore's written statement that if there was a significant collection at the end of the SDNY

litigation, Ashmore "will consent to the reopening of the case and not claim that the litigation was

abandoned by the closing of the case." That same day Ashmore signed the September 16 Letter

Agreement. On September 17, 2013, the former Trustee (1) advised the SDNY that she had closed

the bankruptcy case and the SDNY litigation could proceed outside it, and (2) filed her Report of

No Distribution in this case. On November 20, 2013, this case was closed.

It was only after the former Trustee had determined not to prosecute the SDNY

litigation and to retain only contingent rights in a possible future recovery from this litigation, that

Ashmore was able to retain his current counsel in the SDNY litigation on a contingency fee basis.

Herbst Dec., ¶ 2. As detailed in the Statement of Facts, between September of 2013 (when

Edwards abandoned the prosecution of this litigation to Ashmore) and the current date, Ashmore

and his current counsel, Herbst, in reliance on the September 16 Letter Agreement, and the former

Trustee's representations to the SDNY that she had abandoned,[11] and would have no role in, the

prosecution of the case to the end, engaged for the past two years in extensive, time-consuming

and costly litigation in the SDNY in support of Ashmore's claims in the SDNY litigation. One

critical highlight was Herbst and Ashmore's successful defense of a substantial summary

judgment motion decided in September of 2015.

The Trustee's full administration of the case was clearly indicated on September

17, 2013 in the Trustee's Report of No Distribution. All assets (including the SDNY litigation)

---

[11] See In re Kane, 628 F.3d 631, 636, 640, 641, 643 (3d Cir. 2010); Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 123 (2d Cir. 2008); Catalano v. Commissioner, 279 F.3d 682, 686, 687 (9th Cir. 2002); Morlan v. Universal Guaranty Life Ins. Co., 298 F.3d 609, 621 (7th Cir. 2002); Auday v. Wet Seal Retail, Inc., 698 F.3d 902,, 905 (6thCir. 2012); In re Furlong, 660 F.3d 81, 86 (1st Cir. 2011); In re Adair, 253 B.R. 85 (9th Cir. BAP (Cal.) 2000); In re Reed, 940 F.2d 1317, 1320 (9th Cir. 1991); LLP Mortgage et al v. Brinley et al., 547 F.3d 643, 648-50 (6th Cir. 2008); In re Woods, 173 f.3d 770, 780-81 (10th Cir. 1999); In re Allen, 2008 Bankr. LEXIS 366 * 9-10 (N.D. Ga. Feb. 14, 2008); Barletta v. Tedeschi, 121 B.R. 669, 672-73 (N.D.N.Y. 1990); In re Hunter, 76 B.R. 117, 119 (Banr. S.D. Ohio 1987).

were referenced as either being on the schedules or "otherwise found in the case records" (<u>i.e.</u>, the Statement of Financial Affairs, the 11 U.S.C. §341 meeting of creditors, Ashmore's explanatory letter docketed in this case (Document 18-1) and on the record before Judge Stern on July 23, 2013). It is clear from the former Trustee's own report to the Court that the former Trustee determined that "the estate of [Ashmore] has been fully administered" and that she be "discharged from any further duties as trustee."

Under exigent circumstances, the former Trustee had entered into the September 16 Letter Agreement to maximize the potential for future recovery, and she did so without the need for the estate to incur substantial expense for years in pursuit of that recovery from a litigation, which at the time of the former Trustee's actions had uncertain value. Thus, the former Trustee prudently agreed well over two years ago to abandon the prosecution of the SDNY litigation, based on Ashmore's agreement that if and when (and only if and when) <u>a recovery</u> occurs in the SDNY litigation, Ashmore would not argue that the former Trustee had abandoned the Estate's interest in that recovery. If such a recovery is obtained, it will only have been obtained by virtue of Herbst's and Ashmore's subsequent massive investment of time and effort in the SDNY litigation in reliance upon the protocol the Trustee herself devised. The SDNY litigation proceeded on the basis of the September 16 Letter Agreement and the former Trustee's September 17, 2013 letter to the SDNY that she had abandoned the prosecution of the SDNY litigation to Ashmore. Ashmore stands by his word and agreement with the former Trustee and expects the former Trustee to stand by hers. And so she should, given that the September 16 construct provides the estate and creditors with all of the benefits of the litigation without the burdens. Ashmore has never asserted that the proceeds of the litigation should not be used to pay creditors, and he and his counsel are doing their very best to make sure that payment happens. In fact, they are doing so well that the CGI defendants are doing everything they can to derail the realization of this asset for creditors.

17

In light of the former Trustee's agreement with Ashmore and Ashmore's and the SDNY's substantial actions in reliance on that agreement, reopening would violate the applicable standards. The former Trustee's agreement protects the creditors and her. The "futility" of the former Trustee's position should preclude the reopening of this case. See, e.g., In re Rashid, supra, 2004 U.S. Dist. LEXIS 25032 at *10; In re Sheib, supra, 2014 Bankr. LEXIS 3084, at *7 - *8; In re Frazer/Exton Development L.P., supra, 503 B.R. at 635; In re Fellheimer, supra, 443 B.R. at 359.

There is, at most, limited benefit to be gained by the estate in wresting control of the SDNY litigation from Ashmore, contrary to the former Trustee's agreement, and representation to the SDNY that she was abandoning the litigation to Ashmore. Under the September 16 Letter Agreement, the estate will receive its interest in the ultimate recovery at the end of the SDNY litigation. The CGI defendants' gamesmanship is no surprise: as discussed, they have done everything in their power to attempt to derail the SDNY litigation as Ashmore and Herbst have made headway. Why wait over two years to raise the issue, after having caused Ashmore and Herbst and, astoundingly, the United States District Court for the Southern District of New York, to spend so much time and effort on the case? It is what the CGI defendants want; a meritless litigation tactic. And the former Trustee, for whatever reason, has fallen prey to it, sadly, to the detriment of creditors and Ashmore, who now have had two trial dates delayed in the SDNY litigation because of the motions in this Court. Herbst Dec., ¶ 14. Every scintilla of doubt that the former Trustee acts on serves to further erode the momentum of the SDNY litigation and expressly contradicts both her September 17, 2013 representation to the SDNY that the SDNY litigation should and would proceed outside of the Bankruptcy Court's jurisdiction and the former Trustee's subsequent representation to Herbst that the SDNY litigation would proceed to conclusion without the former Trustee's involvement. After having set a course over two years ago, Edwards cannot be permitted to change that course mid-stream. This is especially true after Ashmore's and

18

Herbst's substantial investment and repeated successes in fighting off the CGI defendants' efforts to delay discovery, a motion for summary judgment, and other tactics to avoid a trial on the merits. Thus, the factors that are especially relevant to the Court's analysis are: the length of the delay; the prejudice to the Debtor; and the benefit to the estate achieved by reopening. Those factors militate against reopening this case at a time which is clearly premature under the September 16 Letter Agreement, and utterly contrary to Edwards's representation to the SDNY District Judge. See, e.g., In re Bianucci, supra, 4 F.3d. at 528; In re Rashid, supra, 2004 U.S. Dist. LEXIS 25032 at *9-10; In re Plumlee, supra, 236 B.R. at 610-611; In re Frazer/Exton Development, L.P., supra, 503 B.R. at 634-635; In re Fellheimer, supra, 443 B.R. at 359; In re Munoz-Gonzalez, supra, 2001 Bankr. LEXIS 2375 at *15.

Notwithstanding the last minute, self-serving arguments by the CGI defendants, who are strangers to this case, this Court should instead hold the former Trustee to her September 16 Letter Agreement and her September 17 letter and representation to the SDNY by denying the former Trustee's request to reopen the case at this time. In accordance with those letters, this case should only be reopened when a recovery is had in the SDNY litigation in order to administer the proceeds.

## CONCLUSION

As a result of the foregoing, Ashmore respectfully requests that this Court deny the

former Trustee's motion to reopen this case.

HELLRING LINDEMAN GOLDSTEIN & SIEGAL LLP

By: _____ /s/ Patricia A. Staiano _____
PATRICIA A. STAIANO
ROBERT S. RAYMAR
Members of the Firm

and

ROBERT L. HERBST
HERBST LAW PLLC
420 Lexington Avenue, Suite 300
New York, New York  10170

Attorneys for Ashmore

Dated:    March 7, 2016

54774



IN RE: TIMOTHY L. ALLEN, Debtor.

CHAPTER 7, CASE NO. 01-82408-MHM

UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT
OF GEORGIA, ATLANTA DIVISION

*2008 Bankr. LEXIS 366*

February 14, 2008, Decided
February 14, 2008, Entered on Docket

**PRIOR HISTORY:** *Gingold v. Allen, 272 Ga. App. 653, 613 S.E.2d 173, 2005 Ga. App. LEXIS 354 (2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The Chapter 7 case was before the court on the trustee's motion to approve the conditional abandonment of a tort claim to debtor.

**OVERVIEW:** The subject of the motion was a legal malpractice claim against debtor's former attorney. Among other things, the court noted *11 U.S.C.S. § 554*, which provided that after notice and a hearing, a trustee could abandon any property of the estate that was burdensome to the estate or that was of inconsequential value and benefit to the estate. Abandonment was an absolute term. Additionally, although the claim was unliquidated, the claim had significant value, probably in excess of the aggregate amount of all claims against the estate. The court also noted that *11 U.S.C.S. § 726* set forth the order of priority in which property of the estate was distributed in a Chapter 7 case: Further, a trustee's power and obligation to liquidate assets of the estate was not unlimited. Thus, the instant case presented a dilemma: Abandonment of the claim was not supported by the law. The only option left was to require the trustee to prosecute the claim on behalf of the estate. The estate's interest, however, was limited by its liabilities and, thus, the trustee's financial incentive to maximize the claim

may also have been limited. The nature of the claim, itself, however, ameliorated that dilemma.

**OUTCOME:** The trustee's motion was denied. The trustee was directed to undertake measures necessary to be substituted as plaintiff in the state court proceeding on the claim and to prosecute that claim to resolution.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Estate Property > Abandonment > General Overview*
[HN1] See *11 U.S.C.S. § 554.*

*Bankruptcy Law > Estate Property > Abandonment > General Overview*
[HN2] "Abandonment" is not defined in the Bankruptcy Code. Black's Law Dictionary defines "abandonment" as the relinquishing of a right or interest with the intention of never again claiming it. Black's Law Dictionary, Seventh Edition (1999). Abandonment is an absolute term. One cannot slightly abandon, partially abandon, or conditionally abandon an asset of the estate.

*Bankruptcy Law > Liquidations > Estate Property Distribution > General Overview*

2008 Bankr. LEXIS 366, *

[HN3] *11 U.S.C.S. § 726* sets forth the order of priority in which property of the estate is distributed in a Chapter 7 case: First, in payment of claims entitled to priority under *11 U.S.C.S. § 507*; second, in payment of timely-filed, allowed unsecured claims; third, late-filed unsecured claims; fourth, in payment of claims for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages that are not compensation for actual pecuniary loss; fifth, in payment of interest on the above claims at the legal rate; and sixth, to the debtor. Therefore, the Bankruptcy Code recognizes a debtor's interest in proceeds from the liquidation of an asset of the estate to the extent that the value of such asset exceeds the total amount of the claims payable under *11 U.S.C.S. § 726(a)(1)-(5)*.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Compensation*
*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > General Overview*
[HN4] A trustee's power and obligation to liquidate assets of the estate is not unlimited. Under *11 U.S.C.S. § 326*, a trustee's statutory fee is based upon the moneys disbursed or turned over to parties in interest, excluding moneys turned over to the debtor under *11 U.S.C.S. § 726(a)(6)*. Additionally, a trustee should not liquidate property in excess of the liabilities of the estate merely to generate administrative expenses.

**COUNSEL:** [*1] For Timothy L. Allen, Debtor: Ira D. Gingold, Gingold & Associates, Atlanta, GA; Linley Jones, Linley Jones, P.C., Atlanta, GA.

For Paul H. Anderson, Jr., Trustee: Paul H. Anderson, Jr., Paul H. Anderson, Jr., Atlanta, GA.

For Ira D. Gingold, Debtor's Former Attorney, Interested Party: T. Bart Gary, Freeman, Mathis & Gary, LLP, Atlanta, GA.

For Georgia Telco Credit Union, Interested Party: Louis G. McBryan, Howick, Westfall, McBryan & Kaplan, LLP, Atlanta, GA.

**JUDGES:** MARGARET H. MURPHY, UNITED STATES BANKRUPTCY JUDGE.

**OPINION BY:** MARGARET H. MURPHY

**OPINION**

**ORDER DENYING TRUSTEE'S MOTION TO APPROVE CONDITIONAL ABANDONMENT**

This case is before the court on Trustee's motion to approve the conditional abandonment of a tort claim to Debtor. Trustee's motion has a complicated and somewhat tortured evolution.

**STATEMENT OF FACTS**

This case commenced April 30, 2007. The subject of Trustee's motion is a legal malpractice claim (the "Claim")[1] against Debtor's former attorney, Ira Gingold ("Gingold"), which arose prior to the filing of this case.[2] The Claim was not listed in Debtor's bankruptcy schedules[3] and was not disclosed at the §341 meeting of creditors. Debtor's Schedules listed unsecured claims totaling $ 59,221.96. Trustee [*2] filed his No Distribution Report June 13, 2001. Debtors discharge order was entered and the case was closed August 22, 2001.

1   Debtor may have or intend to assert more than one tort claim against his former attorney, but for ease of reference, all tort claims that are property of the estate arising from the relevant operative facts will be referred to as the Claim.
2   The legal malpractice complaint filed by Debtor in state court alleges that, while acting as Debtor's bankruptcy attorney prior to commencement of the bankruptcy case, Debtor's then-attorney, Ira Gingold, negligently advised Debtor to stop payment on two outstanding checks to creditors; that Debtor relied on this advice and stopped payment on the checks; that these actions established probable cause for his arrest on felony charges of theft by deception; and that he was subsequently arrested and jailed on felony theft by deception warrants obtained by the creditors. Although Debtor was not arrested and jailed on the warrants until after the discharge order was entered in this bankruptcy case, the relevant acts (the alleged negligent advice to stop payment on the checks, the actual stop payment by Debtor, and the felony arrest [*3] warrants obtained by the creditors after the stop payment) all occurred prior to the April 30, 2001 commencement of the bankruptcy case. *See Gingold v. Allen, 272 Ga. App. 653, 613 S.E. 2d*

2008 Bankr. LEXIS 366, *3

*173(2005).*

3 *Bankruptcy Rule 1007* requires a debtor to file schedules of assets and liabilities, a schedule of current income and expenditures, a schedule of executory contracts and unexpired leases, and a statement of financial affairs (the "Schedules").

In October, 2001, Debtor employed an attorney to assert the Claim against Gingold and a state court lawsuit was filed May 7, 2003. Gingold moved for judgment on the pleadings on the grounds that the Claim was property of Debtor's bankruptcy estate; as a result, the real party in interest is the Chapter 7 bankruptcy trustee. The Georgia Court of Appeals agreed and remanded the case to the trial court to give Debtor a reasonable time either to secure an abandonment of the Claim by the Trustee or to substitute Trustee as the plaintiff.

As a result of the order by the Georgia Court of Appeals, Debtor filed a motion to reopen this case. Gingold opposed reopening this case, but an order was entered granting Debtor's motion May 27, 2005. Thereafter, Trustee [*4] filed a motion for authority to sell the Claim to the party making the highest offer (the "Motion to Sell"). Gingold had offered to purchase the Claim for $ 25,000. Debtor had offered to purchase the Claim for $ 9,383.27, which represented $ 25,000 net of 40% attorneys fees and expenses payable to the attorney for Debtor who filed the Claim in state court.

In his response to Trustee's Motion to Sell, Gingold asserted that abandonment by Trustee of the Claim is inappropriate because the Claim is not burdensome or of inconsequential value. Gingold also asserted that Debtors attorney is not entitled to attorneys fees because the fees were not listed in Debtor's bankruptcy Schedules and because the attorney had not been employed by Trustee, the real party in interest. Gingold also asserted that Debtor's attorney was not entitled to recover fees under a *quantum meruit* theory because the attorney had not been working as an agent of Trustee or the estate.

At the hearing on Trustee's Motion to Sell, the court agreed with Gingold that the Debtor's offer of purchase, net of the attorneys fees and expenses, was unacceptable. Debtor increased his purchase offer to $ 25,000 plus 10% of the net recovery [*5] on the Claim. The hearing was continued to allow Trustee to more fully investigate the value of the Claim.

Following the hearing, further negotiations ensued.

Trustee offered to settle the Claim with payment by Gingold of funds sufficient to pay all creditors, approximately $ 60,000, which Gingold declined, but Gingold offered to settle for $ 35,000. Trustee's investigation of the value of the Claim convinced Trustee that $ 35,000 was not a reasonable offer of settlement. Trustee filed a motion to sell the Claim to Debtor (the "Second Motion to Sell") for payment of $ 10,000 with the proceeds from the recovery on the Claim to be disbursed as follows: the first 40% would be paid to Debtor's attorney, plus expenses; the next $ 25,000 would be paid to Trustee, plus administrative expenses; and the remainder would be divided evenly between Trustee and Debtor up to an amount to pay all unsecured creditors.

At the hearing on the Second Motion to Sell, the court concluded that it contravened Georgia law and could not be approved. In the case of *United Technologies Corp. v. Gaines, 225 Ga. App. 191, 483 S.E. 2d 357 (1997)*, the Georgia court concluded that when, under the Bankruptcy Code, a Chapter [*6] 7 Trustee acquires a debtor's tort claim, the Trustee becomes the real party in interest and alone possesses the right to pursue the claim. Assignment by the Trustee of the claim to the debtor would violate *O.C.G.A. §44-12-24*, which prohibits the assignment of such tort claims. Another Georgia case concluded that although the assignment of such claim by the Trustee to a debtor violates *O.C.G.A. §44-12-24*, the Trustee's abandonment of the claim, even following payment by the debtor to the estate, does not violate *O.C.G.A. §44-12-24. Denis v. Delta Air Lines, Inc., 248 Ga. App. 377, 546 S.E. 2d 805 (2001).*

Therefore, Trustee amended his Second Motion to Sell to change the title to Motion for Conditional Abandonment. In connection with the Motion for Conditional Abandonment, Trustee showed that the administrative expenses already exceeded the cash on hand, [4] that timely-filed proofs of claim total approximately $ 4,066, and that all claims filed in this case total approximately $ 21,000. [5] Debtor and Trustee agree that the value of the Claim likely substantially exceeds the amount of the estate's administrative expenses and unsecured debt, estimating a recovery of more than $ 100,000. [6] [*7] Therefore, the $ 35,000 settlement amount proposed by Gingold does not constitute a fair settlement. Debtor argues that because the Claim is worth so much more than the claims against the estate, it would be inappropriate for Trustee rather

than Debtor to pursue the Claim.

4    Trustee currently has on hand approximately $ 15,000 obtained by avoidance of a transfer of property from Debtor to his mother-in-law.

5    The bar date for filing proofs of claim was July 21, 2006. Since the expiration of the bar date, Trustee has sent two additional notices to creditors who failed to file timely proofs of claim, notifying them of the discovery of an asset that may provide funds sufficient to pay all claims and soliciting late filing of proofs of claim.

6    Debtor offers to waive his discharge in order to receive the proceeds from the litigation against Gingold. Debtor's discharge, however, was entered in August 2001. Grounds to revoke the discharge do not appear to exist. Therefore, waiver of the discharge does not appear possible.

Trustee proposes to abandon the Claim on the following conditions: Debtor will pay to the estate $ 10,000, non refundable; Debtor will be substituted as Plaintiff in the lawsuit [*8] against Gingold; the complaint against Gingold will be amended to add claims for misuse of confidential information; the proceeds of any recovery on the Claim will be disbursed 40% plus litigation expenses to' Debtor's attorney; $ 25,000 to Trustee; the remainder divided equally between Debtor and Trustee up to the amount of accrued administrative expenses and filed claims; Debtor offers to waive his discharge [7] if Debtor's share of the recovery is more than the aggregate amount of unsecured debt for which no proof of claim is filed, thereby implying that such creditors may seek and obtain payment from Debtor.

7    *See* footnote 5. As Debtor's discharge has already been entered, waiver at this point does not appear to be possible.

In support of his proposal, Trustee showed that the funds currently on hand plus the $ 10,000 from Debtor would be sufficient to pay current administrative expenses and the timely-filed proofs of claim. If additional funds were realized, Trustee would then send notice to creditors advising them of additional assets and providing a deadline to file proofs of claim.

Gingold opposes Trustee's Motion for Conditional Abandonment, pointing out that Trustee cannot abandon [*9] the Claim while retaining an interest in the recovery. Additionally, Gingold points out that the Trustee has

failed to satisfy the statutory requirements for abandonment by failing to show the Claim is burdensome to the estate or of inconsequential value. Gingold also argues that Debtor's interest in the Claim is not entitled to protection by Trustee and that Trustee should be required to accept Gingold's settlement offer, which would provide more than sufficient funds to pay all administrative expenses and all timely-filed proofs of claim.

## DISCUSSION

The *Bankruptcy Code, §554*, provides:

[HN1] After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

[HN2] "Abandonment" is not defined in the Bankruptcy Code. Black's Law Dictionary defines "abandonment":

The relinquishing of a right or interest with the intention of never again claiming it.

BLACK'S LAW DICTIONARY, Seventh Edition, West Publishing Co. (1999). Abandonment is an absolute term. One cannot slightly abandon, partially abandon, or conditionally abandon an asset of the estate. No case law has been found or cited by the parties [*10] to support a proposal to "conditionally abandon" an asset, *i.e.,* abandon the asset while retaining an interest in its proceeds. Just as Trustee could not abandon the estate's interest in a tangible asset of the estate while retaining the right to share in the proceeds from a sale, Trustee cannot abandon the Claim while retaining the right to share in the proceeds of the recovery.

Additionally, although the Claim is unliquidated, all parties agree that the Claim has significant value, probably in excess of the aggregate amount of all claims against the estate. The *Bankruptcy Code, §554*, requires that before abandonment of an asset can be allowed, the trustee or the court must conclude that the asset is burdensome to the estate or of inconsequential value and benefit. No such finding is possible in this case.

The Bankruptcy Code, in [HN3] *§726*, sets forth the order of priority in which property of the estate is distributed in a Chapter 7 case:

. First, in payment of claims entitled to priority under §507;

. Second, in payment of timely-filed, [8] allowed unsecured claims;

. Third, late-filed unsecured claims;

. Fourth, in payment of claims for any fine, penalty, or forfeiture, or multiple, exemplary, [*11] or punitive damages that are not compensation for actual pecuniary loss;

. Fifth, in payment of interest on the above claims at the legal rate; and

. Sixth, to the debtor.

Therefore, the Bankruptcy Code recognizes the debtor's interest in proceeds from the liquidation of an asset of the estate to the extent that the value of such asset exceeds the total amount of the claims payable under §726(a)(1)-(5).

8 Section 726(a)(2)(C) deems a late-filed claim timely if the creditor had no notice or actual knowledge of the case in time to file a timely claim.

The posture of this case is somewhat unique and unlikely to recur often. Occasionally, a trustee discovers assets with value sufficient to pay all claims and return a dividend to a debtor. Such overage or surplus is an asset of any debtor that cannot and should not be artificially reduced to the detriment of its ultimate owner. Had Trustee discovered oil on Debtor's homestead, he would be bound to return the remainder property over to Debtor after payment of claims in accordance with the priorities set forth in the Bankruptcy Code.

[HN4] A trustee's power and obligation to liquidate assets of the estate is not unlimited. Under §326, the trustee's statutory [*12] fee is based upon the moneys disbursed or turned over to parties in interest, excluding moneys turned over to the debtor under §726(a)(6). Additionally, a trustee should not liquidate property in excess of the liabilities of the estate merely to generate administrative expenses. *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874 (11th Cir. 1990).

Therefore, the instant case presents a dilemma: Abandonment of the Claim, conditionally or otherwise, is not supported by the law. Georgia law will not permit Trustee to assign the Claim or part of the Claim to Debtor. The only option left is to require Trustee to prosecute the Claim on behalf of the estate. The estate's interest, however, is limited by its liabilities and, thus, Trustee's financial incentive to maximize the Claim may also be limited. The nature of the claim, itself, however, ameliorates that dilemma. Any attorney employed by Trustee [9] would be employed on a contingency fee basis, so that the litigation costs of prosecuting the Claim would be borne by the estate and by Debtor in proportion to their respective eventual recoveries, thus eliminating any obstacle presented by *Grant v. George Schumann Tire & Battery Company, supra*. [*13] Any proposed settlement of Claim would require approval by the bankruptcy court, 10 which, recognizing Debtor's interest in maximizing the claim, would protect Debtor from any proposal that failed to sufficiently acknowledge Debtor's interests. Therefore, the only disposition of Trustee's Motion for Conditional Abandonment is denial and direction that Trustee be substituted as Plaintiff in the state court proceeding. In that proceeding, the Trustee may consult with Debtor as respects Debtor's interest in the outcome. Accordingly, it is hereby

9 Trustee may employ the attorney who has been prosecuting the Claim up to this time on behalf of Debtor. The interests of Debtor and Trustee would appear to be aligned, so that no conflict of interest exists.
10 *Rule 9019.*

ORDERED that Trustee's Motion for Conditional Abandonment is denied. Trustee is directed to undertake measures necessary to be substituted as Plaintiff in the state court proceeding on the Claim and to prosecute that claim to resolution.

**The Clerk, U.S. Bankruptcy Court, is directed to** serve a copy of this order upon Debtor, Debtor's attorney, the Chapter 7 Trustee, and all creditors and parties in interest.

IT IS SO ORDERED, this [*14] the 14th day of December, 2007.

/s/ Margaret H. Murphy

MARGARET H. MURPHY

2008 Bankr. LEXIS 366, *14

UNITED STATES BANKRUPTCY JUDGE



**In re: DAVID CUTTER and PAMELA E. CUTTER, Debtors/Appellants.**

Case No. CV-05-5527

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

*2006 U.S. Dist. LEXIS 61242*

August 29, 2006, Decided
August 30, 2006, Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant debtors appealed from an order of the United States Bankruptcy Court for the Eastern District of New York, which reopened their joint Chapter 7 bankruptcy proceeding and re-appointed the trustee for the limited purpose of investigating the reconveyance of certain property.

**OVERVIEW:** The court found that the bankruptcy court's order to reopen was not final in that it did not completely resolve the dispute: namely, whether the property should have been administered as part of debtors' estate. The bankruptcy court explicitly avoided making any determination on the merits of the trustee's claim that debtors owned the reconveyed property immediately prior to the filing date of the bankruptcy. Moreover, the court determined that it did not have jurisdiction to review debtors' appeal as from an interlocutory order. The order appealed from involved an exercise of discretion rather than a controlling question of law; accordingly, it was not appealable under *28 U.S.C.S. § 1292.* Further, because the bankruptcy court's final judgment, incorporating its adjudication of debtors' affirmative defenses, would be reviewable on appeal, the collateral order doctrine was not applicable.

**OUTCOME:** The court declined to review the

bankruptcy court's order.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
[HN1] The federal courts are under an independent obligation to examine their own jurisdiction. Irrespective of how the parties conduct their case, the courts have an independent obligation to ensure that federal jurisdiction is not extended beyond its proper limits.

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*
*Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders*
[HN2] Final orders of the bankruptcy court may be appealed to the district court as of right, *28 U.S.C.S. § 158(a)(1),* whereas appeals from interlocutory orders may only be taken with leave of the district court. *28 U.S.C.S. § 158(a)(3).*

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*

2006 U.S. Dist. LEXIS 61242, *

*Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders*

[HN3] The concept of finality is more flexible in the bankruptcy context than in ordinary civil litigation. Yet for a bankruptcy court order to be final it must completely resolve all of the issues pertaining to a discrete claim. Orders which leave affirmative defenses unresolved are not final.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview*

[HN4] Under the Federal Rules of Civil Procedure, laches and statute of limitations are both classified as affirmative defenses. *Fed. R. Civ. P. 8(c).*

*Bankruptcy Law > Case Administration > Closings & Reopenings > General Overview*
*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*

[HN5] An order denying a motion to reopen a bankruptcy case is a final order.

*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
*Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders*

[HN6] Only exceptional circumstances will justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*
*Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders*

[HN7] An appeal from an interlocutory order pursuant to *28 U.S.C.S. § 158(a)(3)* is made by filing a notice of appeal accompanied by a motion for leave to appeal. *Fed. R. Bankr. P. 8001(b).* If the required motion for leave to appeal is not filed, but a notice of appeal is timely filed, the district court may (1) grant leave to appeal, (2) direct that a motion for leave to appeal be filed or (3) consider the notice of appeal as a motion for leave to appeal and deny leave to appeal. *Fed. R. Bankr. P. 8003(c).*

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*

*Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders*

[HN8] Although *28 U.S.C.S. § 158* and the Bankruptcy Rules describe the right to appeal from an interlocutory order and the procedure for doing so, neither provides guidelines for determining whether a district court should grant leave to appeal in a particular case. Most district courts in the United States Court of Appeals for the Second Circuit have applied the analogous standard for certifying an interlocutory appeal from a district court order, set forth in *28 U.S.C.S. § 1292(b).*

*Bankruptcy Law > Case Administration > Closings & Reopenings > Procedures for Reopening*
*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Abuse of Discretion*

[HN9] A bankruptcy case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause, *11 U.S.C.S. § 350(b);* by definition, therefore, the bankruptcy court's decision should only be overturned upon a showing of abuse of discretion.

*Civil Procedure > Appeals > Appellate Jurisdiction > Collateral Order Doctrine*

[HN10] Under the collateral order doctrine, an appellate court may review an interlocutory order that (1) conclusively determines a disputed question, (2) resolves an important issue completely separable from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment. A decision is not reviewable as a collateral order unless it satisfies all three of these requirements.

COUNSEL:  [*1]  For the Appellants: ROY J. LESTER, ESQ., Lester and Weitz, P.C., Garden City, NY.

For the Appellee: ANTHONY C. ACAMPORA, ESQ., Silverman Perlstein & Acampora, P.C., Jericho, NY.

JUDGES: FREDERIC BLOCK, Senior United States District Judge.

OPINION BY: FREDERIC BLOCK

OPINION

MEMORANDUM AND ORDER

**BLOCK, Senior District Judge:**

Co-debtors David Cutter and his wife, Pamela E. Cutter (collectively, the "Debtors"), appeal from an order of the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") reopening their joint Chapter 7 proceeding and re-appointing Kenneth P. Silverman (the "Trustee") to take such steps as necessary to administer the assets of the estate. The Court does not have jurisdiction to hear the Debtors' appeal, and therefore declines to review the Bankruptcy Court's order.

## BACKGROUND

The following undisputed facts are drawn from the parties' submissions in the Record of Appeal ("R.").

By deed recorded on April 29, 1993, the Debtors transferred title to real property (the "Property") to Raymond Kulka, uncle of David Cutter. The Debtors continued to occupy the Property, renting it from Mr. Kulka, for all periods up to and [*2] following the bankruptcy proceedings.

On June 3, 1998 (the "Filing Date"), the Debtors filed an application for bankruptcy under Chapter 7 and the Trustee was appointed. On July 23, 1998, the Trustee convened the First Meeting of Creditors under *11 U.S.C. § 341*; the Debtor's informed the Trustee that they had sold the Property in 1993 and were renting it from the present owner. On July 27, 1998, the Trustee filed a Report of No Assets with the Bankruptcy Court. On October 5, 1998, the Bankruptcy Court granted the Debtors a discharge under *11 U.S.C. § 727*. On October 20, 1998, the Bankruptcy Court issued a final decree discharging the Trustee from his duties and closing the Debtors' case.

Mr. Kulka conveyed the Property back to the Debtors by deed recorded on April 14, 1999. The deed bears the date of January 7, 1998; the deed signing was witnessed on December 7, 1998 and was notarized on March 4, 1999. The parties do not agree as to when the deed was delivered.

On July 12, 2005, the Trustee filed a motion to reopen the Chapter 7 proceeding and administer assets of the estate pursuant to *11 U.S.C. §§ 105, 350(b)* [*3] and *Bankruptcy Rule 5010*, alleging that the co-Debtor, David Cutter, may have owned the reconveyed Property

immediately prior to the Filing Date. The Debtors deny that the Property passed back to them before the Filing Date, and argue that the Bankruptcy Court lacked cause to reopen the case because the Trustee's action is barred by the statute of limitations and laches.

On September 20, 2005, the Bankruptcy Court held a hearing on the Trustee's motion. While acknowledging that the Trustee had a heightened obligation to investigate before filing a Report of No Assets, *see* R. at 12 ("[I]f the Trustee had been aware of the fact that this property was transferred to the uncle, then presumably there might have been a basis at that point to challenge the transfer as a fraudulent transfer . . . ."), the Bankruptcy Court concluded that "the more prudent thing would be to let the Trustee reopen the case, and then we can have litigation over the issue of whether or not the Trustee can assert this cause of action," *id.* at 48; accordingly, the Bankruptcy Court reopened the case "for [the] limited purpose" of further investigation. *Id.* at 59.

The order to reopen was entered September 27, 2005. The [*4] Debtors filed their notice of appeal on October 6, 2005.

## DISCUSSION

The threshold issue is whether the Court has jurisdiction to hear the Debtors' appeal. Although the Trustee does not object to the Debtors' asserted basis for appellate jurisdiction, the Court is nonetheless required to raise the issue *sua sponte*. *See FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990)* [HN1] ("The federal courts are under an independent obligation to examine their own jurisdiction . . . ."); *accord Wight v. BankAmerica Corp., 219 F.3d 79, 90 (2d Cir. 2000)* ("[I]rrespective of how the parties conduct their case, the courts have an independent obligation to ensure that federal jurisdiction is not extended beyond its proper limits.").

[HN2] Final orders of the bankruptcy court may be appealed to the district court as of right, *see 28 U.S.C. § 158(a)(1)*, whereas appeals from interlocutory orders may only be taken with leave of the district court. *See id. § 158(a)(3); In re AroChem Corp. 176 F.3d 610, 618 (2d Cir. 1999)*.

## I. Appeals from Final Orders

The Second Circuit has held that [HN3] "the concept

of 'finality' [*5] is more flexible in the bankruptcy context than in ordinary civil litigation." *In re Flor*, 79 F.3d 281, 283 (2d Cir. 1996). Yet "for a bankruptcy court order to be final . . . it must completely resolve all of the issues pertaining to a discrete claim . . . ." *In re Fugazy Express Inc.*, 982 F.2d 769, 775-76 (2d Cir. 1992); *accord In re Chateaugay Corp.*, 922 F.2d 86, 90 (2d Cir. 1990) ("Orders in bankruptcy cases may be immediately appealed if they resolve discrete disputes within the larger case."). Orders which leave affirmative defenses unresolved are not final. *See City of New York v. Exxon Corp.*, 932 F.2d 1020, 1023 (2d Cir. 1991).

Applying the *Fugazy* standard, the Court finds that the Bankruptcy Court's order to reopen was not final in that it did not completely resolve a discrete dispute: namely, whether the Property should have been administered as part of the Debtors' estate. As evidenced by the hearing transcript, the Bankruptcy Court explicitly avoided making any determination on the merits of the Trustee's claim, *see* R. at 48 ("[T]he more prudent thing would be to let the Trustee reopen the case, [*6] and then we can have litigation over the issue of whether or not the Trustee can assert this cause of action."); accordingly, under *Fugazy*, the order was not final. *See* 982 F.2d at 775-76.

The Court reaches the same result by applying *Exxon*. [HN4] Under the Federal Rules of Civil Procedure, laches and statute of limitations are both classified as affirmative defenses. *See Fed. R. Civ. P. 8(c)*. The hearing transcript shows that the Bankruptcy Court refused to make a determination as to the applicability of either defense. *See* R. at 58-59 ("MR. LESTER: . . . But Judge, let's talk about laches as -- THE COURT: No, we're not talking about anything. I have now determined. You'll have a chance to -- bring the appropriate actions later."). Despite the order to reopen, then, the Debtors' affirmative defenses remain unresolved; accordingly, under *Exxon*, the Bankruptcy Court's decision was not final. *See* 932 F.2d at 1023.

The Debtors cite two unpublished opinions from the Sixth Circuit's Bankruptcy Appellate Panel to support their assertion that the Bankruptcy Court's order to reopen was a final order. The [*7] first opinion, *In re Adams, 1999 Bankr. LEXIS 1728, No. 99-8020 (B.A.P. 6th Cir. 1999)*, does not, as the Debtors claim, hold that "[a]n order deciding a motion to reopen a bankruptcy case is a final order," Brief of Appellants at 5; rather, it

holds that [HN5] "[a]n order *denying* a motion to reopen a bankruptcy case is a final order." *Adams, 1999 Bankr. LEXIS 1728 at *2* (emphasis added). As *Adams* explains, denying a motion to reopen is a final order because it "leaves nothing for the [bankruptcy] court to do but execute the judgment." *Id.* In contrast, the Bankruptcy Court's order *granting* the Trustee's motion did not end the litigation, even with respect to the discrete issue of whether the Property should be considered property of the estate to be administered by the Trustee; instead, as discussed above, it left that issue, including the Debtors' affirmative defenses to the Trustee's claim, unresolved.

The second opinion that the Debtors cite, *In re Bonner*, No. 04-8101, *2005 Bankr. LEXIS 1683 (B.A.P. 6th Cir. 2005)*, is distinguishable on its facts. In *Bonner*, the bankruptcy court granted the trustee's motion to [*8] reopen the estate to administer a personal injury claim of the debtors, *see 2005 Bankr. LEXIS 1683, id. at *6*, a determination found by the bankruptcy appellate panel to be "conclusive on the merits," *2005 Bankr. LEXIS 1683, id. at *2*. Here, the Bankruptcy Court did not grant the Trustee's motion to reopen so that he could administer the Property, but rather "for [the] limited purpose" of investigating the reconveyance of the Property. R. at 59.

Having determined that the Bankruptcy Court's order to reopen was not final, the Court now turns to the question of whether it has jurisdiction to review the Debtors' appeal as from an interlocutory order, keeping in mind that [HN6] "only 'exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'" *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990) (quoting *Coopers & Lybrand*, 437 U.S. 463, 475, 98 S. Ct. 2454, 57 L. Ed. 2d 351 (1978)).

## II. Appeals from Interlocutory Orders

[HN7] An appeal from an interlocutory order pursuant to *28 U.S.C. § 158(a)(3)* is made by filing a notice of appeal accompanied by a motion for leave to appeal. *Fed. R. Bankr. P. 8001(b)* [*9] . If the required motion for leave to appeal is not filed, but a notice of appeal is timely filed, the district court may 1) grant leave to appeal, 2) direct that a motion for leave to appeal be filed or 3) consider the notice of appeal as a motion for leave to appeal and deny leave to appeal. *Fed. R. Bankr. P. 8003(c)*. For the reasons stated below, the Court concludes that leave should be denied; accordingly, it will treat the Debtors' notice of appeal as a motion for

2006 U.S. Dist. LEXIS 61242, *9

leave to appeal. *Id.*

#### A. *Section 1292(b)*

[HN8] Although *section 158* and the Bankruptcy Rules describe the right to appeal from an interlocutory order and the procedure for doing so, neither provides guidelines for determining whether a district court should grant leave to appeal in a particular case. Searching for guidance elsewhere, most district courts in the Second Circuit have applied the analogous standard for certifying an interlocutory appeal from a district court order, set forth in *28 U.S.C. § 1292(b)*. *See North Fork Bank v. Abelson, 207 B.R. 382, 387 (E.D.N.Y.1997)* (citing district court decisions applying *section 1292(b)*). Under [*10] *section 1292(b)*, an interlocutory appeal may be granted when the order appealed from "involves a controlling question of law as to which there is substantial ground for difference of opinion and [when] an immediate appeal from the order may materially advance the ultimate termination of the litigation." *28 U.S.C. § 1292(b)*.

[HN9] A bankruptcy case "may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause," *11 U.S.C. § 350(b)*; by definition, therefore, the bankruptcy court's decision should only be overturned upon a showing of abuse of discretion. *See Bartle v. Markson, 357 F.2d 517, 523 (2d Cir. 1966)* ("What constitutes 'cause' is not defined and lies primarily within the discretion of the district judge; only for plain abuse of discretion should his decision be reversed." (quoting *In re Perlman, 116 F.2d 49, 50 (2d Cir. 1940)*); *In re Candelaria, 121 B.R. 140, 142 (E.D.N.Y. 1990)*. The order appealed from here involves an exercise of discretion rather than a controlling question of law; accordingly, the Court finds [*11] that it is not appealable under *section 1292(b)*.

#### B. Collateral Order Doctrine

A smaller number of district courts in the Second Circuit have applied the collateral order doctrine to decide whether to grant leave to appeal from an interlocutory order. *See, e.g., Alexander v. Bank of Woodstock, 248 B.R. 478 (S.D.N.Y. May 16, 2000)* (applying both *section 1292(b)* and the collateral order doctrine). [HN10] Under this doctrine, an appellate court may review an interlocutory order "that (1) conclusively determines a disputed question, (2) resolves an important issue completely separable from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." *In re Johns-Manville Corp., 824 F.2d 176, 180 (2d Cir. 1987)* (citing *Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949)*). A decision is not reviewable as a collateral order unless it satisfies all three of these requirements. *See Alexander, 248 B.R. at 483* (citing *United States v. Weiss, 7 F.3d 1088, 1089 (2d Cir. 1993)*).

The Bankruptcy Court's order to reopen was limited in scope to allow the Trustee to investigate [*12] the Property's reconveyance; the Bankruptcy Court did not conclusively determine whether the Property should have been administered as part of the Debtors' estate. Furthermore, as discussed above, the Bankruptcy Court's final judgment, incorporating its adjudication of the Debtors' affirmative defenses, will be reviewable on appeal; accordingly, the Court finds that the collateral order doctrine is not applicable.

### CONCLUSION

For the foregoing reasons, the Court finds that it does not have jurisdiction to hear the appeal; accordingly, the appeal is dismissed.

### SO ORDERED

FREDERIC BLOCK

Senior United States District Judge

Brooklyn, New York

August 29, 2006



3 of 132 DOCUMENTS

JOHN W. FINK, Appellant in No. 12-2229 v. EDGELINK, INC.; KAYDON A. STANZIONE;  IN RE: ADVANCED LOGIC SYSTEMS, INC., Debtor v. JOHN W. FINK, Appellant in No. 13-2100

Nos. 12-2229 and 13-2100

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*553 Fed. Appx. 189; 2014 U.S. App. LEXIS 1086*

November 6, 2013, Submitted Under Third Circuit L.A.R. 34.1(a)
January 21, 2014, Filed

**NOTICE:**   NOT PRECEDENTIAL OPINION UNDER THIRD CIRCUIT INTERNAL OPERATING PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT REGARDED AS PRECEDENTS WHICH BIND THE COURT.

PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [**1]
   On Appeal from the United States District Court for the District of New Jersey. (D.C. Civil Nos. 1-09-cv-05078 & 1-12-cv-04479). District Judge: Honorable Noel L. Hillman.
*In re Advanced Logic Sys., 2013 U.S. Dist. LEXIS 41687 (D.N.J., Mar. 25, 2013)*
*Fink v. EdgeLink, Inc., 2012 U.S. Dist. LEXIS 42656 (D.N.J., Mar. 27, 2012)*

**CASE SUMMARY:**

**OVERVIEW:** HOLDINGS: [1]-In a suit alleging breach of contact and other claims, the evidence did not support successor liability on the basis that the new company was a mere continuation of a bankrupt company because there was no direct evidence of a transfer of assets, the record did not show that the new company benefitted from the bankrupt company's intellectual property, which did not have any significant value, there was no continuity of operations or shared customers, and the new company, which was involved in unrelated research and development, had failed; there was also no evidence of any transfer of assets or any personal loans to the founder of the new company; [2]-In a consolidated case, the trustee did not abuse its discretion in declining to reopen the bankruptcy case under *11 U.S.C.S. § 350(b)* because there was no evidence of any undisclosed pre-petition assets.

**OUTCOME:** Decision affirmed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
[HN1] Appellate court review of a district court's grant of summary judgment is plenary.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
[HN2] A grant of summary judgment is appropriate where the movant establishes that there is no genuine

553 Fed. Appx. 189, *; 2014 U.S. App. LEXIS 1086, **1

dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a).*

*Mergers & Acquisitions Law > Liabilities & Rights of Successors > De Facto Mergers*
*Mergers & Acquisitions Law > Liabilities & Rights of Successors > Mere Continuation*
*Mergers & Acquisitions Law > Liabilities & Rights of Successors > Successor Liability Doctrine*
[HN3] The well-established rule under New Jersey law is that successor corporations are legally distinct from their predecessors and do not assume any of the debts or liabilities of the prior entity. There are, however, four recognized exceptions: where (1) the purchasing corporation expressly or impliedly agreed to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape responsibility for such debts and liabilities.

*Mergers & Acquisitions Law > Liabilities & Rights of Successors > Mere Continuation*
[HN4] Factors relevant to the "mere continuation" exception to the successor liability doctrine include continuity of ownership; continuity of management; continuity of personnel; continuity of physical location, assets and general business operations; and cessation of the prior business shortly after the new entity is formed. Also relevant is the extent to which the successor intended to incorporate the predecessor into its system with as much the same structure and operation as possible. Thus, a court should determine whether the purchaser holds itself out to the world as the effective continuation of the seller. Put differently, continuity exists where the successor becomes merely a "new hat" for the predecessor.

*Bankruptcy Law > Case Administration > Closings & Reopenings > General Overview*
*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Abuse of Discretion*
[HN5] Appellate courts review a bankruptcy court's decision whether to reopen a case pursuant to *11 U.S.C.S. § 350(b)* for abuse of discretion.

*Bankruptcy Law > Case Administration > Closings & Reopenings > Grounds for Reopening*
[HN6] Generally speaking, a bankruptcy court should not be expected to reopen a closed proceeding after the parties have had the normal opportunities to present evidence absent a special reason for permitting reopening. The belated discovery of undisclosed pre-petition assets, however, may provide good reason to reopen a bankruptcy case. The inquiry requires a balancing of the costs of such reopening with the expected benefits. In order for the denial of a motion to reopen to constitute an abuse of discretion, assets of such probability, administrability and substance must appear to exist as to make it unreasonable under all the circumstances for the court not to deal with them. Where the chance of any substantial recovery for creditors appears too remote to make the effort worth the risk, a trial court does not abuse its discretion in denying a motion to reopen.

COUNSEL: For JOHN W. FINK (12-2229), Plaintiff - Appellant: Edward R. Grossi, Esq., Monclair, NJ.

For EDGELINK INC (12-2229), Defendant - Appellee: Edward T. Fisher, Esq., White & Williams, Philadelphia, PA.

For KAYDON A. STANZIONE (12-2229), Defendant - Pro se Appellee: Gary M. Marek, Esq., Mount Laurel, NJ.

KAYDON A. STANZIONE (12-2229), Defendant - Pro se Appellee, Pro se, Sewell, NJ.

For In re: ADVANCED LOGIC SYSTEMS INC (13-2100), Debtor - Appellee: John D. Kutzler, Esq., Buzby & Kutzler, Philadelphia, PA.

For JOHN W. FINK (13-2100), Plaintiff - Appellant: Edward R. Grossi, Esq., Monclair, NJ.

JUDGES: Before: GREENAWAY, JR., VANASKIE and ROTH, Circuit Judges.

OPINION BY: VANASKIE

OPINION

[*190] VANASKIE, *Circuit Judge.*

Before us are consolidated appeals from cases in

553 Fed. Appx. 189, *190; 2014 U.S. App. LEXIS 1086, **1

which plaintiff-appellant John Fink attempts to recoup the benefits of a capital investment in Advanced Logic Systems, Inc. ("ALSI"), a now-defunct corporation which dissolved after filing for Chapter 7 bankruptcy in 2009. In Case No. 12-2229, Fink is suing EdgeLink, Inc., a company which he claims [**2] is a "mere continuation" of ALSI and thus responsible for ALSI's financial obligations to him. He also seeks relief from Kaydon Stanzione, the founder of both EdgeLink and ALSI. Fink appeals from the District Court's order granting summary judgment against him. In Case No. 13-2100, Fink seeks to reopen the ALSI bankruptcy on the theory that ALSI concealed assets from the trustee. He appeals from the District Court's order affirming the Bankruptcy Court's denial of his request to reopen. In both cases, we will affirm.

I.

We write primarily for the parties, who are familiar with the somewhat convoluted facts and procedural history of these cases. Accordingly, we set forth only those details necessary to our analysis.

In December 2000, Fink began working as a financial consultant for ALSI, a networking and telecommunications company founded by defendant Kaydon Stanzione. Through its website, ALSI offered the commercial use of "proprietary" communications technology with distinctive trademarks such as the "Alert Notification and Incident Command System (ANICS)," the "WorkQuick Campaign Manager," and something known simply as "Trinity." Prominent ALSI customers of record included the United [**3] States Coast Guard, Verizon, Sunoco, ADT Security Services, Inc., and Holt Logistics, Inc.

In 2001, Fink entered into a series of secured credit agreements with ALSI to loan approximately $830,000 in working capital to the company in return for stock purchasing options detailed in a "warrant agreement." Over the next three years, however, the financial condition of ALSI deteriorated. In March 2003, Fink filed suit against ALSI and Stanzione in New Jersey Superior Court, claiming breaches of the aforementioned credit agreements, as well as fraud. Fink claims that as of December 31, 2003, Stanzione had wrongfully granted over $125,000 in personal loans to himself from ALSI's coffers.

Fink contends that beginning in 2005, during the pendency of the state court litigation, Stanzione began a course of corporate maneuvering that resulted in the theft or fraudulent transfer of valuable ALSI assets, including existing contracts and intellectual property. That year, a company called Advanced Logic Services, Inc. ("ALServ") was incorporated in Nevada, with Stanzione's 85-year-old mother listed as the sole owner and officer. ALSI's accountant, Joseph Troupe, characterized ALServ as a pass-through [**4] entity created as a separate investment vehicle for potential business partners concerned with Fink's lawsuit against ALSI.

In 2007, the parties settled portions of the state court litigation, with ALSI agreeing to pay Fink roughly $1,000,000. In October 2008, however, having paid only about $524,000 to Fink, and with some of Fink's state court claims still pending, ALSI filed for Chapter 11 bankruptcy. Fink was listed as a secured creditor on ALSI's bankruptcy petition.

In January 2009, during the course of ALSI's bankruptcy proceeding, Stanzione [*191] founded the defendant company EdgeLink, Inc., a New Jersey corporation with the same listed business address as ALSI and ALServ. Gregory Cucchi, a former ALSI executive, was named EdgeLink's Chief Executive Officer, and Troupe, ALSI's former accountant, became EdgeLink's Chief Financial Officer. EdgeLink hired Stanzione as a consultant.

Fink bases most of his claims in both cases before us on the contention that EdgeLink was the recipient of valuable ALSI technology and customer relationships. He offers a May 2009 capture of a website, http://www.edgelinkinc.com, which describes a variety of "proprietary" telecommunications offerings from EdgeLink [**5] that are extremely similar to ALSI's former descriptions of its own trademarked products. Fink also points to the resume of a person named Michael Fisher, which states that Fisher did consulting work for "EdgeLink (formerly ALSI)." And Fink notes that even after ALSI had filed for bankruptcy, Stanzione continued to offer ALSI's products and services to certain clients, except that he did so while operating under the auspices of ALServ or EdgeLink. From the summer of 2007 to the summer of 2009, for instance, ALSI provided the ANICS system to a company known alternately as Holt Logistics, Inc. and Greenwich Terminal LLC. In June 2009, Stanzione told a Holt employee that he was switching companies to EdgeLink, Inc., and that Holt would have to

sign a new contract to continue receiving services similar to what ALSI had offered. Holt ultimately declined to sign the new contract, which offered 12 months of service for $1250, because of unacceptable service disruptions.

Defendants presented evidence to rebut Fink's assertion that EdgeLink owned or benefitted from ALSI's property and relationship. In affidavits, depositions, and answers to interrogatories, EdgeLink's principals describe a company [**6] that from its founding was a complete failure as a business venture. The company never sold, licensed, or leased any tangible or intangible assets, fell into debt almost immediately, and, as of March 2010, listed corporate assets consisting of only a single laptop computer. Gregory Cucchi testified at deposition that EdgeLink was primarily a research and development company, and that any product descriptions appearing on EdgeLink's purported website were merely draft language created by Stanzione for products under development. Cucchi stated by affidavit that EdgeLink was created to capitalize on "4G" technology that was not in existence during ALSI's operation, and as a result EdgeLink never received any asset or customer relationship from ALSI and never provided services to any former customer of ALSI. And further, defendants provided documents showing that at least some of the intellectual property used by ALSI was owned by either Stanzione or third parties, such that its use by EdgeLink would not have violated ALSI's rights in any event.

In March 2009, ALSI's bankruptcy was converted to Chapter 7. At the time of ALSI's final bankruptcy petition on April 7, 2009, after the company's [**7] financial situation had been investigated by the assigned trustee, ALSI's assets totaled $263,194, including $200,000 attributable to "patents, copyrights, and other intellectual property." On May 21, 2009, the trustee elected to abandon all ALSI assets, characterizing their value as highly speculative. ALServ, Stanzione's other corporation, was dissolved on June 29, 2009. The ALSI bankruptcy proceeding was formally closed on August 13, 2009 with no distributions to creditors.

In October 2009, Fink filed what is now Case No. 12-2229 in District Court. He [*192] seeks relief from EdgeLink for breach of contract under both the warrant agreement of 2001 (for which Fink requests roughly $58 million in damages) and the settlement agreement of 2007 (for which Fink seeks $2.6 million in damages). Both of these arrangements, as detailed above, were

entered into by Fink and ALSI--but not EdgeLink. Fink claims that EdgeLink is liable for these breaches because it is a successor in interest to, or a mere continuation of, ALSI. Fink also brings claims for unjust enrichment and statutory violations of New Jersey's Fraudulent Transfer Act, *N.J. Stat. Ann. 25:2-25 et seq.* Lastly, Fink claims that Stanzione [**8] breached the fiduciary duties he owed to Fink as a creditor of ALSI.

Between late 2009 and mid-2011, the parties engaged in extensive discovery and motion practice. During this time Fink retained several different attorneys and briefly represented himself. Defendants moved for summary judgment in June 2011, which the District Court granted in full in its order of March 27, 2012.

Also in March 2012, based on evidence obtained in discovery in our Case No. 12-2229, Fink filed what is now before us as Case No. 13-2100, in which he sought to reopen ALSI's bankruptcy to allow the trustee to investigate whether ALSI's principals had stolen, converted, or fraudulently transferred assets to ALServ, EdgeLink, or some other party. Fink predicates this claim in large part on a 2007 application submitted by ALSI to the New Jersey Economic Development Authority (the "NJEDA application"), which lists possession of intellectual property associated with ANICS, WorkQuick, and Trinity. The application also describes contracts from 2006 and 2007 with "GE," the "US Coast Guard Sector Delaware Bay," "ADT," and "a major political party." Fink also relies on a January 2007 ALSI "private placement memorandum" [**9] which describes 44.6 million shares of outstanding ALSI stock valued at $1.30 per share, for a total of $58.5 million. He compares this to the 17.9 million shares of stock listed on the company's bankruptcy petition. Lastly, Fink cites the aforementioned evidence regarding ALSI's purported continuation of its business relationships even after filing for bankruptcy.

The Bankruptcy Court refused to reopen the ALSI estate for several reasons. It noted, among other things, that: 1) Fink had provided no evidence that the alleged NJEDA assets still existed in 2008, at the time of the bankruptcy; 2) Fink had provided no evidence that those assets were fraudulently transferred before, during, or after the bankruptcy; 3) the alleged assets, even if extant and recoverable, were of highly speculative value, such that there was no guarantee they would cover the administrative costs of reopening or recoup value for unsecured creditors; and 4) the trustee had been made

aware of Fink's claims in 2009, before issuing his final report, and found the claims to be fruitless. In an order dated March 25, 2013, the District Court affirmed.

**II.**

In Case No. 12-2229, the first of the two matters in this consolidated [**10] appeal, the District Court had diversity jurisdiction under *28 U.S.C. § 1332*. We have jurisdiction under *28 U.S.C. § 1291*.

[HN1] Our review of a District Court's grant of summary judgment is plenary. *Klein v. Weidner, 729 F.3d 280, 283 (3d Cir. 2013)*. [HN2] A grant of summary judgment is appropriate where the movant establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*.

[*193] [HN3] The well-established rule under New Jersey law is that successor corporations are legally distinct from their predecessors and do not assume any of the debts or liabilities of the prior entity. *Ramirez v. Amsted Industries, Inc., 86 N.J. 332, 340, 431 A.2d 811 (1981)*. There are, however, four recognized exceptions: where (1) the purchasing corporation expressly or impliedly agreed to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape responsibility for such debts and liabilities. *Id. at 340-41*. Here, Fink claims that EdgeLink [**11] is a "mere continuation" of ALSI.

We have previously summarized New Jersey law pertaining to the "mere continuation" rule as follows:

[HN4] Factors relevant to the "mere continuation" exception include continuity of ownership; continuity of management; continuity of personnel; continuity of physical location, assets and general business operations; and cessation of the prior business shortly after the new entity is formed. Also relevant is the extent to which the successor intended "to incorporate [the predecessor] into its system with as much the same structure and operation as possible." Thus the court should determine whether "the purchaser

holds itself out to the world as the effective continuation of the seller."

*Marshak v. Treadwell, 595 F.3d 478, 490 (3d Cir. 2009)* (quoting *Bowen Engineering v. Estate of Reeve, 799 F. Supp. 467, 487-88 (D.N.J. 1992))*. Put differently, continuity exists where the successor becomes merely a "new hat" for the predecessor. *Woodrick v. Jack J. Burke Real Estate, Inc., 306 N.J. Super. 61, 74, 703 A.2d 306 (N.J. Super. Ct. App. Div. 1997)*.

In its well-reasoned analysis, the District Court concluded that Fink's evidence, even when viewed in the most favorable light, would [**12] not allow a jury to conclude that EdgeLink was a mere continuation of ALSI. Because Fink's claims of unjust enrichment and fraudulent transfer were also predicated upon the theory that ALSI directly or indirectly transferred assets to EdgeLink, the Court granted summary judgment on each of Fink's counts against EdgeLink.[1]

1 Fink claims that the District Court contradicted itself with the following sentence: "When, however, there [is] no transfer of assets from one company to another, it is no longer a concern that the company shifted assets to avoid liability." App. at 20. Fink regards the District Court as having found that a "shift of assets to avoid liability" may have occurred, but is irrelevant in the absence of a transfer. We think the better reading is that in the absence of a transfer, the Court no longer needed to worry about a shift of assets to avoid liability, because one rules out the other.

Fink acknowledges that he has no direct evidence of a transfer of assets such as cash, physical property, intellectual property, or confidential client lists. The parties dispute whether, under New Jersey law, a plaintiff must prove a transfer of assets as an essential element for the [**13] imposition of successor liability. *Compare Ramirez, 86 N.J. at 340-41* (discussing successor liability in terms of the "purchasing corporation" and the "seller"), *and Parsons Mfg. Co. v. Hamilton Ice Mfg. Co., 78 N.J.L. 309, 312, 73 A. 254 (N.J. 1909)* (stating that a corporation "having taken over the assets of the former company for the purpose of carrying on its business, without apparent change in the personnel of the concern, is liable for the payment of the debts of the former concern"), *with Marshak, 595 F.3d at 490* [*194] (arguably considering

553 Fed. Appx. 189, *194; 2014 U.S. App. LEXIS 1086, **13

transfer of assets as only one factor among many). We need not reach that question because we conclude that whether a transfer is a formal prerequisite for successor liability or merely one important factor among several, the record before us would not permit a rational factfinder to conclude that EdgeLink is a mere continuation of ALSI.

Fink urges the imposition of successor liability based on the following facts: 1) continuity in personnel; 2) continuity in physical location; 3) the 2007 NJEDA application of ALSI detailing certain intellectual property holdings and describing purported contracts from 2006 and 2007; 4) the aforementioned EdgeLink website [**14] bearing "customer testimonials" and technological offerings nearly identical to those of ALSI; 5) the resume of a former employee which asserts that he performed consulting work for "EdgeLink (formerly ALSI);" and 6) Stanzione's apparent offerings of ALSI's trademarked products and services even after the formal transition from ALSI to ALServ and EdgeLink.

Taken in a vacuum, some of these facts raise at least a question as to the relationship between ALSI and EdgeLink. But discovery in this case has closed and we review the facts against a more developed record. The evidence now includes a reckoning of the corporate histories and holdings of ALSI, ALServ, and EdgeLink. It further incorporates the results of ALSI's bankruptcy proceeding, along with interrogatories, affidavits, and deposition testimony from most of the relevant witnesses.

Crucially, we discern no evidence, from any of these myriad sources, of a benefit to EdgeLink that is even arguably attributable to ALSI's intellectual property. Despite Fink's repeated claims that some measure of such property was stolen, converted, or otherwise wrongfully transferred away from ALSI and into the possession of EdgeLink, he provides no [**15] evidence at all of patent filings, technological blueprints, or anything else substantive in this regard.[2] Instead he points only to vague references made on websites and in email exchanges to generic communications-related technology. Nor does Fink offer any basis for the purportedly significant value of this property. The bankruptcy trustee characterized the value of ALSI's intellectual property as "highly speculative" and ultimately worthless to the estate. And even if EdgeLink was at some time the beneficiary of valuable property, as of 2010, the company boasted a starkly negative cash

flow, no apparent income attributable to intellectual property, and minimal corporate assets.[3]

> 2  Indeed, the only hard evidence of intellectual property rights in the record consists of the contracts by which ALSI leased or was assigned such rights from Stanzione or third parties.
> 3  At best Edgelink stood to gain a single payment of $1250 if Holt had transferred its business from ALSI to EdgeLink (which it did not). That transaction, even if consummated, would hardly provide an equitable basis for exposing EdgeLink to Fink's claims against ALSI for over $60 million.

The record also fails to reveal a continuity [**16] of operations or transfer of confidential customer lists between the two companies. Fink provides no specific evidence that even a single customer in fact signed contracts with or made payments to both companies.[4] EdgeLink's principals instead offer uncontroverted testimony that the company was a total failure, and that its [*195] principal hope was in research and development of technology unrelated to ALSI's that simply never materialized. Nothing in the "diligent inquiry" performed by the bankruptcy trustee contradicts these claims.

> 4  We attribute scant probative value to the "customer testimonials" on EdgeLink's website. Certainly they do not allow the inference that EdgeLink in fact administered services or sold products to any particular ALSI customer.

In sum, we see no basis for the imposition of successor liability on these facts. There is no view of the record under which EdgeLink obtained benefits from ALSI such that it should also be held responsible for that company's liabilities.

Fink also seeks relief directly from Stanzione. In his complaint he alleges that Stanzione breached a fiduciary duty to Fink as a creditor of ALSI by transferring ALSI's assets without fair compensation [**17] and by failing to repay personal loans from the company in excess of $125,000. But for the reasons described above, we conclude that Fink has not submitted evidence that would allow a jury to find a transfer of valuable assets from ALSI. And Fink directs us to no evidence detailing personal loans from ALSI to Stanzione.

Fink has failed to offer specific facts that would allow a jury to return a verdict in his favor. Accordingly, we will affirm the District Court's order of March 27, 2012 insofar as it grants summary judgment in favor of EdgeLink and Stanzione on all claims.

## III.

Fink also appeals the District Court's decision affirming the Bankruptcy Court's denial of Fink's motion to reopen ALSI's bankruptcy. The District Court had jurisdiction over the matter under *28 U.S.C. § 158(a)*. We have jurisdiction under *28 U.S.C. § 158(d)(1)*. [HN5] We review a bankruptcy court's decision whether to reopen a case pursuant to *11 U.S.C. § 350(b)* for abuse of discretion. *Donaldson v. Bernstein, 104 F.3d 547, 551 (3d Cir. 1997)*.

[HN6] Generally speaking, a bankruptcy court "should not be expected to reopen a closed proceeding after the parties have had the normal opportunities to present evidence absent a special [**18] reason for permitting reopening." *In re Time Sales Fin. Corp., 474 F.2d 1197, 1201 (3d Cir. 1971)*. The belated discovery of undisclosed pre-petition assets, however, may provide good reason to reopen a bankruptcy case. *In re Atanasov, 221 B.R. 113, 116 (D.N.J. 1998)*. As noted by the United States Bankruptcy Appellate Panel of the Ninth Circuit, the inquiry requires a balancing of the costs of such reopening with the expected benefits:

> In order for the denial of a motion to reopen to constitute an abuse of discretion, assets of such probability, administrability and substance must appear to exist as to make it unreasonable under all the circumstances for the court not to deal with them. Where the chance of any substantial recovery for creditors appears too remote to make the effort worth the risk, a trial court does not abuse its discretion in denying a motion to reopen.

*In re Herzig, 96 B.R. 264, 266 (B.A.P. 9th Cir. 1989)* (internal citations and quotation marks omitted).

Here, Fink offers the 2007 NJEDA application of ALSI detailing certain intellectual property holdings and describing purported contracts from 2006 and 2007. He also relies on the 2007 ALSI "private placement memorandum" [**19] listing more outstanding shares of stock than the company disclosed on its bankruptcy petition, and on emails in which ALSI appeared to continue rendering services to its customers even after filing for bankruptcy.

ALSI's estate was scrutinized by the trustee in 2008 and 2009. The trustee found no evidence of any asset transfers by ALSI during or prior to its bankruptcy filing made for the purposes of defrauding its creditors. Nor did the trustee find that [*196] any other corporation, such as ALServ or EdgeLink, had agreed to assume any of ALSI's debts or obligations such that additional funds would be recoverable.

Our independent review of the record accords with the trustee's findings. Fink's claims of hidden assets predicated upon the NJEDA application and the stock offering are entirely speculative and offer little hope of additional recovery for the estate. Given that the company was essentially valueless at the time of its bankruptcy, resulting in no distribution to creditors whatsoever, we fail to see how the recovery of purported "missing stock" for a now-defunct corporation could benefit any party. And there is no evidence that ALSI's limited business dealings in the waning days of [**20] its bankruptcy filing were unknown to the trustee or that they resulted in substantial undisclosed income. We conclude that the Bankruptcy Court did not abuse its discretion in declining to reopen ALSI's estate.

## IV.

For the foregoing reasons, we will affirm the District Court's orders of March 28, 2012 and March 25, 2013.



IN RE: DUSTY A. MATHENY, d/b/a ELITE ROOFING AND SIDING, Debtor;
DUSTY A. MATHENY, Movant v. ERIE INSURANCE EXCHANGE, Respondent

Case No. 11-10130-TPA, Chapter 7

UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

*2014 Bankr. LEXIS 3456*

August 14, 2014, Decided

CASE SUMMARY:

**OVERVIEW:** HOLDINGS: [1]-Reopening a debtor's bankruptcy case was not warranted to determine whether an unlisted debt based on an intentional tort claim was discharged, since the creditor's action on the claim was pending and fairly far advanced in state court, and the state court could determine the dischargeability issue which did not appear to be particularly difficult; [2]-Reopening the case was warranted to allow the debtor to list an account receivable as an asset of the estate that was allegedly inadvertently omitted from the original schedule since the asset was a potential source of funds to make payments to creditors.

**OUTCOME:** Motion to reopen the bankruptcy case granted in part and denied in part.

LexisNexis(R) Headnotes

*Bankruptcy Law > Case Administration > Closings & Reopenings > Grounds for Reopening*
[HN1] See 11 U.S.C.S. § 350(b).

*Bankruptcy Law > Case Administration > Closings & Reopenings > Grounds for Reopening*

*Bankruptcy Law > Case Administration > Closings & Reopenings > Procedures for Reopening*
[HN2] A party moving to reopen a bankruptcy case has the burden of proof. The decision to reopen a case is within the sound discretion of the bankruptcy court. In exercising its discretion, the bankruptcy court is to give consideration as to whether similar proceedings are pending in a state court and determine which forum is the most appropriate to adjudicate the issues raised by the motion to reopen. The reopening of a case is a ministerial act that does not have any substantive independent effect. Rather, it provides a moving party with the opportunity to seek substantive relief. The moving party must ordinarily demonstrate that there is a compelling cause. However, a closed bankruptcy proceeding should not be reopened where it appears that to do so would be futile and a waste of judicial resources. In such an instance, no purpose would be served by reopening and, accordingly, there would be no cause to reopen.

*Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts > Unscheduled Debts*
[HN3] In a no-asset Chapter 7 bankruptcy case, debt is typically discharged pursuant to 11 U.S.C.S. § 727(b) even if it was not scheduled. An omitted creditor who would not have received anything even if he had been originally scheduled, has not been harmed by omission from the bankrupt's schedules and the lack of notice to file a proof of claim.

2014 Bankr. LEXIS 3456, *

*Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts > Unscheduled Debts*
[HN4] See *11 U.S.C.S. § 523(a)(3)(B)*.

*Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts > Unscheduled Debts*
[HN5] Under *11 U.S.C.S. § 523(a)(3)(B)*, if a debt falls within any of the intentional tort exceptions it will not be discharged in bankruptcy unless it was listed or scheduled in time to permit the creditor to receive notice of the deadline to file a complaint to determine the dischargeability of the debt, i.e., within 60 days of the meeting of creditors. *Fed. R. Bankr. P. 4007(c)*.

*Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts > Embezzlement & Fraud*
*Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts > Malicious & Reckless Behavior*
[HN6] *11 U.S.C.S. § 523(a)(2), (4), (6)* except from discharge in bankruptcy debts incurred by false pretenses, false representation, or actual fraud (*§ 523(a)(2)*), by fraud or defalcation while acting as a fiduciary (523(a)(4)), and by willful and malicious injury (*§ 523(a)(6)*).

*Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts > General Overview*
[HN7] If a debt is listed by a bankruptcy debtor, and if the creditor believes it should be excepted from discharge in bankruptcy because it was the product of an intentional tort, then it is up to the creditor to take the initiative to seek such a determination, and it is the exclusive province of the bankruptcy court to make that determination. *11 U.S.C.S. § 523(c)(1)*.

*Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts > General Overview*
*Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts > Unscheduled Debts*
[HN8] Once a bankruptcy debtor fails to list a debt and the time for filing a dischargeability action has expired under *Fed. R. Bankr. P. 4007(c)*, thereby triggering *11 U.S.C.S. § 523(a)(3)(B)*, the bankruptcy court no longer has exclusive jurisdiction of the nondischargeability determination and such determination can also be made

in a state court.

*Bankruptcy Law > Case Administration > Closings & Reopenings > Procedures for Reopening*
[HN9] While there is no absolute deadline for filing a motion to reopen a bankruptcy case, laches can be a valid ground for a bankruptcy court denying such a motion.

COUNSEL: [*1] For Erie Insurance Exchange, Respondent: Kyle Tice McGee, Margolis Edelstein, Pittsburgh PA.

For Dusty A. Matheney, Debtor: Daniel P. Foster, Foster Law Offices, Meadville PA; Michael E. Hughes, Michael Hughes & Associates LLC, Pittsburgh PA.

Trustee: Richard W. Roeder, Roeder & Jones, Titusville PA.

JUDGES: Thomas P. Agresti, United States Bankruptcy Judge.

OPINION BY: Thomas P. Agresti

OPINION

Related to Doc. No. 28

## MEMORANDUM ORDER

Presently before the Court is the ***Amended Motion to Reopen Bankruptcy Case*** ("Motion") filed by the Debtor at Doc. No. 28. The *Motion* is opposed by Respondent, Erie Insurance Exchange ("Erie"). The Parties have briefed the issues raised by the *Motion* and on July 28, 2014, the Court heard oral argument on the matter. For the reasons that follow, the *Motion* will be granted in part and denied in part.

## *BACKGROUND*

The case was filed on January 25, 2011, as a Chapter 7 at which time a trustee was appointed. The Trustee filed a report of no distribution on March 29, 2011. The discharge order and final decree were entered on June 1, 2011, and the case was closed that same date. There was no further activity in the case until April 30, 2014, when the Debtor filed the *Motion*. The Debtor is seeking to [*2] reopen the case so he can file an amended Schedule F adding Erie as a creditor so that any debt he owes to Erie can be found to have been discharged. Upon reopening,

the Debtor also seeks to file an amended Schedule B to list an account receivable of $13,323.34 as an asset of the estate that he says was "inadvertently omitted" from the original Schedule B.

Prior to the filing of the bankruptcy the Debtor was the sole proprietor owner of a company called Elite Roofing. On October 23, 2008, the Debtor entered into a contract with 31st Street Business Park, LLC ("31st Street") to perform certain roofing work on an old industrial building located in Pittsburgh ("the Property") that was owned by 31st Street. Erie provided insurance on the Property, which was being rehabilitated for use as a movie studio. On the morning of Sunday, May 3, 2009, one of the owners of 31st Street, Brian Kowalski, happened to stop by the Property and discovered the Debtor and two of his employees in the process of cutting copper wire from the ceiling area of the building. Brian Kowalski called his father, David Kowalski, the other owner of 31st Street, to report the incident.

The Kowalskis suspected theft and the [*3] next day contacted the police. On May 11, 2009, the Debtor and his two employees were charged with theft by unlawful taking, criminal mischief, and criminal conspiracy. One of the employees pleaded guilty, but the Debtor and the other employee went to trial in December 2009. The Debtor testified that he was removing the wire for safety reasons, and that he thought he had the approval of David Kowalski to do that. The Debtor and the remaining employee were both acquitted in the criminal case on December 21, 2009.[1]

> 1    The acquittal is not dispositive on a dischargeability issue because the burden of proof in the criminal case was beyond a reasonable doubt, whereas for purposes of dischargeability the burden is only by a preponderance. *See, In re Henton, 2014 Bankr. LEXIS 624, 2014 WL 585307 footnote 2 (W.D. Pa. 2014). See also In re Dietz, 2011 Bankr. LEXIS 5563, 2011 WL 10637551 (Bankr. E.D. Cal. 2011)* (acquittal in criminal case was not relevant to determination of dischargeability of a debt).

Sometime prior to the criminal trial, 31st Street filed a damage claim with Erie over missing copper wire and eventually negotiated a settlement in the amount of approximately $780,000, leaving Erie with a right of subrogation against the Debtor. Based on that right of subrogation, on October 23, 2010 Erie filed a civil action

against the Debtor in the [*4] Allegheny County Court of Common Pleas ("the State Action") by writ of summons.

As indicated above, the Debtor filed this bankruptcy case on January 25, 2011. At that point, the Debtor had not yet been served with the writ of summons in the State Action, such service not occurring until March 23, 2011. Erie was not named as a creditor in the bankruptcy petition and the Debtor did not take any steps to add Erie or 31st Street as a creditor after he was served with the writ of summons. On June 1, 2011, a discharge order was entered and the bankruptcy case was closed as a no-asset case.

On March 2, 2012, Erie filed a complaint in the State Action, alleging claims of conversion, breach of contract and civil conspiracy against the Debtor related to the copper wire. On March 26, 2012 the Debtor filed an answer, new matter and counterclaim in the State Action. The counterclaim alleged that the Debtor was still owed money for his work on the Property. The Debtor did not raise a defense of discharge in bankruptcy as to any of the claims asserted by Erie. The State Action has proceeded, albeit at a somewhat slow pace, and remains pending. Following the closing of the bankruptcy case, no further [*5] activity took place in this Court until the original version of the *Motion* was filed on April 30, 2014.

## DISCUSSION

The *Motion* was filed pursuant to *11 U.S.C. §350(b)*, which provides:

> [HN1] (b) A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause.

Chief Judge Jeffery A. Deller of this Court recently summarized the applicable law to be applied in deciding a motion to reopen, stating:

> [HN2] The party moving to reopen the case has the burden of proof .... The decision to reopen a case is within the sound discretion of the Court .... In exercising its discretion, a bankruptcy court is to give consideration as to whether similar proceedings are pending in a state court and determine which forum is the most appropriate to adjudicate the issues raised by the motion to reopen ....

The reopening of a case is a ministerial act that does not have any substantive independent effect .... Rather, it provides a moving party with the opportunity to seek substantive relief .... The moving party must ordinarily demonstrate that there is a compelling cause .... However, "a closed bankruptcy proceeding should not be reopened where it appears that to do [*6] so would be futile and a waste of judicial resources."....
In such an instance, no purpose would be served by reopening and, accordingly, there would be no cause to reopen.

*In re Scheib, 2014 Bankr. LEXIS 3084, 2014 WL 3571010 *3 (Bankr. W.D. Pa. July 18, 2014)* (citations omitted).

As previously noted, the "substantive relief" that the Debtor ultimately seeks to accomplish by getting the case reopened is two-fold. The primary reason appears to be so that he may add Erie as a creditor on his Schedule F. The ultimate purpose for doing so would be to ensure that any debt he might owe to Erie has been discharged. Such relief is necessary because the Debtor's potential debt to Erie was not previously listed or scheduled.

[HN3] In a no-asset Chapter 7 case, such as the present one, debt is typically discharged pursuant to *11 U.S.C. §727(b)* even if it was not scheduled. *See, Judd v. Wolfe (In re Judd), 78 F.3d 110, 114 (3rd Cir. 1996).* That is because

> [a]n omitted creditor who would not have received anything even if he had been originally scheduled, has not been harmed by omission from the bankrupt's schedules and the lack of notice to file a proof of claim.

*Id. at 115.* However, the *Judd* court also recognized that an exception to this general rule is created for debt that was incurred as a result of "intentional tort." This results from the operation of *11 U.S.C. §523(a)(3)(B),* which provides:

> [HN4] (a) [*7] A discharge under *section 727, 1141, 1228(a), 1228(b),* or *1328(b)* of this title does not discharge an individual debtor from any debt--

...

> (3) neither listed nor scheduled under section 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit--

...

> (B)  if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection,[2] timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request; ....

[HN5] Thus, under *Section 523(a)(3)(B),* if a debt falls within any of these intentional tort exceptions it will not

be discharged unless it was listed or scheduled in time to permit the creditor to receive notice of the deadline to file a complaint to determine the dischargeability of the debt, i.e., within 60 days of the meeting of creditors. *See Fed.R.Bankr.P. 4007(c)*. As there was no debt to Erie listed in the present case, *Section 523(a)(3)(B)* is directly implicated.

    2    The *"paragraph (2), (4), or (6)* of this subsection" language refers to *11 U.S.C.§§523(a)(2), 523(a)(4),* and *523(a)(6)*. [HN6] These provisions except from discharge debts incurred by "false pretenses, false representation or actual fraud" (*§523(a)(2)*), by"fraud or defalcation while acting [*8] as a fiduciary" (*§523(a)(4)*), and by "willful and malicious injury" (*§523(a)(6)*).

    The procedure to be followed in such circumstances presents something of a conundrum. [HN7] If a debt is listed, and if the creditor believes it should be excepted from discharge because it was the product of an intentional tort, then it is up to the creditor to take the initiative to seek such a determination, and it is the exclusive province of the bankruptcy court to make that determination. *See, 11 U.S.C. §523(c)(1)*. But if a debt has not been listed in a no-asset chapter 7 case, how is one to know whether it is of the type that was not discharged under *Section 523(a)(3)(B)*? Neither the *Bankruptcy Code* nor the *Rules* specify how the determination is to be made in those circumstances as to whether a debt is of the kind specified in *Section 523(a)(2), (4)* or *(6)*, and therefore excepted from discharge. Must the determination still be made exclusively by the bankruptcy court, in which case the *Motion* would have to be granted, or may another court, for example the court in the State Action, make that determination?

    The Debtor argues that bankruptcy court exclusivity still applies in these circumstances. He relies on *In re Padilla, 84 B.R. 194 (Bankr. D. Col. 1987),* where the debtors in a closed no-asset chapter 7 case moved to reopen to add [*9] two unsecured creditors to their schedules, and the court held as follows:

    *11 U.S.C. § 350(b)* provides that the Court may reopen a case "to accord relief to the debtor, or for other cause". In a no-asset Chapter 7 case there would be no

purpose served by reopening a case to allow a debtor to add an omitted creditor to his schedules unless that debt falls under *§§ 523(a)(2), (4),* or *(6)*. If it is not a debt under *§§ 523(a)(2), (4),* or *(6)*, it is discharged whether or not it was listed. If it is a debt under *§§ 523(a)(2), (4),* or *(6)* it is not discharged by reason of *§ 523(a)(3)(B)*. But this Court will not know which type of debt it is unless the case is reopened and the omitted creditor is given an opportunity to prove that the debt falls under *§§ 523(a)(2), (4),* or *(6)*. And because the Bankruptcy Court has exclusive jurisdiction to make that determination, there is "cause" under *§ 350(b)* to reopen no-asset Chapter 7 cases, on motion of either the debtor or the omitted creditor so that such a determination can be made.

*84 B.R. at 197.*

    *Padilla*, however, represents the minority view.[3] The majority view, and the "better" one according to *Collier on Bankruptcy, see ¶523.09[3][b],* is that [HN8] once a debtor fails to list a debt and the time for filing a dischargeability action has expired under *Rule 4007(c),* thereby triggering *Section 523(a)(3)(B),* the [*10] bankruptcy court no longer has exclusive jurisdiction of the nondischargeability determination and such determination can also be made in a state court.

    3   *Padilla* has also been rejected by another judge of the same court. *See, In re Manning, 2012 Bankr. LEXIS 2793, 2012 WL 2328236 (Bankr. D. Col. June 19, 2012)*.

    A representative decision espousing the majority view is *In re Strano, 248 B.R. 493 (Bankr. D. N.J. 2000),* where the overall conclusion of the court was as follows:

    ... this court concludes that while the bankruptcy court is the forum of choice because of its expertise on dischargeability issues, it is not the exclusive forum in which the dischargeability of an intentional tort debt must be litigated. Rather, bankruptcy courts share jurisdiction with other courts to determine

2014 Bankr. LEXIS 3456, *10

whether a "debt is of a kind specified in paragraph (2), (4), or (6) of this subsection [523(a)]." *§ 523(a)(3)(B)*. The bankruptcy court's decision to accept jurisdiction to determine the dischargeability of unscheduled, intentional tort debts is discretionary, entailing a case by case analysis, similar to that used in discretionary abstention where jurisdiction is shared with other courts.

*248 B.R. at 495-96*. The *Strano* court reached this result by noting that *Section 523(c)(1)*, the provision discussed above that generally confers exclusive jurisdiction on bankruptcy courts to determine dischargeability of [*11] intentional tort debts, contains an exception for unscheduled, intentional tort debts.[4] The *Strano* court quoted the following with approval:

> *Section 523(c)*, by its own terms, does not apply to *Section 523(a)(3)(B)* claims. Therefore, the exclusive jurisdiction provisions of *Section 523(c)* are not applicable to the issue of dischargeability under *Section 523(a)(3)(B)*. The time limitation of *Bankruptcy Rule 4007(c)* is also inapplicable, since that Rule applies only to complaints under *Section 523(c)*, not to complaints under *Section 523(a)(3)(B)*. In effect, a debtor who failed to list a creditor loses the jurisdictional and time-limit protections of *Sections 523(c)* and *Rule 4007(b)* [sic, should be *4007(c)*] with respect to that creditor.

*248 B.R. at 501-502* (quoting *In re Mendiola, 99 B.R. 864, 868 (Bankr. N.D. Ill. 1989))*. The end result is that :

> ... a debtor who fails to schedule an intentional tort debt before the bar date loses the benefit of both the bar date and the exclusive jurisdiction of the bankruptcy court. Although Congress sought to protect debtors from abuse by harassing creditors when it gave bankruptcy courts exclusive jurisdiction over intentional tort debts in 1970, that protection is reserved for debtors who schedule such debts.

*Id. at 502*. For other cases adopting the majority view that state courts have concurrent jurisdiction to make a

dischargeability determination with respect to non-scheduled debts, [*12] *see Casey v. Abdelrahman, 323 B.R. 834 (S.D.N.Y. 2005)*, *In re Milburn, 218 B.R. 862 (Bankr. W.D. Ky. 1998)*, *In re Toussaint, 259 B.R. 96 (Bankr. E.D. N.C. 2000)*, *In re Gustin, 343 B.R. 909 (Bankr. W.D. Wisc. 2005)*.

> 4 *Section 523(c)(1)* provides: *Except as provided in subsection (a)(3)(B) of this section*, the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), or (6) of subsection (a) of this section, unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), or (6), as the case may be, of subsection (a) of this section. [*Emphasis added*].

The Court finds the majority view persuasive and adopts it. The question then becomes whether the Court should grant the *Motion* and reopen the case for the purpose of deciding the dischargeability issue, or deny the *Motion* and defer to the already-ongoing State Action. For a number of reasons, the Court will follow the latter approach. First, the Court is familiar with the court in which the State Action is pending and is confident that the Parties will receive a fair hearing there. Second, even though the Debtor has somewhat inexplicably never pleaded discharge in bankruptcy as an affirmative defense in his answer in the State Action, as he would be required to do under the Pennsylvania Rules of Civil Procedure if he wished to preserve such defense, at oral argument on the *Motion* Counsel for Erie represented [*13] that Erie would not oppose a motion by the Debtor to amend to add such defense. The dischargeability issue can thus be heard in the State Action.

A third reason for deferring to the State Action is that answering the question of whether any debt that the Debtor might be found to owe Erie falls under one of the *Section 523(a)* intentional tort exceptions does not appear particularly difficult. It seems fairly clear that if any liability on the conversion or civil conspiracy claims is found to exist in the State Action it would fall directly within the intentional tort exceptions of *Section 523(a)*. Furthermore, even though the third claim in the State Action is entitled as "one in breach of contract," Counsel for Erie acknowledged at the oral argument that its claim is based solely on the allegation that Matheny wilfully and wrongly took copper from the Property, thereby

violating the contract as well. Any liability found on this breach of contract claim would thus likely implicate the intentional tort exception. *See, e.g., In re Singh, 2012 Bankr. LEXIS 1310, 2012 WL 993782 (Bankr. D. N.J. 2012)* (although *Section 523(a)(6)* generally applies to torts rather than contracts and an intentional breach of contract will not give rise to a non-dischargeable debt, where an intentional breach of contract is accompanied [*14] by tortious conduct which results in willful and malicious injury, the resulting debt is excepted from discharge under *Section 523(a)(6)*). In short, the determination of liability in the State Action appears to be coextensive with the dischargeability determination.

A fourth reason for the Court's decision is the length of time that the State Action has been ongoing. While the pace of that action does seem to have been somewhat slow, it is nevertheless fairly far advanced and it makes little sense to restart the whole process in this Court. A fifth factor concerns the long delay that occurred before the Debtor filed his *Motion*. [HN9] While there is no absolute deadline for filing a motion to reopen, laches can be a valid ground for a court denying such a motion. *See, e.g., In re Am. Remanufacturers, Inc., 439 B.R. 633, 636 (Bankr. D. Del. 2010)*. The Court does not find that the Debtor here is absolutely barred by laches from filing the *Motion*, but the lengthy delay does at least weigh against a grant of the *Motion*.

Finally, although the Court is deferring to the State Action at this time, that does not necessarily preclude the Court from revisiting the issue in the future. In particular, if the State Court were to determine that the Debtor is liable to Erie, and that the debt [*15] was not discharged by the bankruptcy, the Court could potentially void such judgment pursuant to *11 U.S.C. §524(a)(1)*, though it would not anticipate taking such step absent exceptional circumstances. *See, e.g., In re Keenom, 231 B.R. 116 (Bankr. M.D. Ga. 1999)* ( court found that under *Section 524(a)(1)* it would have the power to void a state court finding of non-dischargeability that was "clearly erroneous").

The second ground upon which the Debtor is seeking to reopen the case is so he can add an account receivable to his Schedule B. This appears to relate to a counterclaim he filed in the State Action pursuant to which he is seeking to recover the amount of $13,323.34 that he claims is still owed to him on the contract with 31st Street. It is unclear whether this counterclaim has

any merit or not, but if it does it could potentially be a source of funds to make payments to the creditors of the Debtor. The Court will exercise its discretion and grant the *Motion* for the limited purpose of allowing the Debtor to amend his Schedule B. *See, e.g., Matter of Mesta Mach. Co., 67 B.R. 147 (Bankr. W.D. Pa. 1985)* (reopening case for limited purpose). The Trustee will be given an opportunity to determine whether he would like to keep the case open so that he can administer the asset, move to abandon it, or move to allow the Debtor to continue [*16] pursuing the counterclaim while keeping the Trustee informed so that the Trustee can make a determination whether to seek a further reopening of the case to administer the asset.

*AND NOW*, this *14th* day of *August, 2014,* for the reasons stated above and on the record at the time of the oral argument, it is *ORDERED, ADJUDGED* and *DECREED* that,

(1) The *Amended Motion to Reopen Bankruptcy Case* is *DENIED in part* with respect to the request to reopen the case for the purpose of filing an amended Schedule F adding Erie Insurance Exchange as a creditor in the case.

(2) The *Amended Motion to Reopen Bankruptcy Case* is *GRANTED in part* with respect to the request to reopen the case for the limited purpose of filing an amended Schedule B adding an account receivable in the amount of $13,323.34.

(3) The case is reopened for the limited purpose as set forth in Paragraph 2 above, and if the Debtor wishes to file an amended Schedule B, he shall do so *on or before September 2, 2014,* or the case will be re-closed effective September 3, 2014 without further Order.

(4) If the Debtor does timely file an amended Schedule B, then the United States Trustee is directed to *forthwith* take whatever action is appropriate [*17] to re-appoint a Chapter 7 Trustee. Thereafter, *on or before September 23, 2014,* in addition to his other statutory duties, the Chapter 7 Trustee shall either: file a notice indicating that he wishes the case to remain open so that he may administer the new asset; file a motion to abandon the new asset and close the case; or, file a motion to close the case but allow the Debtor to continue pursuing the counterclaim while keeping the Trustee apprised of the status so the Trustee can make a determination whether to seek a further reopening of the

2014 Bankr. LEXIS 3456, *17

case to administer the asset.                          Thomas P. Agresti, Judge

  /s/ Thomas P. Agresti                          United States Bankruptcy Court



IN RE: CYRUS MEAD IV, DEBTOR

CASE NO. 10-09630-8-SWH

UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF
NORTH CAROLINA, RALEIGH DIVISION

*2012 Bankr. LEXIS 714; Bankr. L. Rep. (CCH) P82,209*

February 24, 2012, Decided
February 24, 2012, Filed, Entered

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The matter before the court was the chapter 7 debtor's motion to reopen the bankruptcy case and for the court to find a creditor, his former fiancee, in contempt for violating the discharge injunction by reinstating her federal lawsuit against him in Illinois after the discharge injunction was imposed and his case was closed.

**OVERVIEW:** The creditor argued that her motion in district court did not violate the discharge injunction because she had an equitable claim to a property, and the discharge injunction in *11 U.S.C.S. § 524* did not bar in rem proceedings. The court stated that *11 U.S.C.S. § 350(b)* permitted a bankruptcy court to reopen a case which had been closed in order to administer assets, accord relief to the debtor, or for other cause. The court was satisfied that it was appropriate to reopen debtor's closed case for the limited purpose of giving him the opportunity to present his claim. Next, out of the five elements to be proven to establish civil contempt, the only two elements in controversy were whether there was a violation of the discharge injunction, and whether that violation was willful. The court found that because the creditor brought the action directly against debtor and sought affirmative monetary relief in addition to specific performance, she violated the discharge. The

reinstatement of the Illinois Lawsuit also constituted a willful violation of the discharge injunction. As for damages, debtor's attorneys provided the court with invoices totaling $4,469 related to the contempt motion.

**OUTCOME:** Debtor's motion to reopen the case was allowed. The court found the creditor in contempt of the discharge injunction and sanctioned her for violation of the discharge injunction in the amount of $4,469.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Case Administration > Closings & Reopenings > Grounds for Reopening*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN1] *11 U.S.C.S. § 350(b)* of the Bankruptcy Code permits a bankruptcy court to reopen a case which has been closed in order to administer assets, accord relief to the debtor, or for other cause. *11 U.S.C.S. § 350(b)*. The decision to reopen a closed case is within the court's discretion and depends upon the circumstances of the particular case. To establish grounds for a motion to reopen a case, the moving party bears the burden of proof.

2012 Bankr. LEXIS 714, *; Bankr. L. Rep. (CCH) P82,209

*Bankruptcy Law > Case Administration > Court Powers*
*Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection*
[HN2] The discharge injunction set forth in *11 U.S.C.S. § 524* operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not such debt is waived. *11 U.S.C.S. § 524(a)(2)*. A violation of the discharge injunction may be redressed by a bankruptcy court under its civil contempt power. *11 U.S.C.S. § 105(a)*. Discharge is a Bankruptcy Court order, and as such, most courts treat its violation as civil contempt. Although *§ 524* does not explicitly authorize monetary damages for violation of a discharge injunction, the court may award actual damages pursuant to the statutory contempt powers set forth in *§ 105*.

*Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection*
*Civil Procedure > Sanctions > Contempt > Civil Contempt*
*Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof*
[HN3] The U.S. Court of Appeals for the Fourth Circuit has articulated the standard to establish civil contempt in Ashcraft as follows: (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's "favor"; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result. Each of these elements must be established by clear and convincing evidence. In addition to the four Ashcraft factors, bankruptcy courts in the Fourth Circuit have increasingly looked to whether a creditor's violation of the discharge injunction was willful. While it is not clear that willfulness is an element to contempt required in the Fourth Circuit, the rule established in the Eleventh Circuit in In re Hardy has found increasing acceptance by other courts, including courts in the Fourth Circuit.

*Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection*
*Civil Procedure > Remedies > Injunctions > Contempt*
*Evidence > Procedural Considerations > Burdens of Proof > Preponderance of Evidence*
[HN4] Pursuant to Hardy and the decisions that follow it,

the burden of proving that a creditor's violation was "willful" can be met by a showing that the creditors knew that the discharge injunction was invoked and intended the act which violated the injunction. In contrast to the standard for civil contempt, a willful violation of the discharge injunction must be proven by the lower preponderance of the evidence standard.

*Bankruptcy Law > Claims > Types > Definitions*
*Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Rem Actions > General Overview*
[HN5] A bankruptcy discharge, of course, extinguishes the personal liability of the debtor with respect to any debt. *11 U.S.C.S. § 524(a)(1)*. The Bankruptcy Code defines "debt" as a liability on a claim. *11 U.S.C.S. § 101(12)*. The Code defines "claim" as a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. *11 U.S.C.S. § 101(5)*. Therefore, a discharge extinguishes the debtor's personal liability on his creditor's claims. However, a discharge does not extinguish a creditor's right to seek a claim in rem.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Rem Actions > General Overview*
[HN6] Illinois law states that an action in rem is considered to be taken directly against property or brought to enforce a right in the thing itself.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Rem Actions > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > General Overview*
[HN7] Illinois law focuses on the requirement of personal service of process in distinguishing between in rem and in personam proceedings. In a proceeding strictly in rem, no notice is required to be given; that in such a proceeding seizure of the res, or what is regarded as equivalent to seizure, is essential, and sufficient constructive notice. For example, suits to enforce liens or contracts relating to property, may be regarded as proceedings in rem, so far as they affect property in this

2012 Bankr. LEXIS 714, *; Bankr. L. Rep. (CCH) P82,209

state.

*Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Rem Actions > General Overview*
[HN8] The fact that a creditor could have brought a proceeding strictly in rem without violating the discharge injunction does not mean that she can also seek legal remedies against the debtor without violating the injunction.

*Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection*
[HN9] In the context of willfulness of a discharge injunction violation, willfulness is proven by showing creditor knew the discharge injunction was invoked and intended the act which violated the injunction.

*Bankruptcy Law > Case Administration > Court Powers*
*Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection*
[HN10] A bankruptcy court has not only the inherent authority to enforce its orders, but also the statutory authority, under *11 U.S.C.S. § 105(a)*, to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. This authority encompasses the court's ability to impose sanctions as a consequence of violating the discharge injunction. Thus, while *11 U.S.C.S. § 524* does not explicitly authorize an award of monetary damages for violation of the discharge injunction, damages for those violations may be awarded under *§ 105(a)*. Such sanctions may include actual damages, attorney's fees and, when appropriate, punitive damages. Awarding punitive damages requires some sort of egregious conduct, malevolent intent, or clear disregard of the bankruptcy laws.

COUNSEL: [*1] For Cyrus Mead, IV, Debtor: Justine S. O'Connor-Petts, Janvier Law Firm, Raleigh, NC; Samantha Y. Moore, William P Janvier, Janvier Law Firm, PLLC, Raleigh, NC.

For Holmes P Harden, Trustee: Holmes P Harden, Williams Mullen, A Professional Corporation, Raleigh, NC.

JUDGES: Stephani W. Humrickhouse, United States Bankruptcy Judge.

OPINION BY: Stephani W. Humrickhouse

OPINION

**ORDER REOPENING CASE, FINDING CONTEMPT OF DISCHARGE INJUNCTION, AND IMPOSING SANCTIONS**

The matter before the court is the chapter 7 debtor's motion to reopen the bankruptcy case and for the court to find Madeleine M. Ward in contempt for violating the discharge injunction by reinstating her federal lawsuit against the debtor in Illinois after the discharge injunction was imposed and his case closed. A hearing took place in Raleigh, North Carolina, on January 4, 2012. At the conclusion of the hearing, the court announced that it would take the matter under advisement. The court requested that counsel provide it with supplemental briefs on the effect of the discharge injunction on *in rem* and *in personam* claims, and both parties have done so.

Background

The debtor filed a petition for relief under chapter 7 of the Bankruptcy Code on November 22, 2010. [*2] Ms. Ward, the debtor's former fianciï¿½e, was included on Schedule F as a creditor with a disputed claim in an unknown amount. The statement of financial affairs listed a pending civil lawsuit brought by Ms. Ward against the debtor in the United States District Court for the Northern District of Illinois, Eastern Division. The civil proceeding, Ward v. Mead, (Case No. 08-5581) (hereinafter referred to as the "Illinois Lawsuit"), was filed by Ms. Ward in 2008, and was dismissed on July 26, 2011 without prejudice.

The Illinois lawsuit arose in the context of a property dispute in the state of Illinois. Ms. Ward owned a home in Naperville, Illinois for several years, but in 2005, her ownership was contested in Illinois state court by a third-party. In order to settle the dispute, the debtor purchased the third-party's interest in the home, and Ms. Ward relinquished her claim in the home at that time to allow him to acquire free and clear title. The debtor agreed that the home would be re-titled in Ms. Ward's name if he died or their relationship ended, and a written agreement containing those terms dated May 13, 2005,

2012 Bankr. LEXIS 714, *2; Bankr. L. Rep. (CCH) P82,209

was filed with the registrar of deeds in Illinois. The written agreement [*3] did not contain any provisions detailing how the reconveyance was to be accomplished. The relationship between the debtor and Ms Ward ended and she initially filed the Illinois Lawsuit to enforce the agreement. Ms. Ward sought five forms of relief in the Illinois Lawsuit: Count I sought specific performance of the written agreement; Count II sought recovery against the debtor for breach of contract; and Counts III through V sought claims against the debtor for conversion of specific items of personal property of significant value that Ms. Ward claimed to own.

During the debtor's chapter 7 bankruptcy, on April 4, 2011, Ms. Ward filed an adversary proceeding against the debtor, seeking denial of the debtor's discharge for his alleged failure to disclose transfers of money that occurred within one year of the petition. Ms. Ward's attorney was allowed to withdraw from the adversary proceeding on July 26, 2011, the complaint was dismissed on August 11, 2011, and the adversary proceeding was closed on August 26, 2011. The debtor received his discharge on April 12, 2011, and his chapter 7 case was closed on August 29, 2011.

On September 16, 2011, Ms. Ward filed a *pro se* motion in the Illinois [*4] district court to reinstate the Illinois Lawsuit. The Illinois district court denied Ms. Ward's motion to reinstate her lawsuit on October 4, 2011. On October 5, 2011, the debtor filed this motion to reopen his chapter 7 case and to hold Ms. Ward in contempt of the discharge injunction. The debtor contends that Ms. Ward's filing of her motion to reinstate the Illinois Lawsuit was a willful violation of the injunction that arose as a result of the debtor's discharge in bankruptcy. Ms. Ward counters that her motion in district court did not violate the discharge injunction because she had an equitable claim to the property, and the discharge injunction does not bar *in rem* proceedings.

### Discussion

I. Motion to Reopen the Case

[HN1] *Section 350(b) of the Bankruptcy Code* permits a bankruptcy court to reopen a case which has been closed in order to administer assets, accord relief to the debtor, or for other cause. *11 U.S.C. § 350(b)*. The decision to reopen a closed case is within the court's discretion and depends upon the circumstances of the particular case. *Hawkins v. Landmark Fin. Co. (In re*

*Hawkins), 727 F.2d 324, 326 (4th Cir. 1984)*. To establish grounds for a motion to reopen a case, the moving [*5] party bears the burden of proof. *In re Lee, 356 B.R. 177, 180 (Bankr. N.D. W. Va. 2006)* (citing *In re Cloninger, 209 B.R. 125, 126 (Bankr. E.D. Ark. 1997)*. The court is satisfied that it is appropriate to **reopen** the debtor's closed case for the **limited** purpose of giving the debtor the opportunity to present his claim that Ms. Ward violated the discharge injunction by seeking to reinstate the Illinois Lawsuit against him. E.g., *In re Schneider, 126 B.R. 626, 628 (Bankr. M.D. Fla. 1991)* (court allowed debtor to reopen a closed chapter 7 case for the purpose of considering debtor's motion for a finding of contempt against a creditor who filed suit in state court after discharge).

II. Civil Contempt

[HN2] The discharge injunction set forth in *11 U.S.C. § 524* "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not such debt is waived." *11 U.S.C. § 524(a)(2)*. A violation of the discharge injunction may be redressed by a bankruptcy court under its civil contempt power. *11 U.S.C. § 105(a)*; *In re Bock, 297 B.R. 22, 29 (Bankr. W.D.N.C. 2002)* [*6] ("[D]ischarge is a Bankruptcy Court order, and as such, most courts treat its violation as civil contempt."); *Burd v. Walters, 868 F.2d 665 (4th Cir. 1989)* (holding that bankruptcy court has civil contempt powers to carry out the provisions of the Code); *In re Bruce, 2000 WL 33673773 (Bankr. M.D.N.C. 2000)* ("Although *section 524* does not explicitly authorize monetary damages for violation of a discharge injunction, the court may award actual damages pursuant to the statutory contempt powers set forth in *11 U.S.C. § 105*."). [HN3] The Court of Appeals for the Fourth Circuit articulated the standard to establish civil contempt in *Ashcraft v. Conoco, Inc., 218 F.3d 288, 301 (4th Cir. 2000)* (internal quotations omitted), as follows:

> 1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) ... that the decree was in the movant's "favor"; (3) ... that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) ...

Page 5

2012 Bankr. LEXIS 714, *6; Bankr. L. Rep. (CCH) P82,209

that [the] movant suffered harm as a result.

Each of these elements must be established by clear and convincing evidence. *Ashcraft, 218 F. 3d at 301* [*7] (construing *Colonial Williamsburg Found. v. The Kittinger Co., 792 F. Supp. 1397, 1405-06 (E.D.Va. 1992),* aff'd, *38 F.3d 133, 136 (4th Cir. 1994)).*

In addition to the four Ashcraft factors, bankruptcy courts in this circuit, including this court, have increasingly looked to whether a creditor's violation of the discharge injunction was willful. E.g., *In re Adams, 2010 Bankr. LEXIS 2207, 2010 WL 2721205 at *3 (Bankr. E.D.N.C 2010); In re Morton, 2011 Bankr. LEXIS 4416, 2011 WL 5509196 *3 (Bankr. E.D.N.C. 2011)* (debtors failed to carry burden of proving willful violation of automatic stay, and failed to establish civil contempt); *In re Kirkbride, 2010 Bankr. LEXIS 4103, 2010 WL 4809334 (Bankr. E.D.N.C. 2010).* While it is not clear that willfulness is an element to contempt required in the Fourth Circuit, the rule established in the Eleventh Circuit in *In re Hardy, 97 F.3d 1384 (11th Cir. 1996)* "has found increasing acceptance by other courts, including courts in this circuit." *Adams, 2010 Bankr. LEXIS 2207, 2010 WL 2721205 at *4* (citing *Almond v. Ford Motor Co. (In re Almond), 2007 Bankr. LEXIS 1595, 2007 WL 1345224, at *5 (Bankr. M.D.N.C 2007)).* [HN4] Pursuant to Hardy and the decisions that follow it, the burden of proving that the creditor's violation was "willful" can be met by a showing that "the creditors [*8] knew that the discharge injunction was invoked and intended the act which violated the injunction.'" *In re Adams, 2010 Bankr. LEXIS 2207, 2010 WL 2721205 at *3* (citing *In re Dendy, 396 B.R. 171, 178 (Bankr. D.S.C. 2008)).* In contrast to the standard for civil contempt, a willful violation of the discharge injunction must be proven by the lower preponderance of the evidence standard. *In re Cherry, 247 B.R. 176, 188 n. 18 (Bankr. E.D.Va. 2000).*

Out of the five elements to be proven, the only two elements in controversy are whether there was a violation of the discharge injunction and whether that violation was willful. It is established that Ms. Ward had actual or constructive knowledge of the debtor's receipt of his discharge on April 12, 2011, prior to the dismissal of the adversary proceeding. The discharge is a decree in the debtor's favor, and Ms. Ward, in reinstating the Illinois Lawsuit against the debtor, caused the debtor to suffer harm in that he was forced to reopen his bankruptcy case

and incur additional attorneys' fees to insure that the behavior did not continue or was not repeated.

To determine whether Ms. Ward's attempt to reinstate the Illinois Lawsuit constitutes a violation of the discharge [*9] injunction, the court must review the effects of the discharge. [HN5] A bankruptcy discharge, of course, extinguishes "the personal liability of the debtor with respect to any debt." *11 U.S.C. § 524(a)(1).* The Code defines "debt" as a "liability on a claim." *11 U.S.C. § 101(12).* The Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *11 U.S.C. § 101(5).* Therefore, a discharge extinguishes the debtor's personal liability on his creditor's claims. However, a discharge does not extinguish a creditor's right to seek a claim *in rem. Coastal Fed. Credit Union v. Hardiman, 398 B.R. 161, 183 (Bankr. E.D.N.C 2008)* (quoting *Johnson v. Home State Bank, 501 U.S. 78, 84, 111 S. Ct. 2150, 115 L. Ed. 2d 66 (1991)*("[I]t is well settled that a bankruptcy discharge extinguishes only one mode of enforcing a claim -- namely, an action against the debtor *in personam* -- while leaving intact another -- namely, an action against the debtor *in rem.*").

The debtor listed Ms. Ward on his schedules as the holder of a disputed claim, in an unknown amount, growing out of the Illinois lawsuit. [*10] His personal liability on this claim was discharged in his bankruptcy if the claim was of the kind subject to discharge, and Illinois law determines the nature of the claim brought by Ms. Ward. The Illinois Lawsuit sought both equitable and legal relief in the form of specific performance of the terms of the agreement, recovery against the debtor for breach of contract, and recovery against the debtor for wrongful conversion of personal property. [HN6] Illinois law states that "[a]n action *in rem* is considered to be taken directly against property or brought to enforce a right in the thing itself." *Metrobank v. Cannatello, 964 N.E.2d 656, 2012 Ill. App. LEXIS 15, 357 Ill. Dec. 977, 2012 IL App (1st) 110529, 2012 WL 146706, *4 (Ill. Ct. of App. 2012).* Ms. Ward's action sought not just to enforce her right in the property through specific performance or other equitable means, but also to seek affirmative monetary relief from the debtor -- in other words, a legal remedy.

[HN7] Illinois law focuses on the requirement of

Case 13-17450-VFP    Doc 60    Filed 03/07/16    Entered 03/07/16 11:02:40    Desc Main
Document    Page 56 of 76

Page 6

2012 Bankr. LEXIS 714, *10; Bankr. L. Rep. (CCH) P82,209

personal service of process in distinguishing between *in rem* and *in personam* proceedings. "[I]n a proceeding strictly *in rem*, no notice is required to be given; that in such a proceeding seizure of the *res*, or what is regarded as equivalent to seizure, is essential, and... [*11] sufficient constructive notice." *Austin v. Royal League, 232 Ill. App. 359, 372 (1924)*. For example, suits "to enforce liens or contracts relating to property, may be regarded as proceedings *in rem*, so far as they affect property in this state." *Id., at 373* (citing *Pennoyer v. Neff, 95 U.S. 714, 24 L. Ed. 565 (1878)*). While it is unclear whether Ms. Ward was required to serve the debtor with personal service of process, the claims she brought against the debtor exceed the limited relief in equity that she could have sought without violating the discharge injunction. [HN8] The fact that Ms. Ward could have brought a proceeding strictly *in rem* without violating the injunction does not mean that she can also seek legal remedies against the debtor without violating the injunction. Because Ms. Ward brought the action directly against the debtor and sought affirmative monetary relief in addition to specific performance, she violated the discharge.

The reinstatement of the Illinois Lawsuit by Ms. Ward also constitutes a willful violation of the discharge injunction. Ms. Ward intended to reinstate her claim when she filed the *pro se* motion with the Illinois district court, and she had knowledge of the discharge [*12] injunction entered in the debtor's bankruptcy case. There is therefore ample evidence that Ms. Ward's action in attempting to reinstate the Illinois Lawsuit was willful. E.g., *Adams, 2010 Bankr. LEXIS 2207, 2010 WL 2721205 *3* ([HN9] willfulness is proven by showing creditor knew the discharge injunction was invoked and intended the act which violated the injunction). For these reasons the court finds that Ms. Ward has willfully violated the discharge injunction and is in civil contempt of a court order.

III. Damages

[HN10] A bankruptcy court has not only the inherent authority to enforce its orders, but also the statutory authority, under *11 U.S.C. § 105(a)*, to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. This authority encompasses the court's ability to impose sanctions as a consequence of violating the discharge injunction. *In re Barbour, 77 B.R. 530, 532 (Bankr. E.D.N.C. 1987)*; see also *In re Workman, 392 B.R. 189, 194 (Bankr. D.S.C. 2007)* (citing multiple recent cases in which bankruptcy courts invoked power under *§105(a)* to sanction parties who violated the discharge injunction). Thus, while *§ 524* does not explicitly authorize an award [*13] of monetary damages for violation of the discharge injunction, damages for those violations may be awarded under *§105(a)*. See, e.g., *Workman, 392 B.R. at 195*. Such sanctions may include "actual damages, attorney's fees and, when appropriate, punitive damages." *In re Cherry, 247 B.R. 176, 187 (Bankr. E.D. Va. 2000)* (citing *Mickens v. Waynesboro Dupont Employees Credit Union, Inc. (In re Mickens), 229 B.R. 114, 118 (Bankr. W.D.Va. 1999)*).

Debtor's attorneys have provided the court with invoices totaling $4,469 related to the contempt motion. No other evidence of compensatory damages was introduced. There is insufficient evidence of the egregious conduct the Cherry court required as a basis for an award of punitive damages, and the court chooses not to impose them. *Cherry, 247 B.R. at 189-90* (awarding punitive damages requires some sort of egregious conduct, malevolent intent, or clear disregard of the bankruptcy laws).

Accordingly, the debtor's motion to reopen the case is ALLOWED. The court finds Madeleine M. Ward in contempt of the discharge injunction and sanctions her for violation of the discharge injunction in the amount of $4,469. Ms. Ward is ORDERED to pay such amount no later [*14] than fourteen (14) days from the date of this order to THE JANVIER LAW FIRM, counsel for the debtor, 1101 Haynes Street, Suite 102, Raleigh, NC, 27604.

**SO ORDERED.**

**SIGNED this 24 day of February, 2012.**

/s/ Stephani W. Humrickhouse

**Stephani W. Humrickhouse**

**United States Bankruptcy Judge**



IN RE: OLIVERIO MUNOZ-GONZALES and RUTH MARIE
MUNOZ-GONZALES, Debtors.

No. 99-80751

UNITED STATES BANKRUPTCY COURT FOR THE CENTRAL DISTRICT OF
ILLINOIS

*2001 Bankr. LEXIS 2375*

January 30, 2001, Decided
January 30, 2001, Filed

## CASE SUMMARY:

**PROCEDURAL POSTURE:** An unsecured creditor moved to reopen debtors' Chapter 7 case, alleging that they failed to disclose a pre-petition workers' compensation claim and that the case should be reopened to permit the trustee to administer the undisclosed asset for the benefit of creditors. The debtors alleged that the asset was exempt from creditors under Illinois law and was not property of the estate. They characterized the motion as frivolous and sought sanctions.

**OVERVIEW:** The debtors contended that a pending workers' compensation claim was properly disclosed. The court disagreed. Even if a postpetition property schedule disclosure of an unspecified personal injury claim was intended to be a disclosure of the workers' compensation claim, it was too vague to constitute a valid disclosure or to make a valid claim of exemption. Even if the trustee was aware of the workers' compensation claim, this did not cure the debtors' failure to formally list the asset or result in a de facto abandonment of the asset under *11 U.S.C.S. § 554(c)*. Because the debtors failed to properly schedule the claim as a pre-petition asset, the claim (and any proceeds thereof) was an unabandoned asset that remained property of the estate. The court rejected the debtors' alternative argument that the workers' compensation claim was fully exempt and, as such, did

not have to be listed as an asset on their schedules. Exemptions were not automatic. Rather, under *11 U.S.C.S. § 522(b)(1)* and *Fed. R. Bankr. P. 4003(a)*, the debtors were required to list the property claimed as exempt on Schedule C. Sufficient cause existed to reopen the debtors' case under *11 U.S.C.S. § 350(b)*.

**OUTCOME:** The court granted the creditor's motion to reopen and denied the debtors' request for sanctions.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Estate Property > Abandonment > Operation of Law*
*Bankruptcy Law > Estate Property > Abandonment > Trustee Action*
[HN1] Ordinarily, a properly scheduled estate asset not otherwise administered at the time of the closing of a bankruptcy case is abandoned to the debtor. *11 U.S.C.S. § 554(c)*. Property of the estate that is not expressly abandoned by the trustee pursuant to *11 U.S.C.S. § 554(a)*, or abandoned by operation of law pursuant to § *554(c)*, and that is not otherwise administered, remains property of the estate. An asset is not abandoned by operation of law under § *554(c)* unless it has been formally scheduled before the case is closed, even if the

trustee had knowledge of the asset.

*Bankruptcy Law > Estate Property > Abandonment > Operation of Law*
*Bankruptcy Law > Estate Property > Content*
[HN2] A debtor's failure to amend his or her schedules to include a postpetition claim that was property of the estate pursuant to *11 U.S.C.S. § 541(a)(7)* does not result in abandonment of the asset even if the trustee was made aware of it. *11 U.S.C.S. § 554(c)* does not speak in terms of the trustee's awareness of the asset, or accept proof of such awareness as an alternative to proof that the asset was scheduled in accordance with *11 U.S.C.S. § 521(a)(1)*. Consequently, the vast majority of courts have taken the statute at its word, requiring that an asset be scheduled before it can be abandoned, regardless of the trustee's awareness of it.

*Bankruptcy Law > Case Administration > Closings & Reopenings > Grounds for Reopening*
*Bankruptcy Law > Estate Property > Abandonment > Operation of Law*
*Bankruptcy Law > Estate Property > Content*
[HN3] Because an unabandoned claim remains property of a debtor's bankruptcy estate, a debtor has no right to prosecute or enforce the claim on his own behalf, during the pendency of the case or after it is closed. This is so regardless of whether the failure to schedule the claim is innocent. In that event, the only option open to the debtor is to seek to have the case reopened to allow the trustee or the court to decide whether the claim should be abandoned or administered for the benefit of creditors.

*Bankruptcy Law > Estate Property > Content*
*Bankruptcy Law > Exemptions > General Overview*
[HN4] A debtor's interest in a workers' compensation claim on the date of a Chapter 7 filing is sufficient to bring it into the debtor's bankruptcy estate under *11 U.S.C.S. § 541*, even if the claim is subject to an allowable exemption.

*Bankruptcy Law > Estate Property > Content*
*Bankruptcy Law > Exemptions > Claims & Objections*
[HN5] At *11 U.S.C.S. § 522*, the Bankruptcy Code permits debtors to claim certain property as exempt from the bankruptcy estate. However, *Fed. R. Bankr. P. 4003* and *11 U.S.C.S. § 522(b)(1)* dictates that debtors who

claim exemptions must list such exempt property on the required schedule of assets. All property a debtor owns at the time a bankruptcy petition is filed becomes property of the debtor's bankruptcy estate. Rather than withholding property from the estate, the debtor actually seeks a return of the property from the estate by filing the claim for exemption. The bankruptcy court, not the debtor, decides what property is exempt from the bankruptcy estate.

*Bankruptcy Law > Case Administration > Commencement > Voluntary Cases > Requirements*
*Bankruptcy Law > Estate Property > Content*
*Bankruptcy Law > Exemptions > Claims & Objections*
[HN6] Exemptions in bankruptcy are not automatic. Under *11 U.S.C.S. § 522(b)(1)* and *Fed. R. Bankr. P. 4003(a)*, a debtor is required to list the property claimed as exempt on Schedule C required to be filed by *Fed. R. Bankr. P. 1007*. There can be no exemption unless the property claimed as exempt is properly listed pursuant to *Fed. R. Bankr. P. 4003(a)*.

*Bankruptcy Law > Case Administration > Commencement > Voluntary Cases > Requirements*
*Bankruptcy Law > Estate Property > Content*
*Bankruptcy Law > Exemptions > Claims & Objections*
[HN7] A pre-petition workers' compensation claim is property of the bankruptcy estate that debtors are required to disclose as an asset on their bankruptcy schedules, even if they believe it is fully exempt and even if it is, in fact, fully exempt. In order for a workers' compensation claim (and the proceeds thereof) to be exempt, debtors must claim an exemption therein.

*Bankruptcy Law > Case Administration > Closings & Reopenings > Grounds for Reopening*
[HN8] *11 U.S.C.S. § 350(b)* provides that a case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause.

*Bankruptcy Law > Case Administration > Closings & Reopenings > Grounds for Reopening*
[HN9] Evidence of an undisclosed pre-petition asset provides sufficient grounds to reopen a bankruptcy case. Reopening is not mandatory, however. A bankruptcy court has broad discretion to weigh the equitable factors

when deciding whether to reopen a case.

*Bankruptcy Law > Case Administration > Closings & Reopenings > Grounds for Reopening*

[HN10] In deciding whether to reopen a closed case, a bankruptcy court may consider the length of time that has passed since the case was closed, the value of the potential bankruptcy asset at issue and any potential prejudice to the debtor.

**JUDGES:** [*1] THOMAS L. PERKINS, UNITED STATES BANKRUPTCY JUDGE.

**OPINION BY:** THOMAS L. PERKINS

**OPINION**

**ORDER**

For the reasons set forth in an Opinion filed this day, IT IS HEREBY ORDERED that OSF'S Motion to Reopen Case is GRANTED; and DEBTORS' request for sanctions against OSF is DENIED.

Dated: January 30, 2001.

/s/ Thomas L. Perkins

THOMAS L. PERKINS

UNITED STATES BANKRUPTCY JUDGE

OSF Healthcare Systems, Inc. (OSF), an unsecured creditor of the Debtors, Oliverio Munoz-Gonzales and Ruth Marie Munoz-Gonzales (DEBTORS) filed a motion to reopen the DEBTORS' closed Chapter 7 case alleging that the DEBTORS failed to disclose a pre-petition workers' compensation claim and that the case should be reopened to permit the Trustee to administer the undisclosed asset for the benefit of creditors. For the reasons set forth herein, the Court grants OSF'S motion to reopen the bankruptcy case. The Court has jurisdiction to hear this matter pursuant to *28 U.S.C. § 1334* and *§ 157(b)(2)(A) and (B)*.

**FACTS AND BACKGROUND**

On March 8, 1999, the DEBTORS filed their Chapter 13 bankruptcy petition. In their statement of financial affairs, they were required to "list all suits and administrative proceedings to which the debtor is or was a party within [*2] one year immediately preceding the filing of the bankruptcy case." In response, they listed a single suit captioned "Ruth Munoz, Oliverio Munoz and Mario Munoz v. Thomas Roofing" (the "Thomas Roofing suit") and they listed the court or agency and location as "Peoria County." The DEBTORS did not list the Thomas Roofing suit or any other claim or cause of action on Schedule B, requiring them to disclose all personal property interests. Nor did they claim an exemption on Schedule C in the Thomas Roofing suit or any other lawsuit, claim or cause of action.

On the DEBTORS' motion, pursuant to *Federal Rule of Bankruptcy Procedure 1017(f)(3)*, the case was converted to Chapter 7 on April 22, 1999. On that same day, the DEBTORS filed a disclosure of post-petition property listing the following single item: "Personal Injury - Exempt for $7,500.00."

The *11 U.S.C. § 341* meeting was held on May 19, 1999. Thereafter, on June 8, 1999, the Trustee filed a no asset report. The DEBTORS received a discharge on July 26, 1999. The bankruptcy case was subsequently closed on August 23, 1999.

OSF filed its motion to reopen on September 15, 2000, alleging the existence of an undisclosed workers' compensation [*3] claim filed by Oliverio Munoz-Gonzales (OLIVERIO) in 1995 and settled as of March 31, 1999 (post-petition) for $18,622.17. The DEBTORS, not denying that OLIVERIO had a workers' compensation claim pending at the time of the bankruptcy, filed a response alleging that the workers' compensation claim is exempt from creditors under Illinois law and is not property of the bankruptcy estate. The DEBTORS characterize OSF'S motion as "frivolous" and request attorney fees and punitive damages.

OSF filed a reply attached to which are copies of the Workers' Compensation Settlement Contract Lump Sum Petition and Order. The Settlement Contract indicates that OLIVERIO filed a workers' compensation claim with the Illinois Industrial Commission in 1995 as Case No. 95 WC 58712 against I. Erlichman Company, arising out of an accident that occurred on September 29, 1995. The amount of medical bills not paid by the employer is shown as $25,151.85. The total dollar amount of the settlement is $18,622.17 from which is deducted attorney's fees in the amount of $3,724.43 and expenses for a doctor report and x-rays in the amount of $136.00,

leaving $14,761.74 to be distributed to OLIVERIO. Of the total amount [*4] of the settlement, the parties allocated $16,000.00 for unpaid medical bills and $2,622.17 for partial disability to the claimant's arm and eye. The settlement contract is dated as having been signed by OLIVERIO on March 31, 1999.

In its reply, OSF contends that even if the DEBTORS may claim an exemption in the workers' compensation settlement proceeds, the exemption does not apply to that portion of the settlement proceeds attributable to unpaid medical expenses, in this case $16,000.00. The Court conducted a hearing on OSF'S motion to reopen on October 16, 2000. At the hearing, the DEBTORS contended that OLIVERIO'S workers' compensation claim was in fact disclosed orally to the Chapter 7 Trustee at the § 341 meeting. The Court gave the parties time to file additional briefs or authorities. The DEBTORS did not file an additional brief. OSF filed a supplemental reply alleging that the post-petition property disclosure filed by the DEBTORS on April 22, 1999, of an unspecified personal injury claim exempt for $7,500.00 does not refer to the workers' compensation settlement. OSF also reiterated its position that the portion of the workers' compensation settlement allocated to unpaid medical [*5] expenses is not properly exempt.

## DISCUSSION

The DEBTORS' position is two-fold. First, the DEBTORS contend that OLIVERIO's pending workers' compensation claim was properly disclosed. This Court disagrees. The DEBTORS' disclosure in the Statement of Affairs of the pending litigation involving Thomas Roofing is unrelated to the workers' compensation claim against I. Erlichman Company. Given the DEBTORS' failure to disclose or claim an exemption in the workers' compensation claim in their originally filed schedules, the only possibilities of a proper disclosure and claim of exemption are the post-petition property schedule filed April 22, 1999 or the oral disclosure to the Trustee at the § 341 meeting. As pointed out by OSF, the DEBTORS' filing of a post-petition property schedule disclosing an unspecified personal injury claim, and an exemption therein for $7,500.00, is ambiguous to say the least. OLIVERIO'S workers' compensation claim was commenced approximately three and one half years prior to the DEBTORS' bankruptcy filing and is clearly a pre-petition asset. Furthermore, the disclosure claims an exemption of only $7,500.00, contrary to the DEBTORS'

more recent assertion that the entire [*6] amount of the workers' compensation benefits is exempt. The post-petition property disclosure does not, on its face, refer to OLIVERIO'S pre-petition workers' compensation claim. Even if the post-petition property disclosure was intended by the DEBTORS to be a disclosure of OLIVERIO'S workers' compensation claim, it is too vague to constitute a valid disclosure of the claim or to make a valid claim of exemption therein as required by F.R.B.P. 4003(a).

While acknowledging that the disclosure of the pending personal injury litigation may have been imprecise, the DEBTORS suggest that such disclosure would have alerted the Trustee and caused him to inquire regarding the nature of the suit. Assuming such inquiry was in fact made, the DEBTORS further assume that the Trustee learned of OLIVERIO'S pending workers' compensation claim. The DEBTORS conclude that the Trustee determined that the claim would be exempt and abandoned the claim to the DEBTORS. [1] Such knowledge on the part of a trustee, however, does not cure a debtor's failure to formally list the asset on the appropriate bankruptcy schedule, or result in a de facto abandonment of the asset.

> 1 Nothing in the case file evidences that the [*7] Trustee expressly abandoned the workers' compensation claim to the DEBTORS.

[HN1] Ordinarily, a properly scheduled estate asset not otherwise administered at the time of the closing of a case is abandoned to the debtor. 11 U.S.C. § 554(c). Property of the estate that is not expressly abandoned by the trustee pursuant to § 554(a) or abandoned by operation of law pursuant to § 554(c), and that is not otherwise administered, remains property of the estate. An asset is not abandoned by operation of law under § 554(c) unless it has been formally scheduled before the case is closed, even if the trustee had knowledge of the asset. In re Capozzi, 229 B.R. 250 (Bkrtcy. S.D. Fla. 1999).

In In re Kottmeier, 240 B.R. 440, 443-44, (M.D.Fla. 1999), the court rejected the debtors' contention that if a trustee is aware of an asset, it will be deemed abandoned even though it was not properly scheduled by the debtors. Reaching its conclusion that [HN2] the debtors' failure to amend their schedules to include a post-petition claim that was property of the estate pursuant to 11 U.S.C § 541 (a)(7) did not result in abandonment of the asset even

2001 Bankr. LEXIS 2375, *7

though the trustee was made aware of it, the court stated:

Prior to the enactment [*8] of *section 554* such "assumed abandonment" was not impossible. (Citations). *Section 554(c)*, however, does not speak in terms of the trustee's awareness of the asset, or accept proof of such awareness as an alternative to proof that the asset was scheduled in accordance with *section 521(1). See supra* note 1; *see also In re McCoy, 139 B.R. 430, 431 (Bankr.S.D.Ohio 1991)* ("[T]he word 'scheduled' in *554(c)* has a specific meaning and refers only to assets listed in a debtor's schedule of assets and liabilities."). Consequently, the vast majority of courts have taken the statute at its word, requiring that an asset be scheduled before it can be abandoned, regardless of the trustee's awareness of it. *See Jeffrey v. Desmond, 70 F.3d 183, 186 (1st Cir.1995)* (holding that "[debtors'] alleged discussion with Trustee" about unscheduled cause of action does not lift requirement that it be scheduled under *521(1)* to be abandoned under *554(c)*); *Bittel v. Yamato Int'l Corp., 70 F.3d 1271, 1995 WL 699672 at *4* [published in full-text format at *1995 U.S. App. LEXIS 37082*] (6th Cir.1995) ("[Section 554(c)] requires listing the asset, even if the trustee is aware of the asset through other channels."); *In re Pace, No. 92-36787, 1994 U.S. App. LEXIS 3891, 1994 WL 55523, at *2 (9th Cir. Feb. 24, 1994)* [*9] ("Whether or not a trustee has knowledge of a potentially valuable asset, formal scheduling is required...."); *Vreugdenhill v. Navistar Int'l Transp. Corp., 950 F.2d 524, 526 (8th Cir. 1991)* ("It is not enough that the trustee learns of the property through other means; the property must be scheduled pursuant to *section 521(1).*"); *In re Capozzi, 229 B.R. 250, 251 (Bankr.S.D.Fla.1999)* ("Actual knowledge of the asset by the Trustee is irrelevant if the asset is not scheduled before the close of the case."); *Conklin v. St. Lawrence Valley Educ. T. V. Council, Inc., No. 93-CV-984, 1994 U.S. Dist. LEXIS 20188,*

*1994 WL 780898, at *3 (N.D.N.Y. Oct. 31, 1994)* ("A cause of action that was never scheduled as an asset can not be abandoned by operation of law, even if the trustee knew of the cause of action and determined not to pursue it...."); *In re Winburn, 167 B.R. 673, 676 (Bankr.N.D.Fla. 1993)* ("If the debtor fails to list an asset of the estate in his schedules and this property is not administered before the case is closed, then the asset is not deemed abandoned. Whether the trustee or any creditor knew about the asset is irrelevant."); *In re Davis, 158 B.R. 1000, 1002 (Bankr.N.D.Ind.1993)* ("[Section 554(c)] explicitly [*10] provides that it applies only to property that has been scheduled, and it is not enough that the trustee learns of the property through other means."); *Stanley v. Sherwin-Williams Co., 156 B.R. 25, 27 (W.D.Va.1993); In re McCoy, 139 B.R. at 431* ("[T]here is no support for the thesis that knowledge changes the express language of the statute."); *In re Fossey, 119 B.R. 268, 271 (D.Utah 1990)* (same).

Based on the express language of the statute and on the consensus among the courts that have interpreted that language, the Court concludes that Bankruptcy Court did not err in determining that the funds in question had not been abandoned, and that, as a consequence, they must be turned over to the [Trustee.]....

[HN3] Since an unabandoned claim remains property of the estate, the debtor has no right to prosecute or enforce the claim on his own behalf, during the pendency of the case or after it is closed. *In re Costello, 255 B.R. 110, 113 (Bkrtcy. E.D. N.Y. 2000)*. This is so regardless of whether the failure to schedule the claim is innocent. *Id. at 113*. In that event, the only option open to the debtor is to seek to have the case reopened to allow the trustee or the court to decide whether the [*11] claim should be abandoned or administered for the benefit of creditors. *Krank v. Utica Mutual Insurance Co., 109 B.R. 668 (E.D. Pa. 1990) aff'd, 908 F.2d 962 (3rd Cir. 1990)*. Subject to the following consideration of the DEBTORS'

second argument, it appears at this point that because the DEBTORS failed to properly schedule OLIVERIO'S workers' compensation claim as a pre-petition asset, the claim (and any proceeds thereof) is an unabandoned asset that remains property of the estate.

Alternatively, the DEBTORS contend that a pre-petition workers' compensation claim is fully exempt and, as such, does not have to be listed as an asset on their bankruptcy schedules. Any uncertainty about this issue was erased by the Seventh Circuit's opinion in *Matter of Yonikus, 996 F.2d 866 (7th Cir. 1993)*. In that case, the debtor, Daniel Yonikus, had a workers' compensation claim and a personal injury lawsuit pending at the time that he filed his Chapter 7 petition. He failed to list either proceeding in his schedule of assets or claim an exemption therein. After his discharge was revoked under *§ 727(d)(2)*, based on his failure to schedule the personal injury claim, Yonikus filed a supplemental schedule [*12] of exempt property claiming an exemption in his workers' compensation benefits. The trustee objected, arguing that the debtor's fraudulent concealment of an asset works as a forfeiture of exemption rights. The bankruptcy court agreed and denied Yonikus' claim of exemption. The district court affirmed the bankruptcy court and the Seventh Circuit affirmed the district court.

In its opinion, the Seventh Circuit rejected the identical argument that the DEBTORS make here, that a workers' compensation claim is fully exempt, is not property of the bankruptcy estate, and does not have to be disclosed as an asset. The court held that [HN4] a debtor's interest in a workers' compensation claim on the date of a Chapter 7 filing is sufficient to bring it into the bankruptcy estate under *11 U.S.C. § 541*, even if the claim is subject to an allowable exemption. The court stated that Yonikus was putting the cart before the horse by claiming that his workers' compensation benefits were exempt before he had included them as property of his bankruptcy estate, since an exemption can only be claimed in estate property. *996 F.2d at 869*. The court concluded that Yonikus' interest in his pre-petition workers' compensation [*13] claim was property of the estate as of the commencement of the bankruptcy case under *§ 541(a)(1)* and later as proceeds under *§ 541(a)(6)* when the award was converted to money. *996 F.2d at 871*.

In a prior decision involving the same debtor, the

Seventh Circuit discussed the interrelation between property of the estate and the debtor's right to claim exemptions:

[HN5] At *11 U.S.C. § 522*, the Bankruptcy Code permits debtors to claim certain property as exempt from the bankruptcy estate. However, *Bankruptcy Rule 4003* and *§ 522(a)(1) of the Bankruptcy Code* dictates that debtors who claim exemptions must list such exempt property on the required schedule of assets. All property the debtor owns at the time the bankruptcy petition is filed becomes property of the bankruptcy estate. *3 Collier on Bankruptcy ¶ 522.26 (1992)*. Rather than withholding property from the estate, the debtor actually seeks a return of the property from the estate by filing the claim for exemption. *Id.* The bankruptcy court, not the debtor, decides what property is exempt from the bankruptcy estate. (Footnote omitted). Yonikus erred in not reporting his personal injury claim on the bankruptcy schedules.

*Matter of Yonikus, 974 F.2d 901, 905 (7th Cir. 1992)*.

[HN6] Exemptions [*14] in bankruptcy are not automatic. Under *§ 522(a)(1) of the Bankruptcy Code* and *Federal Rule of Bankruptcy Procedure 4003(a)*, the debtor is required to list the property claimed as exempt on Schedule C required to be filed by *Federal Rule of Bankruptcy Procedure 1007*. There can be no exemption unless the property claimed as exempt is properly listed pursuant to *Rule 4003(a)*. *United States v. Shadduck, 112 F.3d 523 (1st Cir. 1997)*.

This Court holds that [HN7] the pre-petition workers' compensation claim is property of the bankruptcy estate that the DEBTORS were required to disclose as an asset on their bankruptcy schedules, even if they believed it was fully exempt and even if it is, in fact, fully exempt. [2] This Court also holds that in order for the workers' compensation claim (and the proceeds thereof) to be exempt, the DEBTORS must claim an exemption therein, which the DEBTORS have not done.

2    In its second *Yonikus* opinion, the Seventh Circuit left open the question of whether a

2001 Bankr. LEXIS 2375, *14

workers' compensation claim is fully exempt, partially exempt, or not exempt at all under Illinois law and *11 U.S.C. § 522(b)*, noting that no Illinois court had directly addressed the issue of workers' compensation benefits [*15] as exempt property. The Bankruptcy Court for the Northern District of Illinois has since issued its opinion in *In re McClure, 175 B.R. 21 (Bkrtcy. N.D. Ill. 1994)*, holding that a workers' compensation claim is exempt under Illinois law and, therefore, exempt in bankruptcy pursuant to *§ 522(b)*.

[HN8] *Section 350(b) of the Bankruptcy Code* provides as follows:

> A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause.

*11 U.S.C. § 350(b)*. It is well-settled that [HN9] evidence of an undisclosed pre-petition asset provides sufficient grounds to reopen a bankruptcy case. *Matter of Shondel, 950 F.2d 1301 (7th Cir. 1991)*; *In re Atanasov, 221 B.R. 113 (D.N.J.1998)*. Reopening is not mandatory, however. The bankruptcy court has broad discretion to weigh the equitable factors when deciding whether to reopen a case. *Shondel, 950 F.2d at 1304*; *In re Plumlee, 236 B.R. 606 (E.D.Va. 1999)*.

[HN10] In deciding whether to reopen a closed case, the court may consider the length of time that has passed since the case was closed, the value of the potential bankruptcy asset at issue and any potential prejudice to the debtor. *See, Plumlee, 236 B.R. at 610-11* [*16] (holding that the bankruptcy court did not abuse its discretion by reopening the bankruptcy case more than five years after it was closed where the undisclosed asset was a pre-petition claim that resulted in a $225,000 settlement for the debtor that was received only four months prior to the creditor's motion to reopen.)

Here, the DEBTORS' case was closed on August 23, 1999, and OSF'S motion to reopen was filed on September 15, 2000, not much more than one year later. There is no evidence in the record that OSF knew of the

settlement long before it filed its motion to reopen. The settlement amount of $18,622.17 is not insubstantial. It is also a significant factor to this Court that OLIVERIO'S workers' compensation proceeding had been pending before the Illinois Industrial Commission for three and one-half years prior to the bankruptcy filing. This is not a situation where there was any doubt about the disclosure obligation. OSF has also raised an issue as to whether the workers' compensation proceeds are fully exempt, even assuming a proper claim of exemption. In addition, the DEBTORS themselves have created additional confusion and uncertainty by filing a vague post-petition property [*17] disclosure for an unspecified personal injury claim, and asserting an exemption therein of $7,500.

For the foregoing reasons, this Court finds that sufficient cause exists to reopen the DEBTORS' bankruptcy case. By reopening the case, the Court is not granting any substantive relief but merely providing an opportunity for parties in interest to request relief. *In re Chalasani, 92 F.3d 1300, 1307-08 (2d Cir. 1996)*. Once the case is reopened, a hearing will be scheduled to permit the DEBTORS to advise the Court of their position with respect to OLIVERIO'S workers' compensation claim (and its proceeds) and to clarify the meaning of the post-petition property disclosure filed on April 22, 1999.

Further, for the reasons stated herein, the Court finds that OSF'S motion to reopen is well taken and not frivolous. The DEBTORS' request for sanctions against OSF will be denied.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with *Federal Rule of Bankruptcy Procedure 7052*. A separate Order will be entered reopening the case.

Dated: January 30, 2001.

/s/ Thomas L. Perkins

THOMAS L. PERKINS

UNITED STATES BANKRUPTCY JUDGE



IN RE: ABDUR AMIN RASHID.

CIVIL ACTION NO. 04-1585

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*2004 U.S. Dist. LEXIS 25032*

December 13, 2004, Decided
December 13, 2004, Filed; December 14, 2004, Entered

**PRIOR HISTORY:** *Rashid v. United States (In re Rashid), 2002 U.S. Dist. LEXIS 118 (E.D. Pa., Jan. 8, 2002)*

**DISPOSITION:** Bankruptcy Court's decision affirmed. Appeal denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff homeowner, convicted of substantial criminal activity, sought to challenge the forfeiture of his residence following his federal criminal conviction. The United States Bankruptcy Court for the Eastern District of Pennsylvania dismissed his adversary proceeding for lack of subject matter jurisdiction and denied his motion to reopen the bankruptcy case. The homeowner appealed, arguing the bankruptcy court abused its discretion.

**OVERVIEW:** The homeowner was convicted of multiple crimes and sentenced by the district court to 168 months' imprisonment, assessed $ 2,700 in fees, fined $ 15,000, and ordered to pay $ 1,696,470 in criminal restitution. A jury then returned a special verdict on forfeiture, finding that his Philadelphia home was traceable to his criminal activity. The conviction and sentence were upheld on appeal. The homeowner filed a voluntary Chapter 7 bankruptcy petition, and following his discharge, filed three more petitions, seeking in each

case to avoid the forfeiture order, although the bankruptcy court closed his case under *11 U.S.C.S. § 350(a)*. The homeowner claimed that the government committed a fraud on the court and failed to have the district court include a provision for criminal forfeiture in his criminal judgment and commitment order. The district court ruled that the bankruptcy court had properly found that it had no jurisdiction to hear the action unless the homeowner first reopened the bankruptcy case. Even assuming the homeowner had standing to raise the claim, the doctrine of issue preclusion barred him from relitigating the forfeiture claim.

**OUTCOME:** The judgment of the bankruptcy court was affirmed.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*
*Bankruptcy Law > Practice & Proceedings > Appeals > Procedures*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > General Overview*
[HN1] A district court has jurisdiction over appeals from final judgments, orders, and decrees from a bankruptcy court. *28 U.S.C.S. § 158(a); Fed. R. Bankr. P. 8001.*

2004 U.S. Dist. LEXIS 25032, *

Bankruptcy Law > Practice & Proceedings > Appeals > Procedures
Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Clear Error Review
Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > De Novo Review
[HN2] Review of a bankruptcy court's factual findings is made under a clearly erroneous standard, and conclusions of law are reviewed de novo. Fed. R. Bankr. P. 8013.

Bankruptcy Law > Case Administration > Closings & Reopenings > General Overview
Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Abuse of Discretion
[HN3] A bankruptcy court's decision not to reopen a case pursuant to 11 U.S.C.S. § 350(b) is reviewed for an abuse of discretion.

Civil Procedure > Parties > Self-Representation > Pleading Standards
[HN4] Courts must construe pro se pleadings liberally to ensure that pro se litigants are afforded proper deference. Pro se plaintiffs are entitled to greater deference when the sufficiency of their pleadings is called into question. A judge may not, however, act as a surrogate attorney for pro se parties.

Bankruptcy Law > Case Administration > General Overview
Bankruptcy Law > Practice & Proceedings > Jurisdiction > General Overview
[HN5] Statutory law restricts bankruptcy court jurisdiction to those adversary proceedings that could affect the administration of the bankruptcy estate. 28 U.S.C.S. § 1334.

Bankruptcy Law > Case Administration > Closings & Reopenings > Procedures for Reopening
Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings
Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings
[HN6] A bankruptcy court does not have jurisdiction over complaints filed after the underlying bankruptcy case is closed. Where a bankruptcy case is closed and the estate no longer exists, and where plaintiff does not seek to have the bankruptcy case opened for cause pursuant to 11

U.S.C.S. § 350(b) and Fed. R. Bankr. P. 5010, the court is without jurisdiction to entertain any proceedings, irrespective of whether those proceedings are defined as core or related non-core proceedings.

Bankruptcy Law > Case Administration > Closings & Reopenings > Closure
Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Liquidations
[HN7] A Chapter 7 liquidation is closed once the bankruptcy case is fully administered and the trustee has been discharged of his duties. 11 U.S.C.S. § 350(a). Once the case is closed, there is no matter pending before a bankruptcy court.

Bankruptcy Law > Case Administration > Closings & Reopenings > Grounds for Reopening
Bankruptcy Law > Case Administration > Closings & Reopenings > Procedures for Reopening
Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Abuse of Discretion
[HN8] Pursuant to 11 U.S.C.S. § 350(b), a bankruptcy court may reopen a closed case to administer assets, to accord relief to the debtor, or for other cause. Whether to reopen the case on such grounds is within the discretion of the bankruptcy court. Such discretion depends upon the circumstances of the individual case and accords with the equitable nature of all bankruptcy proceedings. A decision denying a motion to reopen is binding on review, absent a clear showing that there was an abuse of discretion.

Bankruptcy Law > Case Administration > Closings & Reopenings > Grounds for Reopening
[HN9] Courts consider a variety of factors when deciding whether to reopen a case: the length of time that the case was closed; whether a non-bankruptcy forum, such as state court, has the ability to determine the issue sought to be posed by the debtor; whether prior litigation in bankruptcy court implicitly determined that the state court would be the appropriate forum to determine the rights, post bankruptcy, of the parties; whether any parties would be prejudiced were the case reopened or not reopened; the extent of the benefit which the debtor seeks to achieve by reopening; and whether it is clear at the outset that the debtor would not be entitled to any relief after the case were reopened.

2004 U.S. Dist. LEXIS 25032, *

*Bankruptcy Law > Case Administration > Closings & Reopenings > General Overview*

[HN10] Generally, a bankruptcy case should remain closed if no valid purpose would be served if the matter were reopened. When the purpose of reopening is to litigate issues that clearly have no merit, the matter should remain closed.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*

[HN11] Issue preclusion bars relitigation of an issue identical to that in a prior action. Issue preclusion applies where (1) the issue decided in the prior litigation was identical to the one presented in the later action, (2) there was a final judgment on the merits, and (3) the party against whom the doctrine is asserted was a party or in privity with a party to the prior adjudication and had a full and fair opportunity to litigate the issue in question in the prior action.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata*

[HN12] Claim preclusion prohibits reexamination of matters that a party might have, but did not, assert in the prior action. Claim preclusion bars a subsequent suit on the same cause of action where there is a final judgment on the merits of an action involving the same parties or their privities.

**COUNSEL:** [*1] ABDUR AMIN RASHID, Pro se, Plaintiff/Appellant/Debtor-in-Possess, Lexington, KY.

For Defendant UNITED STATES OF AMERICA: Joseph F. Minni, United States Attorney's Office, Philadelphia, PA.

CHRISTINE C. SHUBERT, ESQUIRE, Pro se, Trustee, Medford, NJ.

FREDERICK J. BAKER, ESQUIRE, Pro se, Trustee, Philadelphia, PA.

**JUDGES:** PAUL S. DIAMOND, J.

**OPINION BY:** PAUL S. DIAMOND

**OPINION**

    **MEMORANDUM**

Diamond, J.

**December 13, 2004**

This is the fourth challenge by Plaintiff, Amin A. Rashid, to the forfeiture of his residence following his federal criminal conviction. The Bankruptcy Court dismissed Rashid's most recent adversary proceeding for lack of subject matter jurisdiction, and denied his motion to reopen the bankruptcy case. I affirm.

**Background**

In 1993, a jury found Rashid guilty of over fifty criminal counts, including mail fraud, wire fraud, and money laundering. (R. 3, Ex. B). The jury then returned a special verdict on forfeiture, finding that Rashid's Philadelphia home, located at Mount Pleasant Avenue, was traceable to his criminal activity. This Court sentenced him to 168 months imprisonment, assessed him $ 2,700 in fees, fined him $ 15,000, and ordered him to pay [*2] $ 1,696,470 in criminal restitution. The Third Circuit affirmed his conviction and sentence. *United States v. Rashid, 66 F.3d 3314 (3d Cir. 1995)* (unpublished), cert. denied, *516 U.S. 1121, 133 L. Ed. 2d 857 (1996)*. On May 19, 1994, this Court enforced the jury's special verdict, entering a preliminary Order forfeiting to the United States Rashid's right, title, claim, and interest in the Mount Pleasant Avenue house. (R. 3, Ex. A). Rashid failed to appeal from that Order, thus divesting himself of standing to challenge the forfeiture. *United States v. Rashid, 168 F.3d 480 (3d Cir. 1998)* (mem. op.).

On July 6, 1994, Rashid, acting *pro se*, filed a voluntary Chapter 7 bankruptcy petition. On April 10, 1998, Rashid received a discharge of his debts, and on May 13, 1998, the Bankruptcy Court closed Rashid's case in accordance with *11 U.S.C. § 350(a)*.

Despite his lack of standing, for the last ten years "Rashid has unsuccessfully challenged the forfeiture in a number of different fora." *United States v. Rashid, 168 F.3d 480 (3d Cir. 1998)* (mem. op.). Acting *pro se*, he has filed seven separate Bankruptcy [*3] Court actions seeking damages and an invalidation of the forfeiture Order. See Rashid v. Powel, Adv. No. 94-0739, *aff'd by Rashid v. Powel (In re Rashid), 1998 U.S. Dist. LEXIS 8069, 1998 WL 288426 (E.D. Pa. 1998), aff'd in part, rev'd in part by Rashid v. Powel, 210 F.3d 201 (3d Cir. 2000)*; Rashid v. United States, Adv. No. 97-0890;

Rashid v. United States, Adv. No. 00-0633, *aff'd by Rashid v. United States (In re Rashid), 2002 U.S. Dist. LEXIS 118, 2002 WL 15939 (E.D. Pa. 2002)*; see also *United States v. Rashid, 168 F.3d 480 (3d Cir. 1998)* (mem. op.) (affirming the forfeiture).

On December 2, 2003, Rashid filed his fourth *pro se* action in Bankruptcy Court, again challenging the validity of the forfeiture. Rashid v. United States, Adv. No. 03-1269. On January 19, 2004, the government moved to dismiss, arguing that the Bankruptcy Court lacked subject matter jurisdiction because Rashid filed the adversary complaint after his bankruptcy case was closed. (R. 5). Rashid argued that the Court had jurisdiction, and also moved, *nunc pro tunc*, for his case to be reopened. (R. 7, 8). On February 17, 2004, the Bankruptcy Court dismissed the adversary proceeding for lack of subject [*4] matter jurisdiction, and denied Rashid's motion to reopen. (Bankruptcy Court Order dated February 17, 2004, attached as Exhibit B to Def.'s Brief).

Rashid now appeals to this Court, arguing that the Bankruptcy Court erred in dismissing his fourth adversary complaint.

**Legal Standards**

[HN1] This Court has jurisdiction over appeals from final judgments, orders, and decrees from the Bankruptcy Court. *28 U.S.C. § 158(a)*; *FED. R. BANKR. P. 8001.* [HN2] I must review the Bankruptcy Court's factual findings under a clearly erroneous standard, and conclusions of law *de novo.* See *FED. R. BANKR. P. 8013*; see also *In re Pransky, 318 F.3d 536, 542 (3d Cir. 2003)*; *Donaldson v. Bernstein, 104 F.3d 547, 551 (3d Cir. 1997)*; *In re Brown, 311 B.R. 409 (E.D. Pa. 2004).* [HN3] A Bankruptcy Court's decision not to reopen a case pursuant to *11 U.S.C. § 350(b)* is reviewed for an abuse of discretion. *Donaldson, 104 F.3d at 551.*

[HN4] Courts must construe *pro se* pleadings liberally to ensure that *pro se* litigants are afforded proper [*5] deference. *Castro v. Chesney, No. 97-4983, 1998 U.S. Dist. LEXIS 17278, *26 (E.D. Pa. Nov. 3, 1998)* (citing *Haines v. Kerner, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972)*); *Lancaster County Office of Aging v. Schoener, No. 02-7248, 2003 U.S. Dist. LEXIS 1342, *3, n.2 (E.D. Pa. Jan. 13, 2003)* (citations omitted); see also *United States ex rel. Turner v. Rundle, 438 F.2d 839, 845 (3d Cir. 1971)* (pro se petitions may be

inartfully drawn and should be read "with a measure of tolerance") (citations omitted). "Pro se plaintiffs . . . are entitled to even greater deference when the sufficiency of their pleadings are [sic] called into question." *Boone v. Chesney, No. 94-3293, 1994 U.S. Dist. LEXIS 12339, at *1 (E.D. Pa. Sept. 2, 1994)* (citing *Haines; Hughes v. Rowe, 449 U.S. 5, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980)*). A judge may not, however, act as a "surrogate attorney" for *pro se* parties. See e.g., *Taylor v. Diznoff, 633 F. Supp. 640, 641 (W.D. Pa. 1986)* (quoting *Mazur v. Pa. Dept. of Transp., 507 F. Supp. 3, 5 (E.D. Pa. 1980)*, [*6] aff'd *649 F.2d 860 (3d Cir. 1981)*).

Rashid raises two issues in his appeal: (1) whether the Bankruptcy Court properly dismissed for lack of subject matter jurisdiction; and (2) whether the Bankruptcy Court abused its discretion in denying Rashid's motion to reopen his Chapter 7 bankruptcy case.

**Discussion**

*I. The Bankruptcy Court Lacked Subject Matter Jurisdiction Over the Adversary Proceeding*

[HN5] Statutory law restricts Bankruptcy Court jurisdiction to those adversary proceedings that could affect the administration of the bankruptcy estate. *28 U.S.C. § 1334*; see also *Halper v. Halper, 164 F.3d 830, 837 (3d Cir. 1999)*. [HN6] The Bankruptcy Court does not have jurisdiction over complaints filed after the underlying bankruptcy case is closed. See *Donaldson, 104 F.3d at 552*; see also *Cook v. Chrysler Credit Corp., 174 B.R. 321, 327 (M.D. Ala. 1994)*; *Brantley v. Union Motor Co. (In re Brantley), 1997 Bankr. LEXIS 164, 1997 WL 74663 (Bankr. W.D. Ark. 1997)* (citing *In re Stardust Inn, Inc., 70 B.R. 888, 890 (E.D. Pa. 1987)*). "Where a bankruptcy case is closed and the estate no longer exists, and where plaintiff [*7] does not seek to have the bankruptcy case opened for cause pursuant to *11 U.S.C. § 350(b)* and Bankruptcy *Rule 5010*, the court is without jurisdiction to entertain any proceedings, irrespective of whether those proceedings are defined as 'core' or related 'non-core' proceedings." *Walnut Associates v. Saidel, 164 B.R. 487, 491 (E.D. Pa. 1994)*.

[HN7] A Chapter 7 liquidation is closed once the bankruptcy case is fully administered and the trustee has been discharged of his duties. *11 U.S.C. § 350(a)*. Once the case is closed, there is no matter pending before the Bankruptcy Court.

Rashid received a discharge of debts on April 10, 1998, and, as required by *Bankruptcy Code Section 350(a)*, the Bankruptcy Court Clerk closed Rashid's case on May 13, 1998. In December 2000, the Bankruptcy Clerk reopened the case for statistical purposes after it received documents from this Court regarding certain appeals taken by Rashid before the closing of the bankruptcy case. (R. 2). Although the bankruptcy docket indicated that the case was "reopened," the docket "did not reflect any determination under *section 350(b).*" (February 17, 2004 Order [*8] at 2, n.1). For jurisdictional purposes, the case was still closed. Thus, when Rashid filed his fourth adversary action in 2003, his case had been closed for more than five years. The Bankruptcy Court had no jurisdiction to hear the action unless Rashid first reopened his bankruptcy case. Accordingly, I affirm the Bankruptcy Court's ruling that it lacked subject matter jurisdiction over the adversary proceeding.

## II. The Bankruptcy Court Did Not Err in Refusing to Reopen Rashid's Bankruptcy Case

[HN8] Pursuant to *Section 350(b)*, a Bankruptcy Court may reopen a closed case "to administer assets, to accord relief to the debtor, or for other cause." *11 U.S.C. § 350(b)*; see also *FED. R. BANKR. P. 5010*; *In re Otto, 311 B.R. 43, 47 (Bankr. E.D. Pa. 2004)*. Whether to reopen the case is within the discretion of the Bankruptcy Court. See, e.g., *Donaldson v. Bernstein, 104 F.3d 547, 551 (3d Cir. 1997)*; *Judd v. Wolfe, 78 F.3d 110, 116 (3d Cir. 1996)*; *In re Case, 937 F.2d 1014, 1018 (5th Cir. 1991)* ("This discretion depends upon the circumstances of [*9] the individual case and accords with the equitable nature of all bankruptcy proceedings."). A decision denying a motion to reopen "is binding on review absent a clear showing that there was an abuse of discretion." *In re Emmerling, 223 B.R. 860, 864 (B.A.P. 2d Cir. 1997)*.

Rashid bears the burden of demonstrating circumstances sufficient to justify the reopening of his bankruptcy case. See, e.g., *In re Cloninger, 209 B.R. 125, 126 (Bankr. E.D. Ark. 1997)*; *In re Nelson, 100 B.R. 905 (Bankr. N.D. Ohio 1989)*. [HN9] Courts consider a variety of factors when deciding whether to reopen a case:

the length of time that the case was closed...; whether a non-bankruptcy forum, such as state court, has the ability

to determine the issue sought to be posed by the debtor...; whether prior litigation in bankruptcy court implicitly determined that the state court would be the appropriate forum to determine the rights, post bankruptcy, of the parties; whether any parties would be prejudiced were the case reopened or not reopened; the extent of the benefit which the debtor seeks to achieve by reopening; and whether it is clear at the outset that [*10] the debtor would not be entitled to any relief after the case were reopened.

*Otto, 311 B.R. at 47* (internal citations omitted). [HN10] Generally, a bankruptcy case should remain closed if no valid purpose would be served if the matter were reopened. See *In re Carberry, 186 B.R. 401, 402 (Bankr. E.D. Va. 1995)* (noting that a bankruptcy case should remain closed "where it appears that [reopening the case] would be futile and a waste of judicial resources"). Further, when the purpose of reopening is to litigate issues that clearly have no merit, the matter should remain closed. See *Arleaux v. Arleaux, 210 B.R. 148, 149 (B.A.P. 8th Cir. 1997)*.

In 2002, this Court dismissed Rashid's third challenge to the 1994 forfeiture based on issue and claim preclusion. See *Rashid v. United States, 2002 U.S. Dist. LEXIS 118, 2002 WL 15939 (E.D. Pa. 2002)*. That analysis applies to Rashid's current arguments.

[HN11] Issue preclusion "bars relitigation of an issue identical to that in a prior action." *Parkview Assocs. Partnership v. City of Lebanon, 225 F.3d 321, 329 n.2 (3d Cir. 2000)*. Issue preclusion applies where "(1) the issue decided in the [*11] prior litigation [was] identical to the one presented in the later action, (2) there [was] a final judgment on the merits, and (3) the party against whom the doctrine is asserted [was] a party or in privity with a party to the prior adjudication and [had] a full and fair opportunity to litigate the issue in question in the prior action." *Seborowski v. Pittsburgh Press Co., 188 F.3d 163, 169 (3d Cir. 1999)*. [HN12] Claim preclusion prohibits re-examination of matters that a party might have, but did not, assert in the prior action. *Parkview Assocs., 225 F.3d at 329 n.2*. Claim preclusion "bars a subsequent suit on the same cause of action" where there is "a final judgment on the merits of an action involving the same parties (or their privities)." *Id.*

Rashid has already litigated the validity of his home's forfeiture three times. In 1994, he sought damages and asked to set aside the forfeiture judgment, arguing that the forfeiture Order was a fraudulent transfer under *11 U.S.C. § 548*. The Third Circuit concluded that the transfer was not fraudulent, and that the government's post petition activities did not warrant the award [*12] of damages. *Rashid v. Powel, 210 F.3d 201, 208-09 (3d Cir. 2000)*.

In 1997, Rashid contended that the criminal forfeiture proceeding violated both the bankruptcy stay and the Constitution. (R. 5, Ex. B at 7-9). The Bankruptcy Court disagreed, concluding that Rashid, "would not be able to establish [a] violation [of the bankruptcy stay] and, hence, could prove no set of facts upon which relief could be premised." (R. 5, Ex. B at 9) (quoting Order Dated March 26, 1998, Adv. No. 97-0890, at 5-8). Rashid did not appeal that decision.

In 2000, Rashid again argued that the forfeiture was invalid because it violated the bankruptcy stay. (R. 5, Ex. B, at 3-4). This Court affirmed the Bankruptcy Court's conclusion that the doctrine of claim and issue preclusion barred this challenge. *Rashid, 2002 U.S. Dist. LEXIS 118, 2002 WL 15939 at *4-5*.

In his December 2, 2003 complaint, Rashid once again attacks the forfeiture, this time seeking a declaration that: 1) the forfeiture was a "fraud on the court" because the Court's criminal judgment form did not include a property forfeiture provision (R. 3 at P 15); 2) the forfeiture violated the automatic bankruptcy stay; and 3) the government's [*13] obtaining of a pre-bankruptcy forfeiture Order was a "fraudulent conveyance." (R. 3 at 4, PP 1-3).

Even assuming Rashid has standing to challenge the forfeiture, it is clear that Rashid seeks to raise issues that he has litigated, or could have litigated, in his prior actions. First, as Rashid himself acknowledges, the Third Circuit has rejected his claim that the government participated in a fraudulent conveyance. See e.g., *Rashid, 210 F.3d at 208* (rejecting Rashid's contention in his first complaint that the forfeiture was a fraudulent conveyance); (R. 3 at P 12). Similarly, in 1997 and 2000, Rashid unsuccessfully argued that the government violated the bankruptcy stay. See March 26, 1998 Order, Adv. No. 97-0890; *Rashid, 2002 U.S. Dist. LEXIS 118, 2002 WL 15939 at *4-5*. In these circumstances, the

doctrine of issue preclusion bars Rashid from re-litigating this claim. *Parkview Assocs., 225 F.3d at 329 n.2*.

The doctrine of claim preclusion certainly bars Rashid's claim that the United States committed a "fraud on the court" and "failed to have the District Court include a provision for criminal forfeiture in Rashid's Judgment and Commitment Order. [*14] " (R. 3 at P 15). It appears that Rashid has also unsuccessfully raised his fraud claim twice before. See *Rashid, 210 F.3d at 205*; *Rashid, 2002 U.S. Dist. LEXIS 118, 2002 WL 15939 at *2*. In any event, this Court and the Third Circuit have affirmed the legality of the forfeiture Order. *Rashid, 210 F.3d at 203, 209*; *Rashid, 2002 U.S. Dist. LEXIS 118, 2002 WL 15939 at *2*. Rashid could have raised any challenge to the criminal judgment form -- which is, in essence, a challenge the forfeiture itself -- in that earlier litigation. His failure to do so bars him from litigating this claim in the present action. *Parkview Assocs., 225 F.3d at 329 n.2*.

In sum, Rashid's latest lawsuit is merely an attempt to relitigate claims that he has raised -- or could have raised -- in his three prior lawsuits. Plainly, he is precluded from raising them in this fourth lawsuit. Where "it is clear at the outset that [Rashid] would not be entitled to any relief," there is no valid reason to reopen his bankruptcy case. *Otto, 311 B.R. at 47*. In these circumstances, the Bankruptcy Court's refusal to reopen Rashid's case certainly was not an abuse of discretion. [*15] Accordingly, I affirm.

An appropriate Order follows.

BY THE COURT:

PAUL S. DIAMOND, J.

**ORDER**

AND NOW, this 13th day of December, 2004, for the reasons given in the accompanying memorandum opinion, it is ORDERED, that the February 17, 2004 decision of the Bankruptcy Court is AFFIRMED and the appeal is DENIED.

The Clerk of Court shall close this matter for statistical purposes.

PAUL S. DIAMOND, J.



IN RE: CAROLE L. SCHEIB and GEORGE SCHEIB, Debtors.

Bankruptcy No. 97-25582-JAD, Chapter 7

UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

*2014 Bankr. LEXIS 3084*

July 18, 2014, Decided
July 18, 2014, Filed

**SUBSEQUENT HISTORY:** Motion denied by, Request granted *In re Scheib, 2014 Bankr. LEXIS 4442 (Bankr. W.D. Pa., Oct. 20, 2014)*
Appeal dismissed by *Scheib v. Scheib (In re Scheib), 2015 U.S. App. LEXIS 19156 (3d Cir. Pa., Nov. 3, 2015)*

**PRIOR HISTORY:** *Scheib v. Mellon Bank, N.A., 2007 U.S. Dist. LEXIS 42798 (W.D. Pa., June 13, 2007)*

**CASE SUMMARY:**

**OVERVIEW:** HOLDINGS: [1]-No purpose was served by reopening this case and the motion to re-open pursuant to *11 U.S.C.S. § 350(b)* should be denied because it appeared that the debtor would not be entitled to the relief that was sought as the record reflected that the debtor's claims were barred by time limitations, the Rooker-Feldman doctrine as well as the doctrine of res judicata; [2]-The Rooker-Feldman doctrine applied where the debtor lost in the state court action and complained of injuries caused by the judgment in foreclosure, the foreclosure judgment was rendered prior to the filing of the instant motion to reopen her bankruptcy case which had been closed since 1998, and the debtor was inviting the instant court to review and reject the state court judgment.

**OUTCOME:** Debtor's motion denied.

LexisNexis(R) Headnotes

*Bankruptcy Law > Case Administration > Closings & Reopenings > Grounds for Reopening*
*Bankruptcy Law > Case Administration > Closings & Reopenings > Procedures for Reopening*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Civil Procedure > Judicial Officers > Judges > Discretion*
[HN1] *11 U.S.C.S. § 350(b)*, which permits a debtor to reopen the debtor's bankruptcy case in order to administer assets, to accord relief to the debtor, or for other cause. *11 U.S.C.S. § 350(b)*. The party moving to reopen the case has the burden of proof. The decision to reopen a case is within the sound discretion of the court. In exercising its discretion, a bankruptcy court is to give consideration as to whether similar proceedings are pending in a state court and determine which forum is the most appropriate to adjudicate the issues raised by the motion to reopen.

*Bankruptcy Law > Case Administration > Closings & Reopenings > Grounds for Reopening*
*Bankruptcy Law > Case Administration > Closings & Reopenings > Procedures for Reopening*

2014 Bankr. LEXIS 3084, *

[HN2] The reopening of a case is a ministerial act that does not have any substantive independent effect. Rather, it provides a moving party with the opportunity to seek substantive relief. The moving party must ordinarily demonstrate that there is a compelling cause. However, a closed bankruptcy proceeding should not be reopened where it appears that to do so would be futile and a waste of judicial resources. In such an instance, no purpose would be served by reopening and, accordingly, there would be no cause to reopen.

*Civil Procedure > Judgments > Relief From Judgment > General Overview*
[HN3] Relief from a judgment or order may be granted pursuant to *Fed. R. Bankr. P. 9024* which makes *Fed. R. Civ. P. 60* applicable in bankruptcy. Relief under *Rule 60(b)* is available only when extreme circumstances are presented. A motion seeking relief pursuant to *Rule 60(b)* must be brought within a reasonable time. *Fed.R. Civ. P. 60(c)(1)*. Additionally, where relief is sought for reasons set forth in *Rule 60(b)(1), (2) or (3)* the motion must be filed no more than one year after entry of the order.

*Civil Procedure > Judgments > Relief From Judgment > General Overview*
[HN4] *Fed. R. Civ. P. 60(b)* provides that on motion, a party may be relieved of a judgment or order for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under *Fed. R. Civ. P. 59(b)*;(3) fraud, misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, release or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

*Civil Procedure > Judgments > Relief From Judgment > Fraud*
[HN5] *Fed. R. Civ. P. 60(c)(1)* requires that any requests for relief based upon alleged fraud must be brought within one year from the entry of the judge's order granting relief from stay.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Full Faith & Credit > Rooker-Feldman*

*Doctrine*
[HN6] The Rooker-Feldman doctrine is a narrow, judicially created doctrine that prohibits a federal district court from exercising subject-matter jurisdiction over a case that is functionally equivalent to an appeal from a state-court judgment.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Full Faith & Credit > Rooker-Feldman Doctrine*
[HN7] The Rooker-Feldman doctrine is confined to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. The Third Circuit articulated four requirements that must be met for the Rooker-Feldman doctrine to apply: (1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata*
[HN8] Res judicata bars a party from initiating a subsequent suit against the same adversary based on the same cause of action where: (1) a final judgment was entered on the merits in a prior suit; (2) both actions involve the same parties; and (3) the subsequent suit is based on the same cause of action.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata*
[HN9] The purpose of res judicata is to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > General Overview*
[HN10] Efforts to invoke bankruptcy jurisdiction after a case is closed, or even as to property of the estate of a pending case after stay relief as to that property has been granted, must be viewed, at some point, as improperly extending bankruptcy jurisdiction beyond its intended scope.

2014 Bankr. LEXIS 3084, *

COUNSEL: [*1] For Carole L. Scheib, dba Crafton Personal Care Home, Debtor: Dennis J. Spyra, Pittsburgh, PA.

Trustee: Gary L. Smith, Pittsburgh, PA.

JUDGES: JEFFERY A. DELLER, Chief United States Bankruptcy Judge.

OPINION BY: JEFFERY A. DELLER

OPINION

Doc. # 122

MEMORANDUM OPINION

The matter before the Court is the *Ex-Parte Motion to Re-Open Chapter 7 Bankruptcy and Motion for Relief from the Dismissal Order Pursuant to Fed.R.Bankr.P. 9024* (the "Motion") filed by the Debtor, Carole L. Scheib, individually (the "Debtor"). For the reasons set forth more fully below, an order shall be entered that denies the Motion.

I.

The Debtor along with her husband, George Scheib, initially filed a joint bankruptcy petition under Chapter 13 of the Bankruptcy Code on May 5, 1997; the case was voluntarily dismissed on May 28, 1997. (See Case No. 97-23162). The Debtor then filed an individual Chapter 13 petition on August 4, 1997, over which the Honorable Judith K. Fitzgerald presided. (See Doc. # 1). The Debtor completed her petition on August 26, 1997, indicating on Schedule D that Mellon Mortgage Co. held a purchase money security interest in real property commonly known as 54 Lawson Street, Crafton, PA 15205 (the "Property"), in the amount of $19,357.00. (See Doc. [*2] # 10). The Debtor did not claim an exemption in the Property. (See id.). The Statement of Financial Affairs filed by the Debtor indicated that Mellon Bank obtained a judgment against the Debtor on June 25, 1997. (See id., Question 4.a.).

On September 22, 1997, Mellon Bank, N.A. ("Mellon Bank") filed a Motion for Relief from the Automatic Stay (the "Motion for Relief"), averring that the Debtor granted Mellon Bank a mortgage on the Property in the amount of $23,900.00 on or about June

14, 1978, and that at the time the Motion for Relief was filed, the balance due to Mellon Bank was $20,497.45 before costs, interests, late charges, and attorney's fees. (See Doc. # 15). Mellon Bank further asserted that as of the date of the Motion for Relief, the Debtor made no plan payments, had not provided adequate protection to Mellon Bank, and that Mellon Bank was entitled to relief from the automatic stay because there was no equity in the Property. (See id.).

After hearings were held on November 20, 1997 on the Motion for Relief and confirmation of the Debtor's Chapter 13 plan, the Motion for Relief was continued and the case was converted to Chapter 7 by order dated November 24, 1997. (See Doc. [*3] ## 36, 37). On December 4, 1997, the Debtor filed a Motion to Reconsider the conversion, which was denied on May 14, 1998. (See Doc. ## 44, 91). On May 18, 1998, the Debtor appealed the May 14, 1998 order denying her request for reconsideration to the United States District Court of the Western District of Pennsylvania (the "District Court"). (See Doc. ## 92, 93, 98). The designated record with respect to the appeal was transmitted to the District Court on July 21, 1998. (See Doc. # 114). The Debtor's appeal was then subsequently dismissed by the District Court based upon the Debtor's failure to comply with applicable bankruptcy rules on September 17, 1998. (See Doc. # 115).

The continued hearing on Mellon Bank's Motion for Relief was held on February 20, 1998, and the Motion for Relief was granted by an order of court dated March 6, 1998. (See Doc. ## 72, 75). However, the effective date of the order granting relief from stay was postponed or stayed for a period of six months to allow the Debtor to commence monthly payments to Mellon Bank; upon failure to do so, the stay would terminate without further order. (See Doc. # 75).

The Debtor's husband, George Scheib, filed an individual [*4] Chapter 13 petition on April 3, 1998. (See Case No. 98-22743). The Debtor's husband's case was consolidated with the instant case on May 18, 1998. (See Case No. 98-22743, Doc. # 21).

On May 21, 1998, Mellon Bank filed an Affidavit of Default averring that the Debtor failed to make a monthly mortgage payment, and, pursuant to the order of court dated March 6, 1998, such failure terminated the automatic stay in this bankruptcy case. (See Doc. # 97). On June 10, 1998, and since George Scheib's case had

2014 Bankr. LEXIS 3084, *4

subsequently been consolidated into this case, Mellon Bank then filed a second Motion for Relief from Stay (the "Second Motion for Relief") against George Scheib. Mellon Bank averred in its Second Motion for Relief that it had no knowledge that the Property was covered by adequate insurance and demanded proof of insurance coverage. (See Doc. # 101). A hearing was held on July 10, 1998, at which time the Court granted the Second Motion for Relief, allowing Mellon Bank to pursue foreclosure of the Property in state court. (See Doc. # 113).

The Debtor received a discharge releasing her from all dischargeable debts on October 1, 1998, and a final decree was entered on October 14, 1998 closing [*5] the case. (See Doc. # 116). However, the Debtor continued to pursue legal action against Mellon Bank to challenge Mellon Bank's state court judgment in foreclosure.

In 1999, the Debtor filed a letter alleging that Mellon Bank filed a fraudulent claim, and in 2001 filed a request to reopen her bankruptcy case to address her allegations of overpayments to Mellon Bank. (See Doc. ## 117, 118). The request to reopen the case was denied by order of Judge Fitzgerald dated December 14, 2001. (See Doc. # 119).

In 2000, the Debtor filed another Chapter 13 petition. (See Case No. 00-20056). The Debtor moved to convert the case to a Chapter 7 which was denied on September 5, 2000 due to debtor ineligibility as a Chapter 7 discharge had been received within the prior 6 years. The bankruptcy case was then dismissed that same day. (See Case No. 00-20056, Doc. # 44). Prior to such dismissal, on April 27, 2000, the Debtor filed an adversary complaint to recover property against Mellon Bank. (See Adv. No. 00-2172). The adversary case was also dismissed; in an order dated August 25, 2000, Judge Fitzgerald noted in the dismissal order that "Debtor must pursue the issues raised about the sale of the property, [*6] the eviction[,] or an alleged civil conspiracy (which are state court claims that must be brought in the appropriate state court(s) in the appropriate state court(s)." (See Adv. No. 00-02172, Doc. # 12).

It appears that the order dated December 14, 2001 denying the motion to reopen *this* bankruptcy was also filed on the docket for the Debtor's second bankruptcy case and the adversary. (See Case No. 00-20056, Doc. # 46; Adv. No. 00-2172, Doc. # 14). Thereafter, the Debtor filed Motions to Reconsider that order that were denied

by order dated January 23, 2002. (See Case No. 00-20056, Doc. # 49; Adv. No. 00-2172, Doc. # 18).

The Debtor then filed the instant Motion on April 8, 2013, again challenging Mellon Bank's state court foreclosure judgment. (See Doc. # 122). Judge Fitzgerald's involvement in the case was terminated and the Honorable Jeffery A. Deller was assigned on April 29, 2014. A hearing on the Motion was held before Judge Deller on June 23, 2014. The Debtor filed exhibits in support of her Motion on June 23, 2014, and filed a document captioned "Addendum of Information in Support of Motion to Re-Open Bankruptcy Case" on July 15, 2014. (See Doc. ##'s 129 and 130). The Court has [*7] considered these items, and the matter is now ripe for decision.

II.

The Debtor wishes to reopen the bankruptcy case in order to continue pursuing legal action against Mellon Bank to challenge the foreclosure and resulting sheriff sale of the Debtor's Property. Presumably, the Debtor seeks to reopen her case pursuant to [HN1] *11 U.S.C. § 350(b)*, which permits a debtor to reopen the debtor's bankruptcy case in order to "administer assets, to accord relief to the debtor, or for other cause." *11 U.S.C. § 350(b)*. The party moving to reopen the case has the burden of proof. *In re Bellano, 456 B.R. 220, 221 (Bankr. E.D. Pa. 2011)*. The decision to reopen a case is within the sound discretion of the Court. *Apex Oil Co. v. Sparks (In re Apex Oil Co.), 406 F.3d 538, 542 (8th Cir. 2005)*; *Hawkins v. Landmark Fin. Co., 727 F.2d 324, 326 (4th Cir. 1984)*. In exercising its discretion, a bankruptcy court is to give consideration as to whether similar proceedings are pending in a state court and determine which forum is the most appropriate to adjudicate the issues raised by the motion to reopen. *In re Lazy Days' RV Center, Inc., 724 F.3d 418, 423 (3d Cir. 2013)* (citing *In re Zinchiak, 406 F.3d 214, 225 (3d Cir. 2005))*.

[HN2] The reopening of a case is a ministerial act that does not have any substantive independent effect. *In re Frazer/Exton Dev., L.P., 503 B.R. 620 (Bankr. E.D. Pa. 2013)*. Rather, it provides a moving party with the opportunity to seek substantive relief. Id. (citing *Horizon Aviation of Virginia, Inc. v. Alexander, 296 B.R. 380, 382 (E.D. Va. 2003))*. The moving party must ordinarily demonstrate that there is a compelling cause. *Horizon Aviation, 296 B.R. at 382*. However, "a closed bankruptcy proceeding should not [*8] be reopened where it appears

2014 Bankr. LEXIS 3084, *8

that to do so would be futile and a waste of judicial resources." *Redmond v. Fifth Third Bank, 624 F.3d 793, 803 (7th Cir. 2010)* (citing *In re Carberry, 186 B.R. 401, 402 (Bankr. E.D. Va. 1995))* (internal citations omitted). In such an instance, no purpose would be served by reopening and, accordingly, there would be no cause to reopen.

In the present case, the Debtor primarily complains of matters related to her residential mortgage with Mellon Bank, and the bank's foreclosure and eviction related to the same.

As previously noted, according to the Debtor's own schedules Mellon Bank obtained a judgment against the Debtor prior to the filing of this case. Mellon Bank was then able to execute on its judgment pursuant to Judge Fitzgerald having granted Mellon Bank relief from the automatic stay. The Debtor appears to seek as relief the undoing of this Court's order granting relief from stay as well as vacatur of the state court orders of judgment in foreclosure and ejectment. Based on the state of the record in this case, there would be no purpose served in reopening the Debtor's case if doing so would not result in providing the Debtor the opportunity to relieve herself of the orders related to the Mellon Bank mortgage. For the reasons more fully discussed below, it appears [*9] that the Debtor would not be entitled to the relief that is sought because the record reflects that the Debtor's claims are barred by time limitations, the *Rooker-Feldman* doctrine as well as the doctrine of res judicata. Accordingly, no purpose is served by reopening this case and the motion to re-open should be denied.

**III.**

As an initial matter, the Court notes that the order granting Mellon Bank relief from stay and allowing Mellon Bank to pursue foreclosure of the Property in state court was a final order. See *Moxley v. Comer (In re Comer), 716 F.2d 168, 172 (3d Cir. 1983); Sonnax Indus., Inc. v. Tri Component Products Corp. (In re Sonnax Indus., Inc.), 907 F.2d 1280, 1283 (2nd Cir. 1990); Caterpillar Fin. Servs. Corp. v. Braunstein (In re Henriquez), 261 B.R. 67, 70 (B.A.P. 1st Cir. 2001); Montgomery v. Dennis Joslin Company II, LLC (In re Montgomery), 262 B.R. 772, 773 (B.A.P. 8th Cir. 2001).* The Debtor did not appeal the orders granting Mellon Bank relief from stay.

[HN3] Relief from a judgment or order may be

granted pursuant to *Fed.R.Bankr.P. 9024* which makes *Fed.R.Civ.P. 60* applicable in bankruptcy.[1] Relief under *Rule 60(b)* is available only when extreme circumstances are presented. See *Zahl v. Harper, 403 Fed. Appx. 729 (3d Cir. 2010)* (citing *Martinez-McBean v. Gov't of Virgin Islands, 562 F.2d 908, 911, 14 V.I. 79 (3d Cir. 1977)).* A motion seeking relief pursuant to *Rule 60(b)* must be brought within a reasonable time. See *Fed.R.Civ.P.60(c)(1).* Additionally, where relief is sought for reasons set forth in *Rule 60(b)(1), (2)* or *(3)* the motion must be filed no more than one year after entry of the order. See id. In this case, the order for judgment in foreclosure was entered in 1997, approximately some sixteen years prior to the filing of the Motion. The orders granting relief from stay [*10] to Mellon Bank were entered in March of 1998, approximately fifteen years prior to the filing of the Motion. The Debtor's bankruptcy case was closed in 1998, also fifteen years prior to the subject Motion. The filing of the instant Motion after such a passage of time from the entry of the orders complained of is simply not within a reasonable time. See e.g., *Moolenaar v. Gov't of Virgin Islands, 822 F.2d 1342 (3d Cir. 1987)(Rule 60(b)(6)* motion brought two years after judgment not made within reasonable time).

1    [HN4] *Fed.R.Civ.P. 60(b)* provides that on motion, a party may be relieved of a judgment or order for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;
(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under *Rule 59(b)*;
(3) fraud ..., misrepresentation, or misconduct by an opposing party;
(4) the judgment is void;
(5) the judgment has been satisfied, release or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
(6) any other reason that justifies relief.

2014 Bankr. LEXIS 3084, *10

In addition, the Debtor attempts to make various allegations of fraud on the part of Mellon Bank in the Motion as a result of filing an allegedly false [*11] claim, and suggests that the order granting relief from stay must be voided as a consequence pursuant to *Fed.R.Civ.P. 60(b)(3)*. [HN5] *Fed.R.Civ.P. 60(c)(1)* requires that any such requests for relief based upon alleged fraud must be brought within one year from the entry of Judge Fitzgerald's order granting relief from stay. The record, however, reflects that the one year time period has long since passed and the Motion is clearly time barred.

Even if this Motion had been brought timely, this Court could not provide the Debtor with relief or undo the Mellon Bank foreclosure judgment that was entered in state court long ago. This Court is barred from exercising what would in effect be appellate jurisdiction over the state court foreclosure action by the Rooker-Feldman doctrine.

[HN6] The Rooker-Feldman doctrine is a narrow, judicially created doctrine that prohibits a federal district court from exercising subject-matter jurisdiction over a case that is functionally equivalent to an appeal from a state-court judgment. See *Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); Dist. of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005).*

In Exxon Mobil, the Supreme Court held that[HN7] the doctrine is confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced [*12] and inviting district court review and rejection of those judgments." *Id. at 284, 125 S.Ct. at 1521-1522.* The Third Circuit, analyzing the Exxon Mobil holding, articulated four requirements that must be met for the Rooker-Feldman doctrine to apply: "(1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Great Western Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 166 (3d Cir. 2010)* (citing *Exxon Mobil, 544 U.S. at 284, 125 S.Ct. 1517*) (internal citations omitted)).

These four requirements have been met here: the Debtor lost in the state court action and complains of injuries caused by the judgment in foreclosure, the foreclosure judgment was rendered prior to the filing of the instant motion to reopen her bankruptcy case which has been closed since 1998, and the Debtor is inviting this Court to review and reject the state court judgment.

Even if this Court could somehow review the judgment, the doctrine of res judicata, or claim preclusion, would further prevent such consideration. [HN8] Res judicata bars a party from initiating a subsequent suit against the same adversary based on the same cause of action where: [*13] (1) a final judgment was entered on the merits in a prior suit; (2) both actions involve the same parties; and (3) the subsequent suit is based on the same cause of action. *Duhaney v. Att'y Gen., 621 F.3d 340, 347 (3d Cir. 2010).*

[HN9] The purpose of res judicata is to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980).* All three of the above-enumerated factors are present in this instance: the foreclosure judgment was entered and is a final judgment; the Debtor seeks to continue to pursue legal action against Mellon Bank; and the Debtor's Motion attempts to bring claims based on the same cause of action already decided in the state court proceedings. Thus, the Debtor's attempts to challenge the foreclosure are barred by the doctrine of res judicata.

The Court also notes that[HN10] "efforts to invoke bankruptcy jurisdiction after a case is closed, or even as to property of the estate of a pending case after stay relief as to that property has been granted, must be viewed, at some point, as improperly extending bankruptcy jurisdiction beyond its intended scope." *In re Ford, 188 B.R. 523, 525 (Bankr. E.D. Pa. 1995),* aff'd *116 F.3d 467 (3d Cir. 1997).* Here, the Debtor was afforded two hearings on two separate [*14] motions for relief from the stay filed by Mellon Bank to challenge the lifting of the automatic stay. Her prior motions to reopen her cases to attempt to relitigate the state court foreclosure have been denied, and the order dismissing her adversary case where she again attempted to relitigate the foreclosure action specifically noted that such claims should be brought in state court, as this Court lacked jurisdiction over these matters. To continue to attempt to challenge

2014 Bankr. LEXIS 3084, *14

these final orders after the case has been closed, and after Mellon Bank pursued its rights and remedies through state court, is a request for an improper extension of bankruptcy jurisdiction.

**IV.**

This Court concludes that the Debtor has failed to meet her burden of proof to reopen the case under *11 U.S.C. §350*. There has been no showing that reopening the case would afford the Debtor any relief. Due to limitations of time, the Debtor is unable to proceed with a motion under *Fed.R.Civ.P. 60*, as adopted by *Fed.R.Bankr.P. 9024*. Even assuming the existence of a timely filed *Rule 60* motion, this Court is bound to honor the state court's disposition in the foreclosure matter pursuant to the doctrines of Rooker-Feldman and res judicata, thus barring the Debtor's claims in that [*15] regard. Nor has there been a showing that reopening the case would allow for the administration of assets or for any other cause. As such, the Court finds that granting the Debtor's Motion would be futile and a waste of judicial resources. Accordingly, no purpose would be served reopening this case.

For the reasons set forth above, the Court shall enter an order that denies the *Ex-Parte Motion to Re-Open Chapter 7 Bankruptcy and Motion for Relief from the Dismissal Order Pursuant to Fed.R.Bankr.P. 9024.*

**Date: July 18, 2014**

/s/ Jeffery A. Deller

**JEFFERY A. DELLER**

Chief United States Bankruptcy Judge

**ORDER OF COURT**

**AND NOW**, this 18th day of **July, 2014**, for the reasons expressed in the Memorandum Opinion filed herewith, the Court hereby **ORDERS, ADJUDGES** and **DECREES** that the *Ex-Parte Motion to Re-Open Chapter 7 Bankruptcy and Motion for Relief from the Dismissal Order Pursuant to Fed.R.Bankr.P. 9024* is hereby **DENIED**.

/s/ Jeffery A. Deller

**JEFFERY A. DELLER**

Chief United States Bankruptcy Judge